IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| A.T.N. INDUSTRIES, INC., a Florida corporation, JIAFANG STEEL PIPES AMERICAS, INC., a Texas corporation, and JOSEPH BENOUDIZ, an individual, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.: _____ |
| MAURICIO GROSS a/k/a MAURICIO GROSS DRACH, an individual, CLARA GROSS a/k/a CLARA SCHWARTZ, an individual, VOLANSS SYSTEMS CO., LIMITED, a Hong Kong private company, BUSINESS MANAGEMENT SERVICES INT. LLC, a Texas limited liability company, SHUMIN XU a/k/a MINA XU, an individual, SEANWAY PIPE LLC, a Texas limited liability company, JIUYI TRADING CO., LIMITED, a Hong Kong private company, SHENG MIN PIPE LIMITED, a Hong Kong private company, SHUTIEN (DAVID) JIN, an individual, and GULF MARITIME CO., LIMITED, a Hong Kong private company, | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## COMPLAINT

Plaintiffs, A.T.N. Industries, Inc. ("ATN"), Jiafang Steel Pipes Americas, Inc. ("Jiafang Americas"), and Joseph Benoudiz ("Mr. Benoudiz") (collectively, "Plaintiffs"), file this Complaint against Defendants Mauricio Gross a/k/a Mauricio Gross Drach ("Mr. Gross"), Clara Gross a/k/a Clara Schwartz ("Mrs. Gross"), Volanss Systems Co., Limited ("Volanss"), Business Management Services Int. LLC ("BMSI"), Shumin Xu a/k/a Mina Xu ("Mrs. Xu"), Seanway Pipe LLC ("Seanway Pipe"), Jiuyi Trading Co., Limited ("Jiuyi Trading"), Sheng Min Pipe

Limited ("Sheng Min Pipe"), Shutien (David) Jin ("Mr. Jin"), and Gulf Maritime Co., Limited ("Gulf Maritime") (collectively, "Defendants"), and allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This action arises from a massive conspiracy that began in 2008 and was orchestrated by Mr. Gross, an employee of ATN and agent of Jiafang Americas.  Mr. Gross had the complete trust of Plaintiffs and unencumbered access to Jiafang Americas' bank accounts. Acting in concert with Defendants, Mr. Gross violated that trust over a span of over six years and defrauded Plaintiffs out of millions of dollars through the use of the mails and the wires.

2.      Mr. Gross could not have perpetrated his fraud without the assistance and cooperation of his wife (Mrs. Gross), Eduardo A. Medrano (Jiafang Americas' tax preparer) ("Mr. Medrano"), and Mr. Jin (a service provider for Jiafang Americas) and Mrs. Xu (Mr. Jin's wife), who in concert with Mr. Gross, created the defendant paper companies in Hong Kong, the United Kingdom and Texas, to receive funds from Plaintiffs via the mails and the wires under fraudulent pretenses.

3.      In particular, as early as 2008, Mr. Gross created Volanss, a Hong Kong private company that acted as nothing more than an offshore vehicle for Mr. Gross to deposit or launder funds stolen from Plaintiffs.

4.      Likewise, Mr. Jin and Mrs. Xu, created several non-operating paper companies based out of Hong Kong purporting to be legitimate logistics, freight, manufacturing and trading companies that, with Mr. Gross initiating the payments, received millions of dollars via the mails and the wires from Jiafang Americas and ATN without rendering any services or providing any goods, or by grossly overcharging for goods or services provided by actual, legitimate suppliers through invoicing fraud.

2

5.      In addition to creating non-operating paper companies that provided phony services to Plaintiffs and received payments for doing nothing or acting as a pass-through vehicle to overcharge for actual invoices, Defendants also created non-operating companies with fraudulent fictitious names matching the exact names of Jiafang Americas' suppliers, and via the mails and the wires, transferred payments from Plaintiffs to those fraudulent companies while leading Plaintiffs to believe they were paying their actual suppliers.

6.      Specifically, with the assistance of Mr. Medrano, Mr. and Mrs. Gross created BMSI, a Texas limited liability company, and registered the name of one of Jiafang Americas' key suppliers—Shanghai Jiafang Steel Pipe (Group) Co., Ltd.—as a fictitious name.  Mr. Gross then opened at least one bank account in Houston under the fraudulent fictitious name and wired millions of dollars from Jiafang Americas to BMSI's bank account maintained under the name of Jiafang Americas' supplier.  Upon receiving these ill-gotten funds, Mr. or Mrs. Gross would then wire all or a portion of the funds to accounts maintained by Mr. Gross or his company Volanss in Hong Kong.

7.      Similarly, with the assistance of Mr. Medrano and with the cooperation of Mr. Gross, Mrs. Xu created Seanway Pipe, a Texas limited liability company, and registered the name of another key Jiafang Americas supplier—Huludao City Steel Pipe Industrial Co., Ltd.—as a fictitious name.  Mr. Gross then established at least two bank accounts—at least one of which was in Houston—under the phony Huludao name and wired millions of dollars from Jiafang Americas to personal bank accounts maintained under the phony name.  Likewise, upon receiving these ill-gotten funds, Mr. or Mrs. Gross would then wire all or a portion of the funds to accounts maintained by Mr. Gross or his company Volanss in Hong Kong.

4347109v1

8.     Through these and other schemes explained in further detail below, Defendants managed to steal millions of dollars from Plaintiffs over a span of over six years, causing Plaintiffs to initiate multiple wire transfers under fraudulent pretenses and injuring Plaintiffs as a result.

## THE PARTIES

9.     Plaintiff, A.T.N. Industries, Inc., was and is a corporation organized and existing under the laws of the State of Florida and maintains its principal place of business at 1001 Brickell Bay Drive, Suite 2910, Miami, Florida 33131.

10.     Plaintiff, Jiafang Steel Pipes Americas, Inc., was and is a corporation organized and existing under the laws of the State of Texas and maintains its principal place of business at 11200 Westheimer Road, Suite 870, Houston, Texas 77042.

11.     Plaintiff, Joseph Benoudiz, resides in Caracas, Venezuela, and is otherwise *sui juris*.

12.     Defendant, Mauricio Gross a/k/a Mauricio Gross Drach, has his principal place of residence at 5902 Dumfries Drive, Houston, Texas 77096, and is otherwise *sui juris*.

13.     Defendant, Clara Gross a/k/a Clara Schwartz, has her principal place of residence at 5902 Dumfries Drive, Houston, Texas 77096, and is otherwise *sui juris*.  Mrs. Gross is the wife of Mr. Gross.

14.     Defendant, Volanss Systems Co., Limited, was and is a private company organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China and maintains its registered office at Unit E, 15/F, Cheuk Nang Plaza, 250 Hennessy Road, Wanchai, Hong Kong.  Mr. Gross is the sole owner and director of Volanss and controls Volanss from his domicile in Houston.

4

15.     Defendant, Business Management Services Int. LLC, was and is a limited liability company organized and existing under the laws of the State of Texas and maintains its principal place of business at 1834 Snake River Drive, Suite C, Katy, Texas 77449.  Mr. and Mrs. Gross are the owners and co-managers of BMSI.

16.     Upon information and belief, Defendant, Shumin Xu a/k/a Mina Xu, is a Chinese national that resides in Vancouver, Canada, and is otherwise *sui juris*.  Upon information and belief, Mrs. Xu is the wife of Defendant, Mr. Jin.

17.     Defendant, Seanway Pipe LLC, was and is a limited liability company organized and existing under the laws of the State of Texas and maintains its principal place of business at 1834 Snake River Drive, Suite C, Katy, Texas 77449.  Seanway Pipe is controlled by Mrs. Xu and is owned and managed by Seanway Pipe Co., Ltd., a United Kingdom private limited company that belongs to Mrs. Xu.

18.     Defendant, Jiuyi Trading Co., Limited was and is a private company organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China and maintains its registered office at Unit E, 15/F, Cheuk Nang Plaza, 250 Hennessy Road, Wanchai, Hong Kong.  Mrs. Xu is the sole owner and director of Jiuyi Trading.

19.     Defendant, Sheng Min Pipe Limited, was and is a private company organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China and maintains its registered office at Unit E, 15/F, Cheuk Nang Plaza, 250 Hennessy Road, Wanchai, Hong Kong.   Mrs. Xu is the sole owner and director of Sheng Min Pipe.

4347109v1

20.    Upon information and belief, Defendant, Shutien (David) Jin, is a Chinese national that resides in Vancouver, Canada, and is otherwise *sui juris*.  Upon information and belief, Mr. Jin is the husband of Defendant, Mrs. Xu.

21.    Defendant, Gulf Maritime Co., Limited, was and is a private company organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China and maintains its registered office at Unit E, 15/F, Cheuk Nang Plaza, 250 Hennessy Road, Wanchai, Hong Kong.  Gulf Maritime was originally owned by Mr. Jin, but was transferred to Mrs. Xu in August 2008, and is now jointly controlled by Mr. Jin and Mrs. Xu.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of this case based on a federal question pursuant to 28 U.S.C. § 1331.  The federal question arises from the fact that this is a civil action brought under the Racketeer Influenced & Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.*

23.    This Court also has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367 as the state law claims asserted herein form part of the same case or controversy, and the fraudulent and tortious acts alleged herein arise from a common nucleus of operative facts.

24.    This Court has personal jurisdiction over Defendants Mr. Gross, Mrs. Gross, BMSI and Seanway Pipe because they are residents of the State of Texas.  Likewise, this Court has personal jurisdiction over Defendants Volanss, Mrs. Xu, Jiuyi Trading, Sheng Min Pipe, Mr. Jin and Gulf Maritime pursuant to § 17.042 TEX. CIV. PRAC. & REM. CODE, because they have contracted with Texas residents with the contracts calling for performance in Texas, and have also committed tortious acts in Texas.  Mrs. Xu also owns, controls and operates Seanway Pipe, a Texas limited liability company for the purpose of owning a fictitious name in Texas used to

6

perpetrate a fraud upon Plaintiffs from Texas. For these reasons, and because the fraud was directed by Mr. Gross from his base of operations in Houston using fictitious company names registered in Texas for conducting fraudulent payments to bank accounts maintained in Texas under the fraudulent fictitious names as the primary instrument to receive funds stolen from Plaintiffs through fraudulent means, Defendants have sufficient contacts with the State of Texas so as not to offend traditional due process notions of fair play and substantial justice.

25.    Venue is proper in the Southern District of Texas, Houston Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas. Furthermore, Defendants Mr. Gross, Mrs. Gross, BMSI and Seanway Pipe all reside or have their principal places of business in Harris County and are therefore subject to the personal jurisdiction of the Court under 28 U.S.C. § 1391(c).

26.    All conditions precedent to filing this Complaint have been performed, waived, or otherwise satisfied.

## FACTUAL BACKGROUND

**A.T.N. Industries, Inc.**

27.    Founded in Miami, Florida in 1994, ATN is an international supplier of industrial equipment and machinery for various industries, including for the petroleum, medical, aeronautical, auto and marine industries.

28.    ATN operates as a procurement arm for Consorcio Pentamat, C.A. ("Pentamat"), a Venezuelan holding company, and purchases and sells equipment and machinery in U.S. Dollars to customers in South America.

29.    As it relates to the petroleum industry, ATN sources it steel pipes and steel pipe fittings for transporting water, gas and petroleum from several manufacturers, including

7

Shanghai Jiafang Steel Pipe (Group) Co., Ltd. ("Shanghai Jiafang"), Liaoning Northern Steel Pipe Co., Ltd. ("Liaoning"), Tiajin Pipe (Group) Corporation, and Huludao City Steel Pipe Industrial Co., Ltd. ("Huludao"), all four of which are located in the People's Republic of China.

**Jiafang Steel Pipes Americas, Inc.**

30.     On December 17, 2008, Shanghai Jiafang, one of ATN's key steel pipe suppliers, incorporated Jiafang Americas in Houston, Texas, to facilitate the sale of steel pipes and pipe fittings to ATN's customers in South America, and to help promote Shanghai Jiafang's name in the Americas.

31.     Shortly thereafter, Shanghai Jiafang transferred control of Jiafang Americas to ATN.  Shanghai Jiafang also transferred ownership of the new company to Mr. Benoudiz and Pablo Cardenas, the owners of Pentamat.

32.     Jiafang Americas and Pentamat are affiliate companies and ATN manages purchases for both.

**Mauricio Gross' Employment with A.T.N. Industries, Inc.**

33.     On March 5, 2006, ATN hired Mr. Gross as a sales coordinator and transport and logistics coordinator for ATN's petroleum division in Miami, Florida.

34.     In his role as the Sales Coordinator and person in charge of transportation and logistics for the petroleum division of ATN, Mr. Gross was introduced to several of ATN's suppliers and he was specifically assigned to work with Shanghai Jiafang, Liaoning, Huludao, and other steel pipe manufacturers, including Tiajin Pipe (Group) Corporation and Linfeng International Trading Co. Ltd.

35.     ATN hired Mr. Gross because Mr. Gross had significant transport and logistics experience, and because he came highly recommended by Rafael Schwartz ("Mr. Schwartz"), a

close friend of Mr. Benoudiz who also happens to be Mr. Gross' father-in-law and who attested as to Mr. Gross' reliability and trustworthiness.

36.     Mr. Gross' primary responsibilities at ATN included working with petroleum equipment and machinery manufacturers and vendors and vetting those suppliers on quality, pricing, and lead time.

37.     Mr. Gross was also responsible for managing ATN's supplier relationships and coordinating logistics for the shipment of goods.  When one of Pentamat or ATN's petroleum industry customers would request a bid for equipment or machinery, Mr. Gross was tasked with sourcing the product and coordinating transport.

38.     Placing great trust in Mr. Gross, ATN authorized Mr. Gross to enter into purchasing agreements with suppliers and to make the necessary transportation arrangements with shipping and logistics companies.

39.     In return for his services, ATN provided Mr. Gross with a bi-weekly salary and monthly consulting fees.

40.     In May 2006, ATN tasked Mr. Gross with establishing an office in Houston to better serve ATN and Pentamat's petroleum industry customers.

41.     After ATN began managing Jiafang Americas in December 2008, Mr. Gross was assigned to manage the affairs of Jiafang Americas, although ATN remained his employer.  Mr. Gross worked alone in Houston with only the help of an assistant.

42.     Placing total trust in him, Plaintiffs authorized Mr. Gross to open and manage bank accounts for Jiafang Americas, to negotiate and enter into agreements on behalf of Jiafang Americas, and to process payments on behalf of Jiafang Americas.  Given the responsibilities, confidence and trust bestowed upon Mr. Gross by Plaintiffs, Mr. Gross was under a duty to act in

the best interest of ATN and Jiafang Americas and to disclose any matter that could be adverse to those interests.

43.     Because the majority of ATN's suppliers were located in China, at the behest of Mr. Gross, in late 2008 or early 2009, Jiafang Americas contracted with David (Shutien) Jin—a purported Chinese national with petroleum industry experience—to act on-the-ground to oversee that the loading of cargo prior to shipment.  Jiafang Americas agreed to compensate Mr. Jin for his services and to reimburse Mr. Jin for his travel expenses in connection with services provided.

44.     Over time, Jiafang Americas engaged in various projects for the sale of steel pipes and steel pipe fittings sourced through Shanghai Jiafang.  In those instances where Shanghai Jiafang did not have the capability of manufacturing the needed materials, Shanghai Jiafang recommended that Jiafang Americas source the product from Liaoning or Huludao.

45.     Accordingly, Jiafang Americas also purchased and supplied steel pipes sourced from Liaoning and Huludao, and tasked Mr. Gross to handle these operations as well.

**Business Management Services Int. LLC**

46.     With the assistance of Mr. Medrano and his company, Medrano Administrative & Tax Services, LLC ("MATS"), in July 2011, Mr. Gross and his wife, Mrs. Gross, created BMSI, a Texas limited liability company which is co-managed by Mr. and Mrs. Gross.

47.     Mr. Medrano and MATS were also Jiafang Americas' tax preparers and corporate services company and had knowledge of Jiafang Americas' operations.

48.     After BMSI was created, Mr. Gross represented to Plaintiffs that he had created the company as a vehicle to receive his consulting fees from ATN, and he specifically requested that ATN pay those consulting fees to BMSI.

49.    Unbeknownst to Plaintiffs, in July 2011, at the same time that Mr. Gross and his wife established BMSI, Mr. Medrano also assisted Mr. and Mrs. Gross in registering "Shanghai Jiafang Steel Pipe (Group) Co., Ltd." as a fictitious name for BMSI.

50.    Plaintiffs were unaware that BMSI had registered a fictitious name that matched the exact name of Shanghai Jiafang, a key supplier to ATN and Jiafang Americas.

51.    BMSI and its principals, Mr. and Mrs. Gross, failed to disclose to Plaintiffs the fictitious name registration because, as explained below, they used that fictitious name to steal millions of dollars from Jiafang Americas.

## DEFENDANTS' PATTERN OF RACKETEERING

### The Fraudulent Payments to Gulf Maritime

52.    In or about April 2008, Mr. Gross informed ATN that he was retaining Gulf Maritime to handle ATN's maritime transport needs.  At that time, Mr. Gross represented to Messrs. Benoudiz and Cardenas that Gulf Maritime was a reputable transport company with global operations.

53.    While there are legitimate maritime transport companies that trade under the name "Gulf Maritime," Gulf Maritime is not related to or associated with any of those legitimate companies.  Gulf Maritime is in fact a paper company based in Hong Kong that was solely owned and controlled by Mr. Jin and subsequently, by Mrs. Xu.

54.    Plaintiffs were not aware of the fact that Gulf Maritime was merely a paper company.

55.    In early 2008, Mr. Gross began directing fraudulent payments from ATN to Gulf Maritime.

4347109v1

56.     At the outset, the fraudulent payments were in small amounts, but the payment amounts ballooned as time passed.  In total, Mr. Gross misdirected over $6,500,000 from ATN to Gulf Maritime in ten fraudulent transactions between April 22, 2008 and July 2, 2009.

57.     Specifically, ATN made the following fraudulent payments to Gulf Maritime via interstate wire transfers to foreign bank accounts on the following dates:

      a.     On April 22, 2008, Mr. Gross directed a payment of $27,708 from ATN to Gulf Maritime;

      b.     On July 25, 2008, Mr. Gross directed a payment of $51,993 from ATN to Gulf Maritime;

      c.     On August 5, 2008, Mr. Gross directed a payment of $408,106.50 from ATN to Gulf Maritime;

      d.     On August 21, 2008, Mr. Gross directed a payment of $186,212.50 from ATN to Gulf Maritime;

      e.     On August 22, 2008, Mr. Gross directed a payment of $233,971.20 from ATN to Gulf Maritime;

      f.     On February 18, 2009, Mr. Gross directed a payment of $166,275 from ATN to Gulf Maritime;

      g.     On March 17, 2009, Mr. Gross directed a payment of $800,000 from ATN to Gulf Maritime;

      h.     On March 18, 2009, Mr. Gross directed a payment of $800,000 from ATN to Gulf Maritime;

      i.     On May 12, 2009, Mr. Gross directed a payment of $1,600,000 from ATN to Gulf Maritime; and

j.      On June 24, 2009, Mr. Gross directed a payment of $2,242,812.90 from ATN to Gulf Maritime.

58.     While Gulf Maritime and Mr. Gross represented to ATN that Gulf Maritime had provided freight and storage services to receive the aforementioned payments, Gulf Maritime in fact was a paper company that was not in position to provide any of the aforementioned services. Mr. Gross omitted to disclose to Plaintiffs that Gulf Maritime was a non-operational paper company before, during or after he directed the ten aforementioned interstate wire transfer payments to Gulf Maritime.

59.     Upon information and belief, upon receiving the fraudulent payments from ATN, Mr. Jin and later, Mrs. Xu, would transfer a portion of the fraudulent funds to bank accounts held by Mr. Gross or his company, Volanss, in Hong Kong.

60.     On August 20, 2008, at or about the time that ATN retained Mr. Jin to oversee the loading of cargo for the company, Mr. Jin transferred ownership of Gulf Maritime to his wife, Mrs. Xu, in an effort to hide his interest in Gulf Maritime from ATN.

61.     Plaintiffs were unaware at this time that Mrs. Xu was the wife of Mr. Jin and Mr. Gross omitted to disclose this fact to Plaintiffs.

62.     Upon information and belief, Mr. Jin continued to control or jointly control Gulf Maritime with Mrs. Xu after transferring ownership of the company in August 2008.

63.     In mid-2009, after ATN assigned Mr. Gross to work primarily with Jiafang Americas, Mr. Gross stopped directing payments from ATN to Gulf Maritime.[1]  It was also at or

---

[1] On February 13, 2013, however, Mr. Gross also induced Messrs. Benoudiz and Cardenas to each wire $775,000 to Gulf Maritime, misrepresenting to them that a payment of $1.5 million was immediately due and that Jiafang Americas lacked the funds in its accounts.  Moreover, on February 14, 2013 and March 19, 2013, he directed payments of $454,075.88 and $440,000, respectively, via wire transfer from Jiafang Americas to Gulf Maritime.  Like with the payments

about this time that Mr. Gross was entrusted with access to Jiafang Americas' bank accounts. Because overcharging for the costs of large quantities of steel pipes purchased from Chinese suppliers could be done for significantly higher amounts than overcharging for the cost of freight charges, after Mr. Gross was given direct access to Jiafang Americas' bank accounts, Mr. Gross and his accomplices concentrated their fraudulent efforts to stealing funds from Jiafang Americas instead of from ATN.

**The Fraudulent Invoicing Scheme**

64.    In May 2006, Mr. Gross established ATN's Houston office to service ATN's petroleum industry customers.   In December 2008, he was assigned to work with Jiafang Americas, and placing great trust in him, the principals of Jiafang Americas provided him with complete access to its bank accounts and with the authority to make payments to suppliers to and from those accounts.

65.    Shortly after Jiafang Americas was acquired by Messrs. Benoudiz and Cardenas, on December 31, 2008, Mr. Gross secretly incorporated Volanss, a Hong Kong private company.

66.    Mr. Gross, who is the sole shareholder and director of Volanss, had no legitimate business purpose for creating a Hong Kong company.

67.    After incorporating Volanss, Mr. Gross also opened several Hong Kong bank accounts with HSBC and Standard Chartered in his name and in Volanss' name.

68.    At or about this time, Mr. Gross—acting in concert with the other defendants— began a fraudulent invoicing scheme where he would overstate the amounts due to Jiafang Americas' suppliers and then cause inflated payments to be made to his personal or company

---

from ATN, Gulf Maritime did not provide any services in connection with the payments and Mr. Gross failed to disclose this information to Plaintiffs.  Upon information and belief, Mrs. Xu directed a portion of the payments to Mr. Gross.

accounts.  After receiving the inflated payments from Jiafang Americas, Mr. Gross would then pay Jiafang Americas' suppliers the actual amounts due, and then wire the overcharge to Volanss or to other non-operating companies controlled by Mr. Gross and Mrs. Xu.

69.    Because Plaintiffs trusted Mr. Gross, and because he was stationed alone in Houston with only an assistant, Plaintiffs rarely, if ever, saw copies of the invoices that Jiafang Americas' suppliers would submit for payment.  When Jiafang Americas had the necessary funds in its bank accounts, Mr. Gross would process the payments himself or cause the wires to be sent, directing the wire transfers from Jiafang Americas' accounts.  On those rare instances where Jiafang Americas did not have the necessary funds in its accounts, Mr. Gross would request the funds from Mr. Benoudiz or Mr. Cardenas.  Trusting Mr. Gross, they would normally send Jiafang Americas the necessary funds or make the payment directly.

70.    Mr. Gross' invoicing fraud took various forms.

***Invoicing Fraud Involving Huludao***

71.    Huludao is a Chinese steel pipe manufacturer that Jiafang Americas contracted with for the supply of steel pipes.

72.    On November 22, 2010, Mr. Jin's wife, Mrs. Xu, incorporated Seanway Pipe Co., Ltd., a United Kingdom private limited company.  Mrs. Xu is the sole owner and director of Seanway Pipe Co., Ltd.

73.    Plaintiffs were unaware of the relationship between Mr. Jin and Mrs. Xu and Mr. Gross omitted to disclose the relationship to Plaintiffs.

74.    Subsequently, with the assistance of Mr. Medrano, on July 5, 2011, Mrs. Xu created Seanway Pipe, a Texas limited liability company.  Seanway Pipe Co., Ltd. is the sole manager of Seanway Pipe.

15

75.      Unbeknownst to Plaintiffs at the time, on July 7, 2011, Mr. Medrano assisted Mrs. Xu and Mr. Gross in registering "Huludao City Steel Pipe Industrial Co., Ltd." as a fictitious name for Seanway Pipe.  Also unbeknownst to Plaintiffs, at or about this time, Mr. Gross then opened bank accounts under the fictitious Huludao name with Compass Bank and Cathay Bank in Houston.  Mr. Gross omitted to disclose to Plaintiffs that he and Mrs. Xu had registered the Huludao name for Seanway Pipe or that he opened bank accounts under the fictitious Huludao name.

76.      Seanway Pipe d/b/a Huludao maintains its offices and mailing addresses at MATS' offices.

77.      On July 2, 2012, Mr. Gross informed Mr. Benoudiz that Jiafang Americas was in need of funds to make a payment to Huludao in the amount of $574,160.70.  Because Jiafang Americas lacked the funds at the time to make the purported payment, Mr. Benoudiz immediately wired the funds from one of his personal accounts to an account in Huludao's name maintained at Compass Bank in Houston ("Gross Compass Account 8958").[2]  Unbeknownst to Mr. Benoudiz, although the bank account was in Huludao's name, the account belonged to Seanway Pipe or Mr. Gross and was managed or co-managed by Mr. Gross.  Mr. Benoudiz wrongly believed his payment went to the real Huludao to pay an invoice.

78.      Mr. Gross also misdirected over $4,700,000 in seven wire transactions from Jiafang Americas' bank accounts to bank accounts belonging to Mr. Gross or to BMSI.  For each transaction, Mr. Gross led Jiafang Americas to believe that it was paying Huludao for product, when instead the funds were going to phony bank accounts maintained by Mr. Gross or by BMSI in Huludao's name in Houston.  Mr. Gross omitted to disclose to Plaintiffs that the seven wire

---

[2] Pursuant to General Order No. 2004-11, Plaintiffs only identify the last four digits of any financial accounts referenced herein.

16

transfer payments were going to bank accounts maintained by him or by BMSI and not to Huludao.

79.     Specifically, Mr. Gross directed the following fraudulent interstate wire transfer payments on the following dates:

a.     On August 2, 2012, Mr. Gross initiated a wire transfer wherein he transmitted $500,000 from Jiafang Americas' Compass Bank account ("JA Compass Account 8532") to Gross Compass Account 8958;

b.     On August 20, 2012, Mr. Gross wired $597,269.26 from JA Compass Account 8532 to Gross Compass Account 8958;

c.     On November 1, 2012, Mr. Gross wired $210,015.60 from JA Compass Account 8532 to a BMSI account maintained in Huludao's name at Cathay Bank in Houston ("BMSI Cathay Account 8254");

d.     On November 8, 2012, Mr. Gross wired $1,000,000 from JA Compass Account 8532 to Gross Compass Account 8958;

e.     On December 19, 2012, Mr. Gross wired $2,024,944.06 from Jiafang Americas' Chase Bank account ("JA Chase Account 3570") to Gross Compass Account 8958;

f.     On December 26, 2012, Mr. Gross wired $167,446.46 from JA Chase Account 3570 to BMSI Cathay Account 8254; and

g.     On December 27, 2012, Mr. Gross wired $262,553.54 from JA Chase Account 3570 to Gross Compass Account 8958.

80.     Given that the eight aforementioned payments totaling $5,336,389.62 were transmitted to accounts in Huludao's name, based on the machinations of Mr. Gross, Mrs. Gross,

Mrs. Xu, and their respective companies, BMSI and Seanway Pipe, Plaintiffs were misled to believe that the funds were transmitted to Huludao to pay for product and were unaware that the funds were instead transmitted to accounts belonging to Mr. Gross, BMSI or Seanway Pipe. For example, the reference line for the August 2, 2012 wire transfer indicated that the payment was for an "advance payment" for the "second milestone" for a project that Jiafang Americas was working on in Venezuela, and the reference lines for the August 20, 2012 and November 8, 2012 wire transfers indicated that the payments were for the "final milestone" and "for further credit" with respect to the same project.

81.     Unfortunately, Plaintiffs have to date been unable to uncover exactly what Defendants did with the funds that Mr. Gross misdirected to the phony Huludao accounts; however, Mr. Gross was only authorized to pay real vendors and suppliers with Jiafang Americas' funds.

### *Invoicing Fraud Involving Shanghai Jiafang*

82.     At the same time that Mr. and Mrs. Gross incorporated BMSI in July 2011, and with the assistance of Mr. Medrano, Mr. and Mrs. Gross registered "Shanghai Jiafang Steel Pipe (Group) Co., Ltd." as a fictitious name for BMSI. They did this to defraud Jiafang Americas into making payments to BMSI while believing it was making payments directly to Shanghai Jiafang, its Chinese steel pipe manufacturer. Indeed, Mr. and Mrs. Gross opened a BMSI bank account with Comerica Bank in Houston under the fictitious Shanghai Jiafang name in order to misdirect payments from Jiafang Americas to BMSI rather than to the real Shanghai Jiafang. Mr. Gross omitted to disclose to Plaintiffs that BMSI had registered the Shanghai Jiafang name or that BMSI had opened bank accounts under that fictitious name.

83.     Between 2012 and 2013, Mr. Gross misdirected over $12,600,000 via eleven wire transactions from Jiafang Americas to BMSI.  For each transaction, Mr. Gross led Jiafang Americas to believe that it was paying Shanghai Jiafang for product, when instead the funds were going BMSI's phony account in Shanghai Jiafang's name at Comerica Bank in Houston. Mr. Gross omitted to disclose to Plaintiffs that the eleven payments were made to BMSI and not to Shanghai Jiafang.

84.     Specifically, Mr. Gross directed the following fraudulent payments via interstate wire transfers on the following dates:

a.     On September 6, 2012, Mr. Gross initiated a wire transfer in the amount of $2,362,426.15 from JA Chase Account 3570 to BMSI's Comerica account in Houston ("BMSI Comerica Account 0549"), which was an account that was fraudulently maintained by BMSI in the name of Shanghai Jiafang, the fraudulent fictitious name that BMSI registered in 2011;

b.     On November 1, 2012, Mr. Gross wired $500,000 from Jiafang Americas' Chase account in Houston ("JA Chase Account 8080") to BMSI Comerica Account 0549;

c.     On December 19, 2012, Mr. Gross wired $2,047,455.94 from JA Chase Account 3570 to BMSI Comerica Account 0549;

d.     On January 22, 2013, Mr. Gross wired $1,700,000 from JA Chase Account 3570 to BMSI Comerica Account 0549;

e.     On March 21, 2013, Mr. Gross caused $1,300,000 to be wired from JA Chase Account 3570 to BMSI Comerica Account 0549;[3]

---

[3] With respect to this transaction, on March 3, 2013, Mr. Gross forwarded an email to Mr. Benoudiz from someone purporting to be Xi Feng Hua a/k/a Fletcher Xi ("Mr. Xi"), Shanghai Jiafang's Manager of International Business Department.  Upon information and belief, Mr.

f.      On April 4, 2013, Mr. Gross caused $66,000 to be wired from JA Chase Account 3570 to BMSI Comerica Account 0549;

g.      On April 12, 2013, Mr. Gross caused $1,500,000 to be wired from JA Chase Account 8080 to BMSI Comerica Account 0549;

h.      On April 26, 2013, Mr. Gross caused $1,000,000 to be wired from JA Chase Account 8080 to BMSI Comerica Account 0549;

i.       On May 9, 2013, Mr. Gross caused $700,000 to be wired from JA Chase Account 8080 to BMSI Comerica Account 0549;

j.       On September 3, 2013, Mr. Gross wired $1,000,000 from JA Chase Account 8080 to BMSI Comerica Account 0549; and

k.      On November 4, 2013, Mr. Gross wired $450,000 from JA Chase Account 3570 to BMSI Comerica Account 0549.

85.      Given that the eleven aforementioned payments totaling over $12,600,000 were transmitted to accounts in Shanghai Jiafang's name, based on the machinations of Mr. Gross, Mrs. Gross, and BMSI, Jiafang Americas was misled to believe that the funds were transmitted to Shanghai Jiafang to pay for product and was unaware that the funds were instead transmitted to accounts belonging to BMSI.

86.      Unfortunately, Plaintiffs have to date been unable to uncover exactly what Defendants did with the funds that Mr. Gross misdirected to BMSI; however, Mr. Gross was not authorized to transfer any funds to accounts maintained in his name or in BMSI's name, and he was only authorized to pay real vendors and suppliers with Jiafang Americas' funds.

---

Gross fabricated or doctored the email as the email contained wire transfer instructions for the payment of a purported invoice in the amount of $1,300,000 to Shanghai Jiafang, but the email directed payment not to Shanghai Jiafang, but to BMSI Comerica Account 0549.

87.     In their recent investigation of Mr. Gross' activities (discussed below), Plaintiffs learned of the existence of the various bank accounts that Mr. Gross and BMSI had established, and of the companies that Defendants had created, and learned that after Mr. Gross wired $2,362,426.15 from JA Chase Account 3570 to BMSI Comerica Account 0549 on September 6, 2012, Mr. or Mrs. Gross caused BMSI to transfer the funds to various unknown bank accounts and transferred $187,951.20—or approximately 8% of the funds received from Jiafang Americas—to a Hong Kong bank account maintained by Volanss, the Hong Kong private company that Mr. Gross owns and controls.

88.     Similarly, Plaintiffs learned that after Mr. Gross wired $2,047,455.94 from JA Chase Account 3570 to BMSI Comerica Account 0549 on December 19, 2012, Mr. or Mrs. Gross caused BMSI to transfer the funds to various unknown bank accounts and transferred $69,500.94—or approximately 3.4% of the funds received from Jiafang Americas—to the same Hong Kong bank account maintained by Volanss.

89.     Unfortunately, Plaintiffs have to date been unable to uncover exactly what Defendants did with the remainder of the funds that Mr. Gross misdirected to BMSI; however, Mr. Gross was not authorized to transfer any funds to accounts maintained in his name or in BMSI's name, and he was only authorized to pay real vendors and suppliers with Jiafang Americas' funds.  Moreover, Mr. Gross omitted to disclose to Plaintiffs that he was misdirecting Jiafang Americas' funds to Volanss or other entities.

**The Phony Guarantee Scheme**

90.     One of the projects that Mr. Gross managed for Jiafang Americas involved the sale of steel pipes to a Bolivian customer.  Liaoning was the supplier for the project.  Jiafang Americas' primary contact at Liaoning was Liu Fushan ("Mr. Liu").

91.     Specifically, in October 2012, Jiafang Americas entered into an agreement with Liaoning wherein Liaoning agreed to sell steel pipes valued at $9,919,320.48 to Jiafang Americas' customer in Bolivia, with Jiafang Americas receiving a 10% commission on the sale.

92.     The Bolivian customer obligated Liaoning to post a performance guarantee in the amount of $1,000,000, which would be refunded upon the completion of the project.

93.     Unbeknownst to Plaintiffs, Liaoning did not post the guarantee.

94.     Instead, in November 2012, Mr. Gross—who had full and unfettered access to Jiafang Americas' bank accounts—withdrew the total sum of $1,000,000 from two bank accounts maintained by Jiafang Americas with Chase Bank and Compass Bank, respectively, and used Jiafang Americas' moneys to fund the guarantee.

95.     Specifically, on November 1, 2012, Mr. Gross wired $500,000 from JA Chase Account 8080 to BMSI Comerica Account 0549, the account that BMSI was fraudulently maintaining under the fraudulent Shanghai Jiafang fictitious name.  Thus, as far as Jiafang Americas was aware, the $500,000 went to Jiafang Americas' supplier, Shanghai Jiafang, and not to BMSI.  Indeed, in the reference section for the wire transfer, Mr. Gross fraudulently referenced an invoice number for a project with Shanghai Jiafang.

96.     After receiving the funds in BMSI Comerica Account 0549, on November 8, 2012, BMSI d/b/a Shanghai Jiafang wrote a check in the amount of $500,000 payable to Jiafang Americas and deposited the funds in Jiafang Americas' Comerica account ("JA Comerica Account 8434").  Thus, in its records, it appeared as though Jiafang Americas had received $500,000 from Shanghai Jiafang to partially fund the guarantee.

4347109v1

97.     Because another $500,000 was needed to fund the guarantee, Mr. Gross had to misappropriate funds from another Jiafang Americas bank account to make it appear as though the guarantee was funded by one of Jiafang Americas' suppliers.

98.     Acting in concert with Mrs. Xu, on October 12, 2012, Mr. Gross transferred $500,000 from Jiafang Americas' Compass Bank account ("JA Compass Account 8532") to Jiuyi Trading, a Hong Kong private company under the sole ownership of Mrs. Xu. Jiafang Americas was not aware that Jiuyi Trading was a non-operating paper company owned by Mrs. Xu; indeed, Mr. Gross had represented to Messrs. Benoudiz and Cardenas that Jiuyi Trading was a legitimate trading company assisting Jiafang Americas with sourcing materials.

99.     Thereafter, Jiuyi Trading—under the direction of Mrs. Xu—transferred the $500,000 to Sheng Min Pipe, another Hong Kong private company that she owned, and, in November 2012, Sheng Min Pipe, returned the funds by wire transfer to JA Comerica Account 8434.

100.    Thus, through the machinations of Mr. and Mrs. Gross and of Mr. Jin and Mrs. Xu and their respective companies, BMSI, Jiuyi Trading and Sheng Min Pipe, Jiafang Americas believed that it had received two payments of $500,000 from Shanghai Americas and Sheng Min Pipe, respectively, to fund the guarantee required by the Bolivian customer. Jiafang Americas then proceeded to fund the guarantee by depositing $1,000,000 in a bank account that Jiafang Americas lost access to for the two-year duration of the project.

101.    Because of the cover up created by Mr. Gross, who had unencumbered access to Jiafang Americas' bank accounts until January 2014, Jiafang Americas was unaware, until recently, that it had provided the funds to finance the guarantee. In late 2013, ATN restructured its Houston office and hired several new employees to work in Houston. Because Mr. Gross was

difficult to work with, in January 2014, ATN assigned Mr. Gross to work from home before the new employees arrived. At this time, ATN transferred the management and control of Jiafang Americas' bank accounts to ATN's Operations Manager in Miami. ATN, however, did not suspect any illicit activity on the part of Mr. Gross until many months later, as explained below.

102.    To make matters worse, once the project with Jiafang Americas' Bolivian customer was completed in June 2014, Mr. Gross and Mrs. Xu attempted to defraud Jiafang Americas into returning the $1,000,000 to Sheng Min Pipe.

103.    Specifically, on June 24, 2014, Mr. Gross forwarded Mr. Benoudiz several emails from someone purporting to be Mr. Liu, Liaoning's representative.

104.    The emails were all purportedly sent from Mr. Liu's company email address, liufushan@npc-pipe.com, although the emails did not come from Mr. Fushan. Upon information and belief, Mr. Gross fabricated or doctored the emails sent by Mr. Liu to deceive Plaintiffs into believing the emails came from Liaoning. Indeed, Plaintiffs later learned that Mr. Liu speaks little or no English.

105.    In the fake emails, the person purported to be Mr. Liu demanded that Jiafang Americas pay $1,000,000 to Sheng Min Pipe to repay the guarantee that Sheng Min Pipe had supposedly financed on behalf of Liaoning. The email further instructed that the payment be transmitted via wire transfer to Sheng Min Pipe's account at Bank of Communications in Shanghai, China, which was later determined to be controlled by Mrs. Xu.

106.    After receiving the forwarded emails from Mr. Gross, Mr. Benoudiz questioned Mr. Gross as to why the refund would be owing from Jiafang Americas and not from Jiafang Americas' Bolivian customer.

107.    Mr. Gross was unable to explain how or why Jiafang Americas was responsible for refunding the guarantee to Sheng Min Pipe—because he couldn't.  Instead, on July 1, 2014, Mr. Gross abruptly resigned from ATN, claiming he had decided to seek opportunities elsewhere.  Two days later, however, on July 3, 2014, Mr. Gross sent Mr. Benoudiz an email claiming that Jiafang Americas still had to refund the guarantee to Sheng Min Pipe.

108.    Subsequently, on July 17, 2014, Mr. Gross forwarded Mr. Benoudiz additional emails that had been purportedly sent by Mr. Liu to Mr. Gross in the prior two weeks.  In these emails, the person claiming to be Mr. Liu continued to demand a refund of the guarantee and threatened to take legal action.

109.    After receiving the emails, Mr. Benoudiz requested that Mr. Liu provide further information and supporting documentation regarding the underlying transaction.

110.    On July 21, 2014, Mr. Benoudiz received another email from the person claiming to be Mr. Liu.  The email falsely represented that the guarantee was paid by Liaoning and that the refund was due to Sheng Min Pipe, Liaoning's agent.  The communication again threatened legal action and stated that Liaoning did not have to answer any questions regarding the transaction.

111.    Shortly thereafter, Jiafang Americas uncovered more information concerning the transaction involving Liaoning and the guarantee, and confirmed that Jiafang Americas had provided the funds for the guarantee and that Jiafang Americas did not have to reimburse Liaoning or Sheng Min Pipe for the guarantee.

112.    When Mr. Benoudiz called Mr. Gross to discuss what he had learned, Mr. Gross placed the call on speakerphone and Mr. Gross' father-in-law, Mr. Schwartz, was present on the call.  After Mr. Benoudiz told Mr. Gross that something was amiss and questioned Mr. Gross as

to what was going on, Mr. Schwartz told Mr. Benoudiz to not worry about the $1,000,000 and to ignore the refund requests.  Mr. Gross then hung up the phone.

113.    Following that conversation, Jiafang Americas stopped receiving threatening emails and neither Liaoning nor Sheng Min Pipe made any further demand against Jiafang Americas.

114.    Given the strange circumstances surrounding the issuance of the guarantee, and the fact that Liaoning was purportedly sending repeated threatening emails to collect on the guarantee only to have those emails immediately stop after Mr. Benoudiz confronted Mr. Gross and Mrs. Schwartz in late July 2014, Plaintiffs began to suspect that Mr. Gross, acting with the assistance of others, had been stealing money from Jiafang Americas and they began to fully investigate Mr. Gross' conduct.

115.    Unfortunately, Plaintiffs' investigation has been hampered by the fact that Mr. Gross was the sole high ranking ATN executive in Houston, and he had been working from home since January 2014.  Moreover, upon information and belief, Mr. Gross covered his tracks upon his departure from the company by destroying or removing most of ATN and Jiafang Americas' documentation relating to their transactions with Shanghai Jiafang, Huludao, Liaoning and the defendant entities involved in this dispute.

116.    Plaintiffs, however, have been able to piece together Defendants' fraud after conducting a global investigation regarding Defendants and their respective companies and after recovering various bank envelopes and similar documents that Mr. Gross accidentally left behind upon his departure, including bank envelopes for accounts maintained by Mr. Gross and Volanss in Hong Kong, and a bank statement for an account held in Mr. Gross' name at Standard Chartered in Hong Kong showing a deposit of approximately $800,000.

**Payments to Fraudulent Paper Companies**

117.    As explained above, several of the defendants created various non-operating paper companies to receive Jiafang Americas' funds under fraudulent pretenses.

118.    Specifically, Mrs. Xu created Sheng Min Pipe and Jiuyi Trading, both Hong Kong private companies, on July 10 and September 10, 2012, respectively.

119.    Neither Jiuyi Trading nor Sheng Min Pipe serve any legitimate business purposes and the entities were created by Mrs. Xu in concert with Mr. Gross and Mr. Jin for the sole purpose of receiving payments from Jiafang Americas under false pretenses.

120.    At no time did Mr. Gross, Mr. Jin, Mrs. Xu or anyone else disclose to Plaintiffs that the two entities were owned or controlled by Mr. Jin or Mrs. Xu or that the companies were non-operational paper companies.

121.    Instead, in October 2012, before Jiafang Americas began making payments to Mrs. Xu's companies, Mr. Gross represented to Plaintiffs and to Mr. Cardenas that Sheng Min Pipe was a Chinese steel pipe manufacturer and that Jiuyi Trading was a Chinese trading company specializing in petroleum industry equipment.

122.    Between 2012 and 2014, Mr. Gross remitted nearly ten million dollars to Sheng Min Pipe and Jiuyi Trading under fraudulent pretenses, with neither company providing any real services or product to Jiafang Americas.  Mr. Gross, Mrs. Xu, Jiuyi Trading and Sheng Min Pipe omitted to disclose to Plaintiffs that Sheng Min Pipe and Jiuyi Trading were paper companies that were not providing real services or product to Jiafang Americas.

123.    Specifically, Mr. Gross directed the following payments totaling $3,384,905.31 to Jiuyi Trading via interstate wire transfers to foreign bank accounts:

a. On October 12, 2012, Mr. Gross directed a payment of $500,000 via wire from JA Compass Account 8532 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong[4];

b. On November 9, 2012, Mr. Gross directed a payment of $227,560.00 via wire from JA Compass Account 8532 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong;

c. On March 5, 2013, Mr. Gross directed a payment of $560,000 via wire from JA Chase Account 8080 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong;

d. On March 5, 2013, Mr. Gross directed a payment of $660,000 via wire from JA Chase Account 8080 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong;

e. On August 29, 2013, Mr. Gross directed a payment of $1,410,481.80 via wire from JA Chase Account 8080 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong; and

f. On May 14, 2014, Mr. Gross caused Jiafang Americas to remit a payment of $26,863.51 via wire to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong.

124. Similarly, Mr. Gross directed the following payments totaling $6,517,079.10 to Sheng Min Pipe via interstate wire transfers to foreign bank accounts:

---

[4] As explained above, Jiuyi Trading subsequently transferred these funds to Sheng Min Pipe, which in turn returned the funds to Jiafang Americas to mislead Jiafang Americas into believing that Sheng Min Pipe had paid Jiafang Americas $500,000 to partially fund the guarantee for the transaction with Liaoning.

a.    On December 21, 2012, Mr. Gross directed a payment of $4,463,694.22 via wire from JA Chase Account 3570 to a bank account maintained by Sheng Min Pipe with Bank of Communications in Shanghai; and

b.    On January 11, 2013, Mr. Gross directed a payment of $1,785,477.69 via wire from JA Chase Account 3570 to a bank account maintained by Sheng Min Pipe with Bank of Communications in Shanghai.

125.    Upon information and belief, Mr. Gross, Mrs. Xu, Jiuyi Trading and Sheng Min Pipe subsequently distributed Jiafang Americas' funds received from the fraudulent payments amongst themselves.

**Mr. Gross' Usurpation of Business Opportunities**

126.    In addition to spearheading the conspiracy to defraud Plaintiffs out of millions of dollars, Mr. Gross also usurped Plaintiffs' business opportunities and misappropriated customers and contracts from Jiafang Americas.

127.    Indeed, using the fictitious and fraudulent Huludao name that Mr. Gross and Mrs. Xu registered in Texas, Mr. Gross—while employed fulltime with ATN and assigned by ATN to manage Jiafang Americas—entered into two contracts with one of Jiafang Americas' most important customers in Bolivia.

128.    Specifically, on March 3, 2012 and September 17, 2012, respectively, the fraudulent Huludao entered into contracts for $4,753,251.55 and 1,784,275.71 with Jiafang Americas' Bolivian customer.

129.    Plaintiffs were unaware that Mr. Gross was entering into contracts with its customers, or that Mr. Gross was even quoting or placing bids for contracts with Jiafang

4347109v1

Americas' customers.  At no time, however, did Plaintiffs authorize Mr. Gross to compete against Jiafang Americas or to place bids or quotes with Jiafang Americas' customers.

130.    Upon information and belief, Mr. Gross was placing lower bids for his fraudulent companies than he was for Jiafang Americas in order to win the business.

131.    Plaintiffs have only recently learned of Mr. Gross' unauthorized competition, and upon discussing the issue with Jiafang Americas' customer, Plaintiffs have learned that the customer was also unaware that that it was contracting with Mr. Gross and not with Jiafang Americas.  Further, the customer confirmed that its payments under the contracts were made to Gross Compass Account 8958.

## COUNT I
### Civil RICO, 18 U.S.C. § 1962(c)
### (Against all Defendants)

132.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

133.    Plaintiffs and Defendants are all natural persons or legal entities, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

**The Enterprise**

134.    Mr. and Mrs. Gross and their wholly-owned companies, BMSI and Volanss (collectively, the "Gross Defendants"), on the one hand, and Mr. Jin and Mrs. Xu and their wholly-owned companies, Seanway Pipe, Jiuyi Trading, Sheng Min Pipe and Gulf Maritime, on the other hand, comprise two distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4).  Each and every defendant is associated with the enterprise. Alternatively, ATN and Jiafang Americas form an enterprise that Mr. Gross used and manipulated to—with the assistance of Defendants—perpetrate a fraud upon Plaintiffs.

135.    Taken together, Defendants are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

136.    The purpose of the enterprise was to steal or misappropriate funds belonging to Plaintiffs under fraudulent pretenses and primarily by way of the interstate wires.

***The Enterprise's Conduct and Participation in Racketeering Activity***

137.    As part of Defendants' fraudulent conspiracy, Mr. and Mrs. Gross and Mr. Jin and Mrs. Xu, individually, collectively and through their respective companies that they owned and controlled (i.e., BMSI, Volanss, Seanway Pipe, Jiuyi Trading, Sheng Min Pipe and Gulf Maritime), operated and managed the enterprise by engaging in, among other things, the acts listed below.  Defendants either personally made the decision that the enterprise should engage in, among other things, the following acts, or knowingly implemented the decision to engage in, among other things, the following acts:

   a.    Mr. Gross causing multiple payments totaling over $6,500,000 to be made between April 2008 and July 2009 from ATN via the mails and the interstate wires to Gulf Maritime, a non-operating paper company that provided no services to ATN or acted as a subterfuge to allow an overcharging mechanism to take place;

   b.    Mr. Jin transferring sole ownership of Gulf Maritime to his wife, Mrs. Xu, in August 2008, to hide his ownership of Gulf Maritime from Plaintiffs;

   c.    Mrs. Xu incorporating Seanway Pipe in Texas in July 2011, and her and Mr. Gross registration the fictitious name "Huludao" (one of Jiafang Americas' key suppliers) for Seanway Pipe;

d.  Mr. Gross causing Mr. Benoudiz to pay $574,160.70 to a bank account held and controlled by Mr. Gross or by Seanway Pipe and Mrs. Xu in Houston under Huludao's name, while misleading Mr. Benoudiz via email communications to believe that the payment was going to Huludao to pay an actual invoice;

e.  Mr. Gross transmitting eight interstate wire transfers between August 2012 and December 2012 totaling over $4,900,000 from Jiafang Americas' bank accounts to bank accounts held and controlled by him or by Seanway Pipe and Mrs. Xu in Houston under Huludao's name;

f.  Mr. Gross transmitting twelve interstate wire transfers between September 2012 and November 2013 totaling over $12,500,000 from Jiafang Americas' bank accounts to bank accounts controlled by him and his wife, Mrs. Gross, belonging to BMSI, but maintained under BMSI fraudulent fictituous name, Shanghai Jiafang (the name of a key supplier to Jiafang Americas);

g.  Mr. Gross, with the assistance of Mrs. Xu and her companies, Jiuyi Trading and Sheng Min Pipe, causing Jiafang Americas to engage in two wire transfers in October and November 2012, respectively, wherein Jiafang Americas wired $500,000 each to BMSI d/b/a Shanghai Jiafang and Jiuyi Trading, respectively, and BMSI, Jiuyi Trading and Sheng Min Pipe returned the same funds to Jiafang Americas causing Jiafang Americas to believe that those parties were funding a guarantee; and wherein, once the guarantee was no longer required in July 2014, Mr. Gross, through email communications and falsified emails, attempted to deceive Jiafang Americas to returning the $1,000,000 to Sheng Min Pipe;

    h.  Mr. Gross transmitting six interstate wire transfers between March 2012 and March 2014 totaling over $3,300,000 from Jiafang Americas' bank accounts to Jiuyi Trading, a non-operational paper company owned and controlled by Mrs. Xu that the aforementioned defendants mislead Jiafang Americas into believing was a real trading company that Jiafang Americas had purchased pipes through; and

    i.  Mr. Gross transmitting two interstate wire transfers between December 2012 and January 2013 totaling over $6,200,000 from Jiafang Americas' bank accounts to Sheng Min Pipe, a non-operational paper company owned and controlled by Mrs. Xu, that the aforementioned defendants mislead Jiafang Americas into believing was a real steel pipe manufacturer that Jiafang Americas had purchased pipes from.

***Pattern of Racketeering Activity – Mail and Wire Fraud***

138.    Defendants, individually and collectively, as an enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described above, in violation of 18 U.S.C. §§ 1962, 1341, 1343, 1956 and 1957.

139.    Defendants, acting individually and as part of the enterprise, have used the mails and interstate wires and have caused the mails and interstate wires to be used, or reasonably knew the mails and interstate wires would be used, in furtherance of their fraudulent schemes, as explained above.

140.    Upon information and belief, each and every defendant had specific knowledge that the mails and wires were being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the mails and wires would be used

given the fraudulent payments all occurred via interstate wire transfers, or to a lesser extent, by check.

141.    In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statutes, 18 U.S.C. § 1961 *et seq.*, and on numerous occasions over a substantial time period of over six years and within ten years of each other. Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced no later that April 2008 and last at least until July 2014.

***Relationship of Pattern of Racketeering Activity to Enterprise***

142.    As described above, the goal of the enterprise was to steal funds from Plaintiffs. This was accomplished, *inter alia*, by the conduct set forth *supra*.

143.    Each defendant has conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the pattern of racketeering described above. Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

144.    Plaintiffs have been injured as a direct and proximate result of the RICO violations described above by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs, and harm to their business/professional reputations, thus constituting an injury to Plaintiffs' business or property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants in violation of 18 U.S.C. § 1962(c).

## <u>COUNT II</u>
### Civil RICO Conspiracy, 18 U.S.C. § 1962(d)
### (Against all Defendants)

145.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

146.     Each defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), by either agreeing to the commission of the numerous predicate acts of mail and wire fraud described above, or agreeing to the enterprise's overall objective of stealing funds from Plaintiffs through fraudulent means, violating 18 U.S.C. § 1962(d).

147.     Plaintiffs have been injured as a direct and proximate result of the RICO violations described above by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs, and harm to their business/professional reputations, thus constituting an injury to Plaintiffs' business or property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants in violation of 18 U.S.C. § 1962(c).

## COUNT III
### Fraud by Nondisclosure
### (Against Mr. Gross)

148.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

149.     As set forth above, Mr. Gross failed to disclose material facts to Plaintiffs concerning Defendants and concerning the payments that Mr. Gross made to Defendants using Plaintiffs' funds.  He also failed to disclose material facts to Plaintiffs concerning his business dealings using fraudulent fictitious names and his competition against Jiafang Americas.

150.     Mr. Gross knew that Plaintiffs were ignorant of the material facts that he failed to disclose, and Plaintiffs did not have an equal opportunity to discover the facts.

151.     Mr. Gross was deliberately silent when he had a duty to speak given that he was placed in a position of confidence and trust by Plaintiffs, and given that he was an employee of ATN and agent of Jiafang Americas.

4347109v1

152.    By failing to disclose material facts, Mr. Gross intended to induce Plaintiffs to allow Mr. Gross to make fraudulent payments using Plaintiffs funds, or to refrain from preventing Mr. Gross from making the fraudulent payments.

153.    Plaintiffs relied on Mr. Gross' nondisclosure.

154.    Plaintiffs have been injured as a direct and proximate result of their action or inaction based on the lack of knowledge of the omitted material facts by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs.

## COUNT IV
## Fraud
## (Against Mr. Gross)

155.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

156.    As set forth above, Mr. Gross made multiple material misrepresentations to Plaintiffs concerning Defendants and concerning the payments that Mr. Gross made to Defendants using Plaintiffs' funds, and those representations were false.

157.    Mr. Gross was aware of the falsity of his representations, or made the representations recklessly and without any knowledge of the truth and as a positive assertion, at the time that Mr. Gross made his misrepresentations to Plaintiffs.

158.    Mr. Gross made his representations with the intent that Plaintiffs would act or rely upon the representations.

159.    Plaintiffs acted in reliance upon Mr. Gross' representations by allowing Mr. Gross to pay millions of dollars to Defendants under fraudulent pretenses.

4347109v1

160.    Plaintiffs have been injured as a direct and proximate result of Defendants' conduct described above by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs.

<strong><u>COUNT V</u><br>Civil Conspiracy<br>(Against all Defendants)</strong>

161.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

162.    Defendants conspired and agreed to engage in the unlawful and fraudulent actions and to make the material misrepresentations and omissions as set forth above with the object of inducing or deceiving Plaintiffs into transferring millions of dollars to Defendants under fraudulent pretenses.

163.    Defendants acted in furtherance of their common plan and there was a meeting of the minds between Defendants on the object or course of action against Plaintiffs.

164.    Defendants have committed multiple unlawful, overt acts in furtherance of their conspiracy as set forth above.

165.    Plaintiffs have been injured as a direct and proximate result of Defendants' conduct described above by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs, and harm to their business/professional reputations.

<strong><u>COUNT VI</u><br>Money Had and Received<br>(Against all Defendants)</strong>

166.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

167.    Plaintiffs have transferred millions of dollars to Defendants as a result of Defendants' fraudulent conduct, and Defendants have held those moneys that in equity and good conscience belong to Plaintiffs.

### COUNT VII
### Breach of Fiduciary Duty
### (Against Mr. Gross)

168.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

169.    A fiduciary relationship was established between Plaintiffs and Mr. Gross, as Mr. Gross was an employee of ATN, and an agent for Jiafang Americas, and was entrusted by Plaintiffs to manage Jiafang Americas' bank accounts and to make payments on behalf of Jiafang Americas.

170.    Mr. Gross breached his fiduciary duty to Plaintiffs by stealing or misappropriating millions of dollars from Plaintiffs through fraudulent wire transactions and misrepresentations, and by competing against Jiafang Americas and usurping Jiafang Americas' business opportunities with at least one if its customers..

171.    Plaintiffs were injured as a result of Mr. Gross' breaches of his fiduciary duties by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs, funds that were stolen or misappropriated by Defendants.

### COUNT VIII
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Mrs. Gross, Mr. Jin, Mrs. Xu, BMSI, Volanss, Seanway Pipe,
### Sheng Min Pipe and Gulf Maritime)

172.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

173.    Defendants, Mrs. Gross, Mr. Jin, Mrs. Xu, BMSI, Volanss, Seanway Pipe, Sheng Min Pipe and Gulf Maritime where aware that a fiduciary relationship existed between Plaintiffs and Mr. Gross, as Mr. Gross was an employee of ATN, and an agent for Jiafang Americas, and was entrusted by Plaintiffs to manage Jiafang Americas' bank accounts and to make payments on behalf of Jiafang Americas.

174.    Defendants knowingly participated in Mr. Gross' breaches of his fiduciary duty to Plaintiffs by, as set forth above, participating with Mr. Gross in the misappropriation of millions of dollars from Plaintiffs through fraudulent wire transactions and misrepresentations.

175.    Plaintiffs were injured as a result of Mr. Gross' breaches of his fiduciary duties by, among other ways, the loss of the use and enjoyment of millions of dollars belonging to Plaintiffs, funds that were stolen or misappropriated by Defendants.

## COUNT IX
### Constructive Trust
### (Against all Defendants)

176.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

177.    A fiduciary relationship was established between Plaintiffs and Mr. Gross, as Mr. Gross was an employee of ATN, and an agent for Jiafang Americas, and was entrusted by Plaintiffs to manage Jiafang Americas' bank accounts and to make payments on behalf of Jiafang Americas.

178.    Acting in concert with Defendants, Mr. Gross breached his fiduciary duty to Plaintiffs by stealing or misappropriating millions of dollars from Plaintiffs through fraudulent wire transactions and misrepresentations.

4347109v1

179.    Moreover, as set forth above, Defendants received millions of dollars from Plaintiffs under fraudulent pretenses.

180.    Defendants have been unjustly enriched through their wrongdoing.

181.    The funds that Defendants have misappropriated from Plaintiffs belonged to Plaintiffs and were funds held in Plaintiffs' respective bank accounts.

**COUNT X**
**Resulting Trust**
**(Against all Defendants)**

182.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

183.    The funds that Mr. Gross misdirected to himself and Defendants under fraudulent pretenses are property held in a resulting trust, and Plaintiffs are the beneficiaries of the resulting trust.  As a result, Plaintiffs have equitable title to the misdirected funds stemming from the resulting trust, and Defendants have no interest in the misdirected funds.

184.    Plaintiffs paid funds to Defendants under fraudulent pretenses on the mistaken belief (based on Defendants' fraudulent conduct) that the funds were for the payment of services and products rendered by third parties.  Defendants subsequently used the funds or a portion of the funds for their personal gain.

185.    Plaintiffs hold bare legal title to misdirected funds in a resulting trust for Plaintiffs who have equitable title.  *See Vicars v. Quinn*, 154 S.W. 2d 947, 948-49 (Tex. Ct. App.-El Paso 1941) (holding that a trust arises if a party agrees to advance consideration for the acquiring of property held in legal title by another if the beneficiary is legally bound to repay the money advance to purchase the property); *see also Cage v. Sung Kang (In re Kang)*, No. 12-03233, 2013 WL 870223, at *5, slip op. (Bankr. S.D. Tex. March 6, 2013).

40

## COUNT XI
### Fraudulent Transfer in Violation of Tex. Bus. & Com. Code Ann. § 24.005
### (Against Mr. Gross)

186.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1-131 hereof with the same force and effect as if fully set forth herein.

187.    As set forth above, Mr. Gross transferred funds belonging to Plaintiffs to his personal accounts, accounts held by BMSI and Volanss, and to accounts held by Defendants, with the actual intent to hinder, delay or defraud Plaintiffs.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to grant the following relief:

a.    Judgment for Plaintiffs against Defendants on all Counts asserted herein;

b.    Temporary and preliminary injunctive relief enjoining the Gross Defendants and each of their officers, agents, servants, employees, and attorneys—and all other persons who are in active concert or participation with these persons or entities—from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien, security interest, or other interest in, or otherwise disposing of, any funds, wherever located, that are (a) owned, controlled, held by, in whole or in part, for the benefit of, or subject to access by, or belonging to, any Gross Defendant; (b) in the actual or constructive possession of any Gross Defendant; or (c) in the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Gross Defendant;

c.      Permanent injunctive relief enjoining Defendants and each of their officers, agents, servants, employees, and attorneys—and all other persons who are in active concert or participation with these persons or entities—from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien, security interest, or other interest in, or otherwise disposing of, any funds that have been stolen or misappropriated from Plaintiffs, wherever located, that are (a) controlled, held by, in whole or in part, for the benefit of, or subject to access by any Defendant; (b) in the actual or constructive possession of any Defendant; or (c) in the actual or constructive possession of, or controlled, or held by, or subject to access by, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Defendant;

d.      An award of actual and compensatory damages as warranted under the law to Plaintiffs, including without limitation, damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964;

e.      Treble recovery pursuant to 18 U.S.C. § 1964;

f.      Pre-judgment and post-judgment interests;

g.      Costs, expenses and reasonable attorneys' fees and litigation expenses incurred in this action pursuant to 18 U.S.C. § 1964; and

h.      Such other and further relief as the Court may deem just and proper.

Dated:   September 24, 2014

Respectfully submitted,

PORTER HEDGES LLP

By: /s/ John F. Higgins
    John F. Higgins
    State Bar No. 09597500
    John A. Irvine
    State Bar No. 10423300
    Heather K. Hatfield
    State Bar No. 24050730
    Porter Hedges LLP
    1000 Main Street, 36th Floor
    Houston, Texas  77002
    Telephone:  (713) 226-6000
    Facsimile:  (713) 228-1331
    Email:  jhiggins@porterhedges.com

    and

    HOLLAND & KNIGHT LLP
    George Mencio
    Florida Bar No. 335861
    Email:  george.mencio@hklaw.com
    Brian Briz
    Florida Bar No. 657557
    Email:  brian.briz@hklaw.com
    701 Brickell Avenue, Suite 3300
    Miami, Florida  33131
    Telephone:  (305) 374-8500
    Facsimile:  (305) 789-7799

    **ATTORNEYS FOR PLAINTIFFS**