IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| A.T.N. INDUSTRIES, INC., a Florida corporation, JIAFANG STEEL PIPES AMERICAS, INC., a Texas corporation, and JOSEPH BENOUDIZ, an individual, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.: _____ |
| MAURICIO GROSS a/k/a MAURICIO GROSS DRACH, an individual, CLARA GROSS a/k/a CLARA SCHWARTZ, an individual, VOLANSS SYSTEMS CO., LIMITED, a Hong Kong private company, BUSINESS MANAGEMENT SERVICES INT. LLC, a Texas limited liability company, SHUMIN XU a/k/a MINA XU, an individual, SEANWAY PIPE LLC, a Texas limited liability company, JIUYI TRADING CO., LIMITED, a Hong Kong private company, SHENG MIN PIPE LIMITED, a Hong Kong company, SHUTIEN (DAVID) JIN, an individual, and GULF MARITIME CO., LIMITED, a Hong Kong private company, | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

**PLAINTIFFS' MOTION FOR (1) AN EX PARTE TEMPORARY RESTRAINING ORDER; (2) LIMITED, EXPEDITED DISCOVERY; AND (3) AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED**

In accordance with Federal Rule of Civil Procedure 65, Plaintiffs, A.T.N. Industries, Inc. ("ATN"), Jiafang Steel Pipes Americas, Inc. ("Jiafang Americas"), and Joseph Benoudiz seek an ex parte temporary restraining order enjoining Defendant Mauricio Gross a/k/a Mauricio Gross Drach ("Gross"), Clara Gross a/k/a Clara Schwartz ("Clara Gross"), Volanss Systems Co., Limited ("Volanss"), and Business Management Services Int. LLC ("BMSI") (collectively, the "Gross Defendants"), and each of their officers, agents, servants, employees, and attorneys—and all other persons who are in active concert or participation with these persons or entities—from transferring or otherwise dissipating any of the millions of dollars that Gross, a former employee or agent of ATN and Jiafang Americas, defrauded from Plaintiffs from 2008 through 2014. Plaintiffs also seek leave of court to take limited, expedited discovery aimed at discovering the present location of this money. Finally, Plaintiffs seek the entry of an order to show cause why the Gross Defendants should not be preliminarily enjoined, in accordance with Rules 64 and 65, from transferring or dissipating any of the money pending the resolution of this action.

## I.      BACKGROUND

### A.      Plaintiffs ATN, Jiafang America, and Benoudiz

ATN is an international supplier of equipment and machinery to companies in the petroleum, medical, aeronautical, auto, and marine industries. *See* Decl. Nancy Mayea ¶ 5, Ex. A. ATN sources its steel pipe and steel pipe fittings from several Chinese steel manufacturers, including Shanghai Jiafang Steel Pipe (Group) Co., Ltd. ("Shanghai Jiafang"), Liaoning Northern Steel Pipe Co., Ltd. ("Liaoning"), and Huludao City Steel Pipe Industrial Co., Ltd. ("Huludao"). *See id.* ¶ 7. ATN supplies products made by these Chinese steel manufacturers, among other things, to its customers in South America. *See id.* ¶ 6. To promote the name Shanghai Jiafang and to facilitate the sale of its steel products in the Americas, Shanghai Jiafang

incorporated a Texas corporation, Jiafang Americas, in 2008, and later transferred ownership of that corporation to Pablo Cárdenas and Benoudiz. *See id.* ¶ 17. ATN, Jiafang Americas, and Benoudiz, who was personally defrauded by Gross in connection with his scheme, are the Plaintiffs in this action.

### B.    Defendant Gross

Defendant Mauricio Gross is a former employee of ATN and agent of Jiafang Americas and is the mastermind of Defendants' fraudulent scheme. In 2006 ATN hired Gross—the son-in-law of one of Benoudiz's close friends—as a sales, transport, and logistics coordinator for ATN. *See id.* ¶¶ 8–9. In that capacity, Gross acted as a liaison between ATN's suppliers in China and its customers in South America. *See id.* ¶¶ 10–11. Later, in 2008, ATN directed Gross to work as an agent for Jiafang Americas (although ATN remained Gross's employer). Although Gross initially worked at ATN's office in Miami, in May 2006 Gross moved to Houston and in late 2008 he was assigned to work for Jiafang Americas. *See id.* ¶ 19.

Gross is a Venezuelan citizen. *See id.* ¶ 15.

### C.    Gross's Fraudulent Scheme

From 2008 through 2014, while working in Houston for ATN and Jiafang Americas, Gross spearheaded an elaborate scheme designed to defraud ATN, Jiafang Americas, and Benoudiz out of millions of dollars. Gross accomplished this massive theft with the help of the other Defendants: his wife (Clara Gross); numerous non-operational paper companies (Volanss, BMSI, Seanway Pipe LLC ("Seanway Pipe"), Jiuyi Trading Co., Limited ("Jiuyi Trading"), Sheng Min Pipe Limited ("Sheng Min Pipe"), and Gulf Maritime Co., Limited ("Gulf Maritime")); and other persons who, while appearing to assist Gross in conducting legitimate

business with Chinese suppliers, were actually assisting him in the fraud (i.e., Shumin Xu a/k/a Mina Xu ("Xu") and Shutien (David) Jin ("Jin")).

The scheme's basic structure was straightforward: Gross—aided by his wife, Xu, Jin, and non-party Eduardo A. Medrano, Jiafang Americas' tax preparer—would misrepresent to Plaintiffs that money was owed to certain of Plaintiffs' suppliers, would set up Defendant-controlled bank accounts in those suppliers' names, and would cause Plaintiffs to wire money to those phony bank accounts. *See id.* ¶ 30. For years, Gross and Defendants made it appear as though money was being paid to Plaintiffs' suppliers when it was actually going to Gross or to the Defendant non-operational paper companies. On information and belief, Gross also committed invoicing fraud while working for Plaintiffs, whereby he would charge Plaintiffs significantly higher prices for the products that the customers were buying, and would remit the overcharges to himself and to Defendants. *See id.*

Until just recently, the scheme was concealed from Plaintiffs owing to the Defendants' sophisticated machinations, the substantial autonomy and trust that Gross enjoyed while working for Plaintiffs, and the high volume of business Plaintiffs conducted internationally. *See id.* ¶ 31. Although the full extent of the fraud is unknown, the following are the chief examples of the fraudulent scheme that Plaintiffs have uncovered to date.

### 1. Gulf Maritime.

In April 2008 Gross informed ATN that he was retaining a company named Gulf Maritime to handle ATN's maritime-transport needs. *See id.* ¶ 38. Gulf Maritime was not, however, a legitimate company, but rather a Hong Kong–based paper company owned or controlled by Jin—a Chinese national whom Gross persuaded ATN to retain on-the-ground to oversee the loading of cargo prior to shipment—and Xu, Jin's wife. *See id.* ¶ 39. From 2008

through 2009 Gross directed over $6,500,000 in payments from ATN to Gulf Maritime under the fraudulent representation that Gulf Maritime had provided freight and storage services to ATN. *See id.* ¶¶ 41–42. In reality, as a non-operational company, Gulf Maritime was not in any position to provide any such services. *See id.* ¶ 43.

### 2.    Huludao.

In July 2011, Gross registered for Seanway Pipe, a company managed solely by Xu, the fictitious name Huludao City Steel Pipe Industrial Co., Ltd. *See id.* ¶¶ 37, 46. Gross also set up two bank accounts in the name of Huludao. *See id.* ¶ 46. As stated, Huludao was one of ATN's principal Chinese suppliers of steel products, and Gross, as will be detailed below, created a fake Huludao account to make it appear as though Plaintiffs would pay Huludao for legitimate services or products. In truth, however, Gross, in concert with Defendants, was committing blatant fraud.

For instance, on July 2, 2012, Gross informed Benoudiz that Jiafang Americas needed to pay Huludao $574,160.70. *See id.* ¶ 47. Because Jiafang Americas did not have immediate available funds, Benoudiz—who, as close friends with Gross's father-in-law, trusted Gross— wired from one of his personal accounts the money to an account in Huludao's name at a Houston bank. *See id.* The payment did not go to the real Huludao, but to an account controlled by Gross. *See id.* In at least seven separate wire transactions throughout the fall and into the winter of 2012, Gross misdirected approximately $4,332,000 from Jiafang Americas' accounts to bank accounts controlled by Gross or BMSI, a company Gross and Clara Gross created in July 2011, in Huludao's name. *See id.* ¶¶ 48–49. For each of these payments, Gross created a paper trial designed to lead Jiafang Americas to believe these payments were for legitimate business

purposes, such as to achieve a "second milestone" or "final milestone" for a project, or "for further credit." *Id.* ¶ 50.

### 3.    Shanghai Jiafang.

Meanwhile, Gross and Defendants made it appear as though Plaintiffs were paying money to Shanghai Jiafang, which is also one of ATN's principal Chinese suppliers of steel products. *See id.* ¶ 52. In July 2011 Gross registered for BMSI the fictitious name Shanghai Jiafang Steel Pile (Group) Co., Ltd. *See id.* ¶ 34. Gross, through BMSI, also set up a bank account in Shanghai Jiafang's name. *See id.* ¶ 55. As with Huludao, Gross did this to make it seem as though money would be paid to Shanghai Jiafang for legitimate business purposes, when Gross was stealing the money for himself and Defendants. From 2012 through 2013, through at least twelve wire payments, Gross misdirected at least $12,500,000 from Jiafang Americas to the fake Shanghai Jiafang account Gross controlled. *See id.* ¶¶ 54–55. As part of this fraud, Gross and Defendants even went so far as to send an e-mail purporting to be from a Shanghai Jiafang representative to an owner of Jiafang Americas requesting a $1,300,000 payment on an invoice. *See id.* ¶ 55 n.2. This false e-mail caused Jiafang Americas to wire the $1,300,000 to the false Shanghai Jiafang bank account. *See id.*

Gross's payments directed to Shanghai Jiafang and Huludao were part of a fraudulent invoicing scheme. On information and belief, Gross, on invoices, overstated amounts owed by Jiafang Americas to its suppliers and then caused Jiafang Americas to make inflated payments to his personal or company accounts. After receiving the inflated payments from Jiafang Americas, it is believed that Gross would pay the suppliers the actual amounts due and then wire the overcharge to Volanss or to other non-operating companies controlled by Gross and Xu. *See id.* ¶ 59.

Additionally, in July and September 2012, Xu created Sheng Min Pipe and Jiuyi Trading, respectively. *See id.* ¶ 90. Neither company served any legitimate business purpose; both were created solely to receive payments from Jiafang Americas under false pretenses. *See id.* ¶ 91. Between 2012 and 2014, Gross remitted nearly ten million dollars through at least seven separate wire transfers to these non-operational companies. *See id.* ¶¶ 94–96.

### 4.    Phony Guarantee Scheme.

In October 2012 Jiafang Americas, acting through Gross, and Liaoning, a Chinese pipe supplier, entered into an agreement by which Liaoning would sell steel pipes valued at approximately $9,919,320.48 to one of Jiafang America's customers in Bolivia. *See id.* ¶¶ 62–63. In connection with this sale, the Bolivian customer required Liaoning to post a performance guarantee in the amount of $1 million. *See id.* ¶ 64. In November 2012 Gross wired or caused to be wired $1 million from Jiafang Americas' bank accounts to accounts controlled by Defendants for the ultimate purpose of funding the guarantee. *See id.* ¶¶ 65–72. Jiafang Americas, however, did not know its money had been used for the guarantee. *See id.* ¶ 73. It is unclear why Gross caused Jiafang Americas, and not Liaoning, to post the guarantee.

What is clear, however, is that after the Bolivian sale was completed, Gross, in concert with other Defendants, seized an opportunity to steal even more money from Jiafang Americas. On June 24, 2014, Gross forwarded to Benoudiz several e-mails from a purported Liaoning representative, demanding that Jiafang Americas return the $1 million to Defendant Sheng Min Pipe, which, the e-mails represented, had supposedly financed the $1 million guarantee on behalf of Liaoning. *See id.* ¶¶ 76–78. On receiving the e-mails, Benoudiz asked Gross why Jiafang Americas would be required to return the $1 million guarantee to Liaoning and not the Bolivian

customer, which had originally received the guarantee. *See id.* ¶ 79. Instead of trying to explain what happened, Gross resigned on July 1, 2014. *See id.* ¶ 80.

Later, on July 17, 2014, Gross forwarded to Jiafang Americas additional e-mails from the purported Liaoning representative, stating that if the refund would not be paid then Liaoning would take legal action. *See id.* ¶ 81. After investigating the underlying transactions and discovering that Jiafang Americas—and not Liaoning—had paid the guarantee, Benoudiz, in late July 2014, called Gross and Gross's father-in-law about what he had learned. *See id.* ¶¶ 84–85. In the face of Benoudiz's questioning, Gross's father-in-law told Benoudiz not to worry about the $1 million, to ignore the refund demands, and then hung up the phone. *See id.* ¶ 85. After that call, the refund demands stopped. *See id.* ¶ 86.

* * *

Since July 2014, investigation into Gross's activities while working for ATN and Jiafang Americas has revealed many of the details of the fraud. Although much of it is described in the Complaint, above, and in the declaration of Nancy Mayea, ATN's operations manager, Plaintiffs are still trying to uncover the full extent of the fraud and—most importantly for Plaintiffs—the ultimate destination of the many millions of dollars that Gross and Defendants stole. Plaintiffs bring this motion for a temporary restraining order and preliminary injunction in order to prevent Defendants from transferring or dissipating any of this stolen money, and also for leave of court to take limited, expedited discovery aimed at discovering the whereabouts thereof.

## II.    ARGUMENT

In accordance with Federal Rule of Civil Procedure 65, Plaintiffs seek both a temporary restraining order without notice and an order to show cause why a preliminary injunction should not be entered. Part of the relief Plaintiffs seek at the preliminary-injunction stage are, as

provided by Rule 64, certain remedies available under Texas state law. Plaintiffs will first address the relief they seek under Rule 65 and will then address the additional or alternative relief they seek under Rule 64.

### A.    Plaintiffs Are Entitled to a Temporary Restraining Order and a Preliminary Injunction

Plaintiffs seek remedies provided by Rule 65, which governs both temporary restraining orders and preliminary injunctions. The general requirements for obtaining both are the same. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) ("The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted."); *Global Healing Ctr. LP v. Nutritional Brands Inc.*, No. 4:14-CV-269, 2014 WL 585401, at *2 (S.D. Tex. Feb. 14, 2014) (stating that a "party seeking a temporary restraining order or preliminary injunction must establish" the four traditional elements). Plaintiffs will first address their request for a preliminary injunction, and will then address their request for a temporary restraining order, which contains a few, additional requirements.

To obtain a preliminary injunction, a plaintiff must establish four elements:

(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury out-weighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (alterations omitted) (internal quotation marks omitted). Plaintiffs satisfy each of these elements.

### 1.    A Substantial Likelihood of Success on the Merits

As stated, Plaintiffs have brought an eleven-count complaint against Defendants. Plaintiffs' principal claims against Defendants are brought under the Racketeer Influenced &

Corrupt Organization Act, 18 U.S.C. § 1961 *et seq*. ("RICO") and state law sounding chiefly in fraud and breach of fiduciary duty. Plaintiffs need only satisfy the substantial-likelihood-of-success-on-the-merits element for some of these claims. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378 (5th Cir. 2008) ("Even assuming *arguendo* that the [movants] have demonstrated a substantial likelihood of success on the merits on *some* and/or all of their claims ...." (emphasis added)). Further, to satisfy this "element, the plaintiff's evidence need not prove that plaintiff is entitled to summary judgment; plaintiff needs only to present a *prima facie* case, but not demonstrate that he is certain to win." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011); 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.3 (3d ed. April 2014) ("All courts agree that plaintiff must present a prima face case but need not show a certainty of winning." (footnote omitted)). Although Plaintiffs satisfy this element for all of their claims, Plaintiffs will address only their three principal claims—RICO, fraud, and breach of fiduciary duty—herein.

### a.    RICO.

"RICO creates a civil cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962.'" *Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 406 (5th Cir. 2003) (alteration in original) (quoting 18 U.S.C. § 1964(c)). To state a claim under section 1962, there must be three things: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Id.* (internal quotation marks omitted). Each of these elements is present in this case.

A "person" within the meaning of RICO "includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Calling this "a very broad definition," the Fifth Circuit has stated that a "RICO person must be one that either poses or *has*

posed a continuous threat of engaging in the acts of racketeering." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995) (emphasis added). Here, the declaration of Nancy Mayea clearly shows Defendants undoubtedly have posed a continuous threat of engaging in racketeering activity. Accordingly, the first element is satisfied.

Similarly, Plaintiffs' evidence establishes a *prima facie* case that Defendants have engaged in "a pattern of racketeering activity." *Brown*, 353 F.3d at 406. A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years … after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5); *accord Brown*, 353 F.3d at 406 ("A pattern of racketeering activity requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity." (internal quotation marks omitted)). RICO defines "racketeering activity" to include mail and wire fraud. *See* 18 U.S.C. § 1961(1).

Here, as described in the declaration of Nancy Mayea, Defendants, from 2008 through 2014, engaged in numerous acts of wire fraud. Defendants transferred millions of dollars using the wires to bank accounts under the fraudulent pretense the money would be paid to Plaintiffs' suppliers for legitimate business purposes. *See supra* Part I.C. These acts constitute wire fraud. *See* 18 U.S.C. § 1343. Plaintiffs have therefore satisfied the second element. *See Crowe*, 43 F.3d at 204 (agreeing with district court's findings that the plaintiff had adequately alleged "the existence of a pattern of racketeering activity consisting of numerous predicate acts of … wire fraud").

Last, Plaintiffs' evidence establishes a *prima facie* case of Defendants' engagement in a pattern of racketeering activity connected to "the acquisition, establishment, conduct, or control

of an enterprise." *Brown*, 353 F.3d at 406. The statute defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Crowe*, 43 F.3d at 204 ("A RICO enterprise can be either a legal entity or an association-in-fact."). The Fifth Circuit has observed the statutory definition of the word "enterprise" is "very broad." *United States v. Brown*, 555 F.2d 407, 415 (5th Cir. 1977).

Here, Gross and Clara Gross and their wholly owned companies, BMSI and Volanss, on the one hand, and Jin and Xu and their wholly owned companies, Seanway Pipe, Jiuyi Trading, Sheng Min Pipe, and Gulf Maritime, on the other hand, make up two distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4). *See* Compl. ¶¶ 134–36. Collectively, Defendants operated as an association in fact. The purpose of the enterprise was to steal money belonging to Plaintiffs under fraudulent pretenses and primarily through wire fraud. *See supra* Part I.C. Accordingly, the final element is satisfied.[1]

Based on the above, Plaintiffs have demonstrated a substantial likelihood of success on the merits on their RICO claim. *Cf. Am. Auto Guardian, Inc. v. Kramer*, No. 05 C 6404, 2008 WL 4553092 (N.D. Ill. July 8, 2008) (ruling in favor of employer's RICO claim against a former employee based on the former employee's embezzlement occurring over a four-year period).

### b.    Fraud.

Plaintiffs also meet the first requirement for their fraud claim. Under Texas law, there are six elements of fraud:

> (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew that it was false or made

---

[1] Plaintiffs also allege, in the alternative, that they themselves constituted the enterprise, as courts have recognized victims of schemes may also constitute a RICO enterprise. *See, e.g.*, *United States v. Warner*, 498 F.3d 666, 696 (7th Cir. 2007).

it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). Plaintiffs have alleged—with the requisite particularity required by Federal Rule of Civil Procedure 9(b)—each of these elements. And, through the declaration in support of this motion, Plaintiffs have established a *prima facie* case that each of these elements is satisfied, too.

First, Gross and Defendants made numerous material misrepresentations. While working for Plaintiffs, Gross and BMSI opened up fake bank accounts in the names of actual suppliers, actions designed to misrepresent that payments were being made to the actual suppliers. *See supra* Part. I.C. Gross also misrepresented that money was owed to companies such as Gulf Maritime, Huludao, and Shanghai Jiafang to pay for products or for other legitimate business purposes. *See id*. On other occasions, Gross and Defendants would fabricate e-mails purporting to be from legitimate suppliers asking for or demanding payment. *See id.* These representations, however, were false. *See id.* Thus, the first and the second elements of fraud are satisfied.

When Gross and Defendants made these false representations, moreover, they knew they were false, and they did so with the intent that Plaintiffs act on the false statements. For example, Gross and Defendants set up bank accounts in Plaintiffs' suppliers' names for the sole purpose of deceiving Plaintiffs into believing money was being wired to those suppliers. *See id.* Further, Gross and Defendants stated on wire transfers that the transfers were being made for certain stages of projects, when the transfers were not being made for that purpose. *See id.* Under Rule 9(b), Plaintiffs are required only to generally allege intent and knowledge. *See* FED. R. CIV. P. 9(b), ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.") But Plaintiffs have far surpassed that standard by having specifically alleged the

reasons why Gross and Defendants actually knew the statements they were making were false, and what their intent was in making the statements. The third and fourth elements of fraud are satisfied.

Finally, Plaintiffs acted in reliance on Defendants' misrepresentations and suffered injuries because of them. On a general level, Plaintiffs relied on Gross's representations that money was being paid to their suppliers. On a specific level—for example, by paying $1,300,000 to a Defendant-controlled bank account based on a fabricated e-mail purporting to come from a well-known supplier, or by fronting money from a personal bank account—Plaintiffs also relied on Defendants' misrepresentations. *See supra* Part I.C. And because Defendants were actually stealing this money from Plaintiffs, Plaintiffs have been severely injured. *See id.*

In sum, Plaintiffs have demonstrated a substantial likelihood of success on the merits on their fraud claim.

### c.    Breach of Fiduciary Duty.

Finally, Plaintiffs have met the substantial-likelihood-of-success element with regard to their breach-of-fiduciary-duty claim. Under Texas law, there are three elements of a breach-of-fiduciary-duty claim: "(1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in jury to the plaintiff or benefit to the defendant." *Saenz v. JP Morgan Chase Bank, N.A.*, No. 8:13-CV-156, 2013 WL 3280214, at *4 (S.D. Tex. June 27, 2013) (internal quotation marks omitted). Plaintiffs have established each of these three elements.

First, a fiduciary duty existed between Gross and Plaintiffs. Plaintiffs hired Gross because he was the son-in-law of one Benoudiz's close friends. *See supra* Part I.B. Plaintiffs also placed great trust in Gross as their employee or agent, permitting him to establish a Houston ATN

office, authorizing him to make payments on Plaintiffs' behalf, and giving him great autonomy. *See id.* These circumstances can give rise to a fiduciary duty between an employer and an employee or agent. *See Tranman, Inc. v. Griffin*, No. 3:11-cv-1046-M, 2013 WL 944502, at *7 (N.D. Tex. Mar. 12, 2013) ("Under Texas law, an employee may owe fiduciary duties to his employer when the employee has been placed in a position of peculiar confidence or trust toward the employer.").

Second, Gross breached that fiduciary duty owed to Plaintiffs. Gross used his position of trust not to further the interests of Plaintiffs, but to enrich his and Defendants' pockets. *See supra* Part I.C. Last, Plaintiffs suffered damages. *See id.*

Thus, Plaintiffs have shown a substantial likelihood of success on the merits of their breach-of-fiduciary-duty claim as well.

### 2.    A Substantial Threat of Irreparable Injury

To satisfy the second element of the preliminary-injunction standard, a movant "must demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Generally, "a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* Still, it is well-established that "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Id.* For example, a "district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." *Id.* For another, "a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the defendant

is likely to be insolvent at the time of judgment." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986) (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)).

Here, injunctive relief is needed to prevent Defendants from transferring or dissipating the many millions of dollars they stole from Plaintiffs, and which Plaintiffs seek to recover in this case. For at least four independent reasons, this threat of dissipation is real. *See Janvey*, 647 F.3d at 601 ("The party seeking a preliminary injunction must also show that the threatened harm is more than mere speculation.").

First, Defendants have international ties. Gross is a Venezuelan citizen. *See supra* Part I.B. Gross's cohorts—Jin and Xu—are Chinese nationals and are believed to be living in Canada. *See id.* And many of the Defendant paper companies—including Volanss, Jiuyi Trading, Sheng Min Pipe, and Gulf Maritime—are Hong Kong companies. *See id.* Given the Defendants' international character, the risk that Defendants would evade the Court's jurisdiction or not comply with its orders is a weighty one. In other circumstances, courts routinely cite the international character of the circumstances of a case in imposing restraints on a party. *See, e.g.*, *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990) (holding that nature and circumstances of charged offense "weigh[ed] against bail" where accusations were "of sophisticated criminal conduct, whose successful completion required the ability to travel internationally, to adapt easily to foreign countries, and to move assets and individuals quickly from one country to another").

Second, Gross and Defendants have over the years demonstrated their sophistication and ability in using the wires to transfer large amounts of money internationally and deceptively for their own gain. *See supra* Part I.C. The concern that Defendants would do so again is well-founded and based on past experience. *See Janvey*, 647 F.3d at 600 ("A showing of speculative

injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." (alteration omitted) (internal quotation marks omitted)); *Donovan*, 830 F. Supp. 2d at 227 ("Regarding the second prong, a threat of irreparable harm, the injury at issue must be actual and imminent, not speculative or remote.").

Third, Plaintiffs' request is tailored to freezing the money that Gross and Defendants obtained while Gross was working for and in connection with Plaintiffs. *See Janvey*, 647 F.3d at 600 ("[A] district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds."). Plaintiffs do not seek to freeze money necessary to provide for Gross's and Clara Gross's reasonable living expenses during this action.

Last, Plaintiffs seek, in part, equitable remedies, such as the imposition of a constructive trust and a resulting trust. *See* Compl. pp. 39–40. If Defendants dissipate the money, Plaintiffs' equitable remedies will be rendered moot. *See Janvey*, 647 F.3d at 601 ("If the defendants were to dissipate or transfer these assets out of the jurisdiction, the district court would not be able to grant the effective remedy, either in equity or in law, that the Receiver seeks."); *see also Productos Carnic v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980) ("By showing that [the defendant] intended to frustrate any judgment on the merits, the Judge was entitled to conclude that [the plaintiff] undoubtedly had shown potential irreparable injury."); *cf. Rio Bravo Produce, Ltd. v. Superior Tomato-Avocado, Ltd.*, No. SA-11-CA-1126-XR, 2011 WL 6938450, at *3 (W.D. Tex. Dec. 30, 2011) ("Trust dissipation can satisfy this factor if, absent injunctive relief, ultimate recovery is rendered unlikely." (citing *Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 141 (3d Cir. 2000))). Additionally, Gross himself received only a modest salary while working for Plaintiffs, and there is no reason

to believe any of the Defendant non-operational paper companies has any assets beyond what Gross stole from Plaintiffs. *See supra* Part I.B–C. Defendants' precarious financial position, which would frustrate any judgment, further underscores the substantial threat of irreparable injury. *See Teradyne*, 797 F.2d at 52.

For these reasons, there is a substantial threat of irreparable injury if the injunction is not entered.

### 3.    The Threatened Injury Outweighs the Threatened Harm

This element "involves an evaluation of the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied." WRIGHT ET AL., *supra*, § 2948.2. Here, Plaintiffs are seeking to prevent Gross and Defendants from transferring or dissipating the money Defendants stole from Plaintiffs. If Gross and Defendants transfer or dissipate this money, Plaintiffs will effectively be left without a remedy. On information and belief, apart from the stolen money, Defendants— largely international in character—would not have the resources to satisfy any judgment entered against them. *See supra* Part I.B–C. Conversely, maintaining the status quo pending the resolution of this action would not harm Defendants because the money sought to be frozen is traceable entirely to Defendants' scheme, and because Gross and Clara Gross would have access to money sufficient to provide for reasonable living expenses. Accordingly, this factor weighs in favor of Plaintiffs.

### 4.    Granting the Preliminary Injunction Will Not Disserve the Public Interest

Finally, granting the preliminary injunction will not disserve the public interest. Gross's and Defendants' conduct was criminal, and providing a remedy to uphold the law is in the public interest. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957) (noting "the public interest in

effective law enforcement"); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553 ¶ 35 (S.D. Tex. 2014) ("[I]t is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law.").

### 5.    No Security Should Be Required

Rule 65(c) states that the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the Fifth Circuit, the amount can be nothing. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (footnote omitted) (internal quotation marks omitted)); *Donovan*, 830 F. Supp. 2d at 235 ("The Fifth Circuit has held that courts in this Circuit have the discretion to issue injunctions without security.").

The Court should not require any security to be posted. Plaintiffs are the victims of Defendants' fraudulent scheme, and seek only to recover *their own money*. In this circumstance, Plaintiffs submit the Court should use its considerable discretion in ordering that no security be posted.

### 6.    Temporary Restraining Order

The Court "may issue a temporary retraining order without written or oral notice to the adverse party or its attorney only if" "specific facts in an affidavit … clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b). Ex

parte temporary restraining orders are "indispensable" to an action when they provide "the sole method of preserving a state of affairs in which the court can provide effective final relief." *In re Vuitton et Fils S.A.*, 606 F.2d 1, 3 (2d Cir. 1979). Courts may enter temporary restraining orders ex parte "when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened. In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all." *Id.*; *see also First Technology Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) ("There is … another limited circumstance for which the district court may proceed ex parte: where notice to the defendant would render fruitless further prosecution of the action."). A temporary restraining order "should be limited to preserving the status quo only as long as necessary to hold a preliminary injunction hearing." *Rio Bravo Produce*, 2011 WL 6938450, at *2; WRIGHT ET AL., *supra*, § 2951 ("The [temporary restraining] order is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction and may be issued with or without notice to the adverse party.").

Because Plaintiffs have satisfied these requirements, a temporary restraining order should be entered. For all the reasons stated, Plaintiffs have a serious, cogent, and legitimate concern that if Gross and Defendants are notified of this action before a temporary restraining order is entered, Gross and Defendants will immediately seek to transfer or further dissipate the money. *See* Decl. George Mencio ¶ 3(a)–(b), Ex. B.[2] In this regard, Plaintiffs emphasize that Gross has shown he, in concert with the other Defendants, have gone to great lengths to conceal their massive fraud from Plaintiffs. *See id.* ¶ 3(b). Given Gross's and Defendants' history of stealing Plaintiffs' money and transferring it, Plaintiffs have good grounds to believe that Gross and

---

[2] As required by Rule 65(b)(1)(B), Plaintiffs' attorney George Mencio has certified in writing the reasons why notice should not be required.

Defendants would further seek to do so if notified. *See Depinet*, 11 F.3d at 651 ("The applicant must support such assertions by showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history."). Finally, if Gross and Defendants were to transfer or dissipate any of the stolen money, then any judgment entered against them would be frustrated, because the evidence shows that Defendants would likely not be able to satisfy it from other sources. *See* Decl. Mencio ¶ 3(c); *see also Depinet*, 11 F.3d at 650 (stating that a "district court may proceed ex parte" "where notice to the defendant would render fruitless further prosecution of the action"); *Vuitton et Fils*, 606 F.2d at 3 (similar). In these circumstances, the entry of an ex parte temporary restraining order is warranted.[3] *See also supra* Part II.A.2.

Additionally, Plaintiffs seek leave of court to take limited, expedited discovery, which the Court in its discretion may grant. *See* FED. R. CIV. P. 26(d)(1) ("A party may not seeking discovery from any source before the parties have conferred … except … when authorized by … court order."). Plaintiffs seek to serve subpoenas duces tecum on Gross's and Defendants' known bank accounts in order to determine the location of the stolen money. These include Comerica Bank, Compass Bank, Cathay Bank, Standard Chartered, and HSBC. This information will allow Plaintiffs not only to determine the location of and to trace the stolen money, but it will inform Plaintiffs whether additional actions should be brought and, if so, where. Plaintiffs also seek leave of court to depose non-parties Medrano and Medrano Administrative & Tax Services, LLC, who, as stated, assisted Gross and Xu in creating certain of the non-operational paper companies. Medrano's deposition will also assist Plaintiffs in their endeavor. Because this

---

[3] Plaintiffs emphasize that although it is believed that Gross's fraud first started to occur in 2008 and although Gross no longer works for Plaintiffs, Plaintiffs only recently discovered Gross's fraud and have been working diligently in investigating the extent thereof. *See* Decl. Mayea ¶¶ 24–31.

discovery may prevent Gross and Defendants from further transferring or dissipating the money, good cause exists to grant this relief. *See St. Louis Grp., Inc. v. Metals & Additives Corp., Inc.*, 275 F.R.D. 236, 240 (S.D. Tex. 2011) ("[C]ourts have granted expedited discovery requests when there is some showing of irreparable harm that can be addressed by limited, expedited discovery." (collecting decisions)).

### B.  Plaintiffs Are Entitled to an Attachment and Injunction Under State Law

Plaintiffs also request, at the preliminary-injunction stage, the entry of additional or alternative remedies available under Texas state law. Rule 64 provides that "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." FED. R. CIV. P. 64(a). Available remedies include "attachment" and "other corresponding or equivalent remedies." *Id.* 64(b). Based on the fraudulent acts set forth above, Plaintiffs' Complaint includes a count for violating the Texas Uniform Fraudulent Transfer Act (the "Act"). Specifically, Plaintiffs have alleged— and the evidence submitted with this motion shows—that Gross transferred money belonging to Plaintiffs to his personal bank accounts, to accounts held by BMSI and Volanss, and to accounts held by other Defendants with the actual intent to hinder, delay, or defraud Plaintiffs. *See* Compl. ¶ 187; *see also supra* Part I.C. Thus, Plaintiffs have shown that Gross violated the Act. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) ("A transfer made … by a debtor is fraudulent as to a creditor … if the debtor made the transfer … with actual intent to hinder, delay, or defraud any creditor of the debtor").

The Act provides that in "an action for relief against a transfer or obligation, a creditor … may obtain," among other things, "an attachment or other provisional remedy against the asset transferred or other property of the transferee," "an injunction against further disposition by the

debtor or a transferee, or both, of the asset transferred or of other property," and "any other relief the circumstances may require." *Id.* § 24.008(a). As provided by the Act, which applies to this action by reason of Rule 64, Plaintiffs therefore request that the Court, at the preliminary-injunction stage, enter an order (1) attaching any and all money that Gross stole from Plaintiffs and (2) enjoining Gross, BMSI, and Volanss, as well as their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of them, from further disposition of any and all money that Gross stole from Plaintiffs.

## III.    PRAYER

For the reasons set forth above, Plaintiffs request (1) the immediate ex parte entry of a temporary restraining order; (2) leave of court to take limited, expedited discovery; (3) a hearing on the motion for preliminary injunction at the earliest possible time, as required by Rule 65(b)(3), for the Gross Defendants to show cause why preliminary injunction should not be entered; and (4) grant such other relief as may be just and proper. A copy of a proposed temporary restraining order, providing for the requested relief, is attached as Exhibit C.

Dated:  September 24, 2014

Respectfully submitted,

PORTER HEDGES LLP


By: /s/ John F. Higgins
     John F. Higgins
     State Bar No. 09597500
     John A. Irvine
     State Bar No. 10423300
     Heather K. Hatfield
     State Bar No. 24050730
     Porter Hedges LLP
     1000 Main Street, 36th Floor
     Houston, Texas  77002
     Telephone:  (713) 226-6000
     Facsimile:  (713) 228-1331
     Email:  jhiggins@porterhedges.com

     and

     HOLLAND & KNIGHT LLP
     George Mencio
     Florida Bar No. 335861
     Email:  george.mencio@hklaw.com
     Brian Briz
     Florida Bar No. 657557
     Email:  brian.briz@hklaw.com
     701 Brickell Avenue, Suite 3300
     Miami, Florida  33131
     Telephone:  (305) 374-8500
     Facsimile:  (305) 789-7799

     **ATTORNEYS FOR PLAINTIFFS**