IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| A.T.N. INDUSTRIES, INC., a Florida corporation, JIAFANG STEEL PIPES AMERICAS, INC., a Texas corporation, and JOSEPH BENOUDIZ, an individual, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No.: _____ |
| MAURICIO GROSS a/k/a MAURICIO GROSS DRACH, an individual, CLARA GROSS a/k/a CLARA SCHWARTZ, an individual, VOLANSS SYSTEMS CO., LIMITED, a Hong Kong private company, BUSINESS MANAGEMENT SERVICES INT. LLC, a Texas limited liability company, SHUMIN XU a/k/a MINA XU, an individual, SEANWAY PIPE LLC, a Texas limited liability company, JIUYI TRADING CO., LIMITED, a Hong Kong private company, SHENG MIN PIPE LIMITED, a Hong Kong private company, SHUTIEN (DAVID) JIN, an individual, and GULF MARITIME CO., LIMITED, a Hong Kong private company, | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## DECLARATION OF NANCY MAYEA

I, Nancy Mayea, declare, certify and verify under penalty of perjury that the statements that follow are true and correct and based on my personal knowledge or review of the corporate and business records belonging to A.T.N. Industries, Inc. and Jiafang Steel Pipes Americas, Inc.:

1.     I am over the age of eighteen and am competent to give this declaration.

# EXHIBIT A

*Personal Background*

2.      I am the Operations Manager at A.T.N. Industries, Inc. ("ATN"), a Florida corporation headquartered in Miami, Florida.

3.      I have been employed with ATN since 2004 and have worked in ATN's Miami headquarters throughout my entire employment with the company.

4.      As Operations Manager, my responsibilities include but are not limited to: bookkeeping, payroll, finalizing bids to customers, project assignment, opening and managing corporate bank accounts, managing special projects, and applying for credit terms with key vendors.  In January 2014, I took over the same responsibilities for Jiafang Steel Pipes Americas, Inc. ("Jiafang Americas"), a company that, as explained below, is managed by ATN.

*A.T.N. Industries, Inc.*

5.      Founded in Miami, Florida in 1994, ATN is an international supplier of industrial equipment and machinery for various industries, including for the petroleum, medical, aeronautical, auto and marine industries.

6.      ATN operates as a procurement arm for Consorcio Pentamat, C.A. ("Pentamat"), a Venezuelan holding company, and purchases and sells equipment and machinery in U.S. Dollars primarily to customers in South America.  Pentamat is owned by Joseph Benoudiz ("Mr. Benoudiz") and Pablo Cardenas ("Mr. Cardenas").

7.      As it relates to the petroleum industry, ATN has conducted business with several manufacturers that fabricate steel pipes and steel pipe fittings for transporting water, gas and petroleum.  Included among those manufacturers are Shanghai Jiafang Steel Pipe (Group) Co., Ltd. ("Shanghai Jiafang"), Liaoning Northern Steel Pipe Co., Ltd. ("Liaoning"), Tiajin Pipe

(Group) Corporation, and Huludao City Steel Pipe Industrial Co., Ltd. ("Huludao"), all four of which are located in the People's Republic of China.

***Mauricio Gross Drach***

8.    On March 5, 2006, ATN hired Mauricio Gross Drach ("Mr. Gross") as a Sales Coordinator for ATN's petroleum division in Miami, Florida.

9.    From what I understand based on my discussions with Mr. Benoudiz and Mr. Cardenas, Mr. Gross is the son-in-law of Rafael Schwartz ("Mr. Schwartz"), a close friend of Mr. Benoudiz, and he came highly recommended as very experienced in transportation and logistics.

10.    In his role as the Sales Coordinator and person in charge of transportation and logistics for the petroleum division of ATN, Mr. Gross was introduced to several of ATN's suppliers and he was specifically assigned to work with Shanghai Jiafang, Liaoning, Huludao, and other steel pipe manufacturers.

11.    Mr. Gross' primary responsibilities at ATN included working with petroleum equipment and machinery manufacturers and vendors and vetting those suppliers on quality, pricing, and lead time.

12.    Mr. Gross was also responsible for managing ATN's supplier relationships and coordinating logistics for the shipment of goods.  When one of Pentamat or ATN's petroleum industry customers would request a bid for equipment or machinery, Mr. Gross was tasked with sourcing the product and coordinating transport.

13.    Mr. Gross was authorized by ATN to enter into purchasing agreements with suppliers and to make the necessary transportation arrangements with shipping and logistics companies.

14.     In return for his services, ATN provided Mr. Gross with a bi-weekly salary and Mr. Gross was also eligible to receive performance bonuses.  At the time of his departure in July 2014, Mr. Gross was receiving a bi-weekly salary of $2,238.31 and a $3,000.00 monthly consulting fee.

15.     Mr. Gross and his wife, Clara Schwartz ("Mrs. Schwartz"), both reside in Houston, Texas.  Mr. Gross is a Venezuelan citizen.

***Establishment of Houston Office and Incorporation of Jiafang Steel Pipes Americas, Inc.***

16.     In early 2006, ATN authorized Mr. Gross to establish an office in Houston to better service ATN's customers in the petroleum industry.  The Houston office opened on May 1, 2006.

17.     On December 17, 2008, Shanghai Jiafang, one of ATN's key steel pipe suppliers, incorporated Jiafang Steel Pipes Americas, Inc. ("Jiafang Americas") in Houston, Texas, to facilitate the sale of steel pipes and pipe fittings to ATN's customers in South America, and to help promote Shanghai Jiafang's name in the Americas.

18.     At or about the same time, Shanghai Jiafang transferred management control of Jiafang Americas to ATN.  Shanghai Jiafang also transferred ownership of the new company to Messrs. Benoudiz and Cardenas.  Jiafang Americas and Pentamat are affiliate companies and ATN manages purchases for both.

19.     Once Jiafang Americas came under management of ATN, Mr. Gross was assigned to oversee the affairs of Jiafang Americas, although Mr. Gross remained an employee of ATN.

20.     Mr. Gross managed Jiafang Americas from ATN's Houston office.

21.     Other than his secretary, Mr. Gross was the lone employee in ATN's Houston office for the majority of the time that he worked for ATN.

22.     After ATN took management control of Jiafang Americas, ATN and Jiafang Americas authorized Mr. Gross to open and manage Jiafang Americas' corporate bank accounts, to negotiate and enter into agreements on behalf of the company, and to process payments on behalf of the company.

23.     ATN and Jiafang Americas placed their trust in Mr. Gross and provided him unfettered access to Jiafang Americas' bank accounts until January 2014, when Mr. Gross began working from home.  At that time, I took over the management of Jiafang Americas' corporate bank accounts.

*The Investigation*

24.     Mr. Gross abruptly resigned from ATN in July 2014 when the company began asking questions concerning a questionable payment (explained below) that he was attempting to extract from Jiafang Americas.

25.     Following his resignation, I was tasked with investigating Mr. Gross' conduct, and specifically, his management of Jiafang Americas' funds, and the tens of millions of dollars in payments that he caused to be made from ATN and Jiafang Americas to certain companies.

26.     My investigation is still ongoing and has been hampered by the fact that Mr. Gross was the sole high ranking ATN executive in Houston and his personal assistant was terminated from the company in January 2014.  Moreover, before or upon his departure from ATN, Mr. Gross apparently destroyed or removed most of ATN and Jiafang Americas' documentation relating to its transactions with vendors and suppliers that Mr. Gross managed.

27.     Because Mr. Gross apparently used ATN's virtual Panama office as the mailing address for several of his bank accounts, after his departure from ATN, I received a bank statement for an account that Mr. Gross maintained at Standard Chartered in Hong Kong, and a terms and conditions letter from an account belonging to a company named Volanss Systems Co., Limited ("Volanss") maintained at HSBC in Hong Kong.  Copies of the Standard Chartered bank statement and the envelope from HSBC directed to Volanss are attached as **Composite Exhibit 1**.  As explained below, Mr. Gross is the sole owner and director of Volanss.

28.     I was surprised to find these documents, and even more surprised to learn that Mr. Gross had HK$ 6,217,295 (approximately US$ 800,000 by my calculation) deposited his account with Standard Chartered in Hong Kong, especially because the amount in the account exceeded the amount that he had been paid by ATN (his lone employer) during his eight-year period with the company.

29.     My investigation led me to conclude that Mr. Gross, with the assistance of others, misdirected and stole millions of dollars from ATN and Jiafang Americas between 2008 and 2014.

30.     Specifically, Mr. Gross, with the participation of his wife, and with the assistance of Shumin Xu a/k/a Mina Xu ("Mrs. Xu") and Shutien (David) Jin ("Mr. Jin), would make misrepresentations that payments were owed to certain of ATN or Jiafang Americas' suppliers, and he would then make payments to bank accounts that he or his accomplices controlled in the name of those suppliers, but the funds, or at least a portion of the funds, were going to Mr. Gross and his accomplices instead.  For years, Mr. Gross made it appear as though money was being paid to actual ATN or Jiafang Americas' suppliers when instead the payments were going to himself or to non-operational "paper" companies that his accomplices had created.  In addition,

for years Mr. Gross would make it appear as though payments were being made to Jiafang Americas' legitimate suppliers when instead the payments were going to bank accounts that were maintained in the names of Jiafang Americas' suppliers, but controlled by Mr. or Mrs. Gross or their company, Business Management Services Int. LLC ("BMSI").

31.     Mr. Gross was able to conceal this fraudulent wrongdoing from ATN and Jiafang Americas, and from its principals, Mr. Benoudiz and Mr. Cardenas, because they placed great trust in Mr. Gross and allowed him substantial autonomy to manage Jiafang Americas' affairs. Thus, due to the sophisticated nature of his wrongful conduct, and because of the high volume of business that ATN and Jiafang Americas engaged in during the relevant time period, Mr. Gross was able to conceal his conduct until I took over management of Jiafang Americas' bank accounts and red flags began to appear.

***The Non-Operational Paper Companies***

32.     My investigation focused on several companies including BMSI, Volanss, Seanway Pipe LLC ("Seanway Pipe"), Jiuyi Trading Co., Limited ("Jiuyi Trading"), Sheng Min Pipe Limited ("Sheng Min Pipe"), and Gulf Maritime Co., Limited ("Gulf Maritime").

33.     Reviewing public records made available online by the Texas Secretary of State and by the Companies Registry of The Government of Hong Kong Special Administrative Region, I was able to identify the owners and directors or managers of the aforementioned companies.

34.     BMSI, I learned, is a Texas limited liability company that is based in Katy, Texas, and that belongs to Mr. and Mrs. Gross, who also serve as BMSI's managers.  A copy of BMSI's Certificate of Formation is attached as **Exhibit 2**.  I was already familiar with BMSI because that was the company that Mr. Gross asked that his performance bonuses should be paid to.  Neither I

nor ATN were aware that BMSI was engaged in any other business.  On July 7, 2011, BMSI registered "Shanghai Jiafang Steel Pipe (Group) Co., Ltd." as a fictitious name.  A copy of Harris County Clerk Assumed Names search results for BMSI is attached as **Exhibit 3**.  Neither I nor ATN were aware that BMSI had registered the name of Shanghai Jiafang, one of Jiafang Americas' primary suppliers, as its own.

35.    Volanss, I learned, is a Hong Kong private company that belongs to Mr. Gross. He is the sole owner and director of Volanss.  A copy of Volanss' 2013 Annual Report is attached as **Exhibit 4**.  Mr. Gross incorporated Volanss on December 31, 2008.

36.    Likewise, I learned that Jiuyi Trading, Sheng Min Pipe and Gulf Maritime are also Hong Kong private companies and that the three companies are solely owned by Mrs. Xu and maintain the same corporate address as Volanss.  Copies of the Certificate of Incorporation and 2014 Annual Report for Jiuyi Trading; the Incorporation Form, Notification of Change of Secretary and Director and 2013 Annual Report for Sheng Min Pipe; and the Notification of Change of Secretary and Director and 2014 Annual Report for Gulf Maritime are attached as **Composite Exhibit 5, 6 and 7**, respectively.  Mrs. Xu is also the sole director for the three companies, although Mr. Jin was the sole owner and director of Gulf Maritime until August 23, 2008, when he transferred the company to Mrs. Xu.  Mrs. Xu incorporated Sheng Min Pipe and Jiuyi Trading on July 10 and September 10, 2012, respectively.

37.    Finally, Seanway Pipe is a Texas limited liability company created on July 5, 2011 that is solely managed by Seanway Pipe Co., Ltd.  A copy of Texas Secretary of State Business Organization Inquiry results for Seanway Pipe is attached as **Exhibit 8**.  Seanway Pipe Co., Ltd. is a United Kingdom private company created by Mrs. Xu on November 22, 2010.  A copy of Seanway Pipe Co., Ltd.'s Certificate of Incorporation is attached as **Exhibit 9**.  Mrs. Xu

is the sole owner and director of Seanway Pipe Co., Ltd. Seanway Pipe maintains the same corporate address as BMSI. On July 7, 2011, Seanway Pipe registered "Huludao City Steel Pipe Industrial Co., Ltd." as a fictitious name for the company with Mr. Gross signing the application for the name registration. A copy of Harris County Clerk Assumed Names search results for Huludao is attached as **Exhibit 10**. Neither I nor any of the plaintiffs in this action were aware that Seanway Pipe had registered the name of Huludao, one of Jiafang Americas' primary suppliers, as its own.

### *The Fraudulent Payments to Gulf Maritime*

38.     In or about April 2008, Mr. Gross informed ATN that he was retaining Gulf Maritime to handle ATN's maritime transport needs. At that time, Mr. Gross represented that Gulf Maritime was a reputable transport company with global operations. Although there is an established company by that name engaged in maritime transport services, this is not the Gulf Maritime that Mr. Gross was suggesting we use.

39.     Gulf Maritime is a company based in Hong Kong that, as explained above, was solely owned and controlled by Mr. Jin and subsequently transferred to Mrs. Xu in August 2008. I have researched Gulf Maritime and have concluded that it is a non-operational company with no legitimate operations. The company does not have a website, does not advertise or market any services, and there is absolutely no information available regarding the company other that its ownership records described above. There is, however, a legitimate transport and logistics company named Gulf Maritime Co. based out of Kuwait that bears no relation to Gulf Maritime.

40.     ATN and Mr. Benoudiz were not aware of the fact that Gulf Maritime was merely a paper company.

41.     Based on my review of ATN's bank records, I concluded that Mr. Gross misdirected over $6,500,000 from ATN to Gulf Maritime in eleven transactions between April 22, 2008 and July 2, 2009.

42.     Specifically, ATN made the following fraudulent payments to Gulf Maritime via wire transfers on the following dates:

    a.  On April 22, 2008, Mr. Gross directed a payment of $27,708 from ATN to Gulf Maritime;

    b.  On July 25, 2008, Mr. Gross directed a payment of $51,993 from ATN to Gulf Maritime;

    c.  On August 5, 2008, Mr. Gross directed a payment of $408,106.50 from ATN to Gulf Maritime;

    d.  On August 21, 2008, Mr. Gross directed a payment of $186,212.50 from ATN to Gulf Maritime;

    e.  On August 22, 2008, Mr. Gross directed a payment of $233,971.20 from ATN to Gulf Maritime;

    f.  On February 18, 2009, Mr. Gross directed a payment of $166,275 from ATN to Gulf Maritime;

    g.  On March 17, 2009, Mr. Gross directed a payment of $800,000 from ATN to Gulf Maritime;

    h.  On March 18, 2009, Mr. Gross directed a payment of $800,000 from ATN to Gulf Maritime;

    i.  On May 12, 2009, Mr. Gross directed a payment of $1,600,000 from ATN to Gulf Maritime; and

j.    On June 24, 2009, Mr. Gross directed a payment of $2,242,812.90 from ATN to Gulf Maritime.

43.    Based on my investigation to date and knowing now that Gulf Maritime was a non-operational company, I strongly suspect and do not believe that Gulf Maritime was in a position to provide the freight and logistics services that it and Mr. Gross claimed it was providing.[1]  I believe that this non-operating paper company was rather used by Mr. Gross and Ms. Xu as a vehicle to extract significantly marked-up charges for transportation and logistic services rendered by others seemingly unaffiliated with the fraud.

44.    Upon further investigation I recently learned that Gulf Maritime was owned and controlled by Mr. Jin, a Chinese national who resides in Vancouver and that we retained at the urging of Mr. Gross to act on-the-ground to oversee that the loading of cargo prior to shipment. Unbeknown to me and the plaintiffs in this action, following my recent investigation, I learned that Mr. Jin transferred ownership of the company to Mrs. Xu in August 2008, at or shortly before the time that we retained his services, apparently to hide his interest in the company from us.  Mrs. Xu, we have recently learned, is the wife of Mr. Jin.

***The Fraudulent Invoicing Scheme***

**Invoicing Fraud Involving Huludao**

45.    Huludao is a Chinese steel pipe manufacturer that Jiafang Americas contracted with for the supply of steel pipes.

---

[1] On February 13, 2013, Mr. Gross also induced Messrs. Benoudiz and Cardenas to each wire $775,000 to Gulf Maritime, misrepresenting that a payment of $1.5 million was immediately due and that Jiafang Americas lacked the funds in its accounts.  Moreover, on February 14, 2013 and March 19, 2013, he directed payments of $454,075.88 and $440,000, respectively, via wire transfer from Jiafang Americas to Gulf Maritime.  Like with ATN, because Gulf Maritime was a non-operational company, I strongly suspect and do not believe that Gulf Maritime was in a position to provide the freight and logistics services that it and Mr. Gross claimed it provided to Jiafang Americas.

46.     As explained above, Mrs. Xu's company, Seanway Pipe, registered Huludao as a fictitious name for the company in July 2011.  *See* **Exhibit 10**.  Sometime thereafter, Mr. Gross opened bank accounts under Huludao's name with Compass Bank and Cathay Bank in Houston. Neither I nor ATN were aware that Seanway Pipe had registered Huludao's name as its own, or that Mr. Gross opened bank accounts for the phony Huludao in Houston.

47.     On July 2, 2012, Mr. Gross informed Mr. Benoudiz via email that Jiafang Americas was in need of funds to make a payment to Huludao in the amount of $574,160.70. Because Jiafang Americas lacked the funds at the time to make the purported payment, Mr. Benoudiz immediately wired the funds from one of his personal accounts to an account in Huludao's name maintained at Compass Bank in Houston ("Gross Compass Account 8958").[2]  A copy of July 2, 2012 swift confirmation sent via email is attached as **Exhibit 11**.  Unbeknownst to Mr. Benoudiz or ATN, although the bank account was in Huludao's name, the account was managed or co-managed by Mr. Gross.

48.     Based on my review of Jiafang Americas' bank records, I concluded that Mr. Gross also misdirected over $4,300,000 in seven wire transactions from Jiafang Americas' bank accounts to bank accounts belonging to Mr. Gross or to BMSI.  For each transaction, Mr. Gross led Jiafang Americas and ATN to believe that it was paying Huludao for product, when instead the funds were going to phony bank accounts maintained by Mr. Gross or by BMSI in Huludao's name in Houston.

49.     Specifically, Mr. Gross directed the following fraudulent payments on the following dates:

---

[2] All bank accounts referenced herein are referenced by the last four digits of the account.

a. On August 2, 2012, Mr. Gross initiated a wire transfer wherein he transmitted $500,000 from Jiafang Americas' Compass Bank account ("JA Compass Account 8532") to Gross Compass Account 8958;

b. On August 20, 2012, Mr. Gross wired $597,269.26 from JA Compass Account 8532 to Gross Compass Account 8958;

c. On November 1, 2012, Mr. Gross wired $210,015.60 from JA Compass Account 8532 to a BMSI account maintained in Huludao's name at Cathay Bank in Houston ("BMSI Cathay Account 8254");

d. On November 8, 2012, Mr. Gross wired $1,000,000 from JA Compass Account 8532 to Gross Compass Account 8958;

e. On December 19, 2012, Mr. Gross wired $2,024,944.06 from Jiafang Americas' Chase Bank account ("JA Chase Account 3570") to Gross Compass Account 8958;

f. On December 26, 2012, Mr. Gross wired $167,446.46 from JA Chase Account 3570 to BMSI Cathay Account 8254; and

g. On December 27, 2012, Mr. Gross wired $262,553.54 from JA Chase Account 3570 to Gross Compass Account 8958.

50.    Given that the eight aforementioned payments totaling $4,906,389.62 were transmitted to accounts in Huludao's name, based on the machinations of Mr. Gross, Mrs. Gross, Mrs. Xu, and their respective companies, BMSI and Seanway Pipe, we were misled to believe that the funds were transmitted to Huludao to pay for product and were unaware that the funds were instead transmitted to accounts belonging to Mr. Gross, BMSI or Seanway Pipe.  For example, the reference line for the August 2, 2012 wire transfer indicated that the payment was

for an "advance payment" for the "second milestone" for a project that Jiafang Americas was working on in Venezuela, and the reference lines for the August 20, 2012 and November 8, 2012 wire transfers indicated that the payments were for the "final milestone" and "for further credit" with respect to the same project.

51.    Unfortunately, I have to date been unable to uncover exactly what Mr. Gross and his accomplices did with the funds that Mr. Gross misdirected to the phony Huludao accounts; however, Mr. Gross was only authorized to pay real vendors and suppliers with Jiafang Americas' funds.

**Invoicing Fraud Involving Shanghai Jiafang**

52.    In July 2011, at the same time that Mr. and Mrs. Gross incorporated BMSI, and at the same time that Seanway Pipe registered the Huludao fictitious name, Mr. and Mrs. Gross registered "Shanghai Jiafang Steel Pipe (Group) Co., Ltd." as a fictitious name for BMSI.  *See* **Exhibit 3**.  They did this, I recently learned, to defraud Jiafang Americas into making payments to BMSI while believing it was making payments directly to Shanghai Jiafang, its Chinese steel pipe manufacturer.

53.    As part of this scheme, Mr. or Mrs. Gross opened a BMSI bank account with Comerica Bank in Houston under the fictitious Shanghai Jiafang name in order to misdirect payments from Jiafang Americas to BMSI rather than to the real Shanghai Jiafang.

54.    From my review of Jiafang Americas' bank records, I confirmed that between 2012 and 2013, Mr. Gross misdirected over $12,500,000 via eleven wire transactions from Jiafang Americas to BMSI.  For each transaction, Mr. Gross led Jiafang Americas to believe that it was paying Shanghai Jiafang for product, when instead the funds were going BMSI's phony account in Shanghai Jiafang's name at Comerica Bank in Houston.

55. Specifically, Mr. Gross directed the following fraudulent payments on the following dates:

a. On September 6, 2012, Mr. Gross initiated a wire transfer in the amount of $2,362,426.15 from JA Chase Account 3570 to BMSI's Comerica account in Houston ("BMSI Comerica Account 0549"), which was an account that was fraudulently maintained by BMSI in the name of Shanghai Jiafang, the fraudulent fictitious name that BMSI registered in 2011;

b. On November 1, 2012, Mr. Gross wired $500,000 from Jiafang Americas' Chase account in Houston ("JA Chase Account 8080") to BMSI Comerica Account 0549;

c. On December 19, 2012, Mr. Gross wired $2,047,455.94 from JA Chase Account 3570 to BMSI Comerica Account 0549;

d. On January 22, 2013, Mr. Gross wired $1,700,000 from JA Chase Account 3570 to BMSI Comerica Account 0549;

e. On March 21, 2013, Mr. Gross caused $1,300,000 to be wired from JA Chase Account 3570 to BMSI Comerica Account 0549;[3]

f. On April 4, 2013, Mr. Gross caused $66,000 to be wired from JA Chase Account 3570 to BMSI Comerica Account 0549;

---

[3] With respect to this transaction, on March 3, 2013, Mr. Gross forwarded an email to Mr. Benoudiz from someone purporting to be Xi Feng Hua a/k/a Fletcher Xi, Shanghai Jiafang's Manager of International Business Department. A copy of the email is attached as **Exhibit 12**. Clearly, Mr. Gross fabricated or doctored the email as the email contained wire transfer instructions for the payment of a purported invoice in the amount of $1,300,000 to Shanghai Jiafang, but the email directed payment not to Shanghai Jiafang, but to BMSI Comerica Account 0549.

g.  On April 12, 2013, Mr. Gross caused $1,500,000 to be wired from JA Chase Account 8080 to BMSI Comerica Account 0549;

h.  On April 26, 2013, Mr. Gross caused $1,000,000 to be wired from JA Chase Account 8080 to BMSI Comerica Account 0549;

i.  On May 9, 2013, Mr. Gross caused $700,000 to be wired from JA Chase Account 8080 to BMSI Comerica Account 0549;

j.  On September 3, 2013, Mr. Gross wired $1,000,000 from JA Chase Account 8080 to BMSI Comerica Account 0549; and

k.  On November 4, 2013, Mr. Gross wired $450,000 from JA Chase Account 3570 to BMSI Comerica Account 0549.

56.    Given that the eleven aforementioned payments totaling over $12,500,000 were transmitted to accounts in Shanghai Jiafang's name, based on the machinations of Mr. Gross, Mrs. Gross, and BMSI, Jiafang Americas was misled to believe that the funds were transmitted to Shanghai Jiafang to pay for product and was unaware that the funds were instead transmitted to accounts belonging to BMSI.

57.    To date, I have been unable to uncover exactly what Mr. Gross and his accomplices did with the funds that Mr. Gross misdirected to BMSI; however, Mr. Gross was not authorized to transfer any funds to accounts maintained in his name or in BMSI's name, and he was only authorized to pay real vendors and suppliers with Jiafang Americas' funds.

58.    In my search for documents, however, I was able to locate account statements for BMSI Comerica Account 0549 for the months of May 2012 through December 2012, when four of the aforementioned transactions took place.  Copies of May 29, 2012 through December 31, 2012 BMSI Comerica Account 0549 statements are attached as **Composite Exhibit 13**.

59.     Those statements reconfirmed what I already learned from reviewing Jiafang Americas' bank records, but also showed what Mr. or Mrs. Gross did with the funds once they were received by BMSI.  Specifically, after Mr. Gross wired $2,362,426.15 from JA Chase Account 3570 to BMSI Comerica Account 0549 on September 6, 2012, Mr. or Mrs. Gross then caused BMSI to transfer the funds to various unknown bank accounts and transferred $187,951.20—or approximately 8% of the funds received from Jiafang Americas—to a Hong Kong bank account maintained by Volanss, the Hong Kong private company that Mr. Gross owns and controls.  Similarly, after Mr. Gross wired $2,047,455.94 from JA Chase Account 3570 to BMSI Comerica Account 0549 on December 19, 2012, Mr. or Mrs. Gross then caused BMSI to transfer the funds to various unknown bank accounts and transferred $69,500.94—or approximately 3.4% of the funds received from Jiafang Americas—to the same Hong Kong bank account maintained by Volanss.

60.     To be clear, Mr. Gross never disclosed the existence of Volanss to Mr. Cardenas or Mr. Benoudiz or to anyone else at ATN or Jiafang Americas.

61.     Unfortunately, I have to date been unable to uncover exactly what Mr. Gross and his accomplices did with the remainder of the funds that Mr. Gross misdirected to BMSI; but again, Mr. Gross was not authorized to transfer any funds to accounts maintained in his name or in BMSI's name, and he was only authorized to pay real vendors and suppliers with Jiafang Americas' funds.

**The Phony Guarantee Scheme**

62.     One of the projects that Mr. Gross managed for Jiafang Americas involved the sale of steel pipes to a Bolivian customer.  Liaoning was the supplier for the project.  Jiafang Americas' primary contact at Liaoning was Liu Fushan ("Mr. Liu").

63.    Specifically, as Mr. Gross represented it, in October 2012, Jiafang Americas entered into an agreement with Liaoning wherein Liaoning agreed to sell steel pipes valued at $9,919,320.48 to Jiafang Americas' customer in Bolivia, with Jiafang Americas receiving a 10% commission on the sale.

64.    The Bolivian customer obligated Liaoning to post a performance guarantee in the amount of $1,000,000, which would be refunded upon the completion of the project.

65.    Unbeknownst to myself or to Mr. Cardenas and Mr. Benoudiz or to anyone else at ATN or Jiafang Americas (other than Mr. Gross, of course), Liaoning did not post the guarantee.

66.    Instead, I have confirmed from reviewing Jiafang Americas' bank records that in November 2012, Mr. Gross—who had full and unfettered access to Jiafang Americas' bank accounts—withdrew the total sum of $1,000,000 from two bank accounts maintained by Jiafang Americas with Chase Bank and Compass Bank, respectively, and used Jiafang Americas' moneys to fund the guarantee.

67.    Specifically, on November 1, 2012, Mr. Gross wired $500,000 from JA Chase Account 8080 to BMSI Comerica Account 0549, the account that BMSI was fraudulently maintaining under the fraudulent Shanghai Jiafang fictitious name.   Thus, as far as Jiafang Americas was aware, the $500,000 went to Jiafang Americas' supplier, Shanghai Jiafang, and not to BMSI.   Indeed, in the reference section for the wire transfer, Mr. Gross fraudulently referenced an invoice number for a project with Shanghai Jiafang.  A copy of the November 1, 2012 Wire Transfer Outgoing Request wire transfer request is attached as **Exhibit 14**.

68.    From my review of the BMSI Comerica Account 0549 documents that I was able to locate, I was able to confirm that after BMSI received the funds from Jiafang Americas, on November 8, 2012, BMSI d/b/a Shanghai Jiafang wrote a check in the amount of $500,000

payable to Jiafang Americas and deposited the funds in Jiafang Americas' Comerica account ("JA Comerica Account 8434").  Thus, in its records, it appeared as though Jiafang Americas had received $500,000 from Shanghai Jiafang to partially fund the guarantee.

69.     Because another $500,000 was needed to fund the guarantee, Mr. Gross had to misappropriate funds from another Jiafang Americas bank account to make it appear as though the guarantee was funded by one of Jiafang Americas' suppliers.

70.     Based on my review of Jiafang Americas' bank records, I was able to confirm that on October 12, 2012, Mr. Gross transferred $500,000 from Jiafang Americas' Compass Bank account ("JA Compass Account 8532") to Jiuyi Trading, the Hong Kong private company under the sole ownership of Mrs. Xu.  Mr. Gross had previously represented to us that Jiuyi Trading was a legitimate trading company assisting Jiafang Americas with sourcing materials.  We were not aware that it was owned by Mrs. Xu or that Mrs. Xu was the wife of Mr. Jin.

71.     Thereafter, it appears that Jiuyi Trading transferred the $500,000 to Sheng Min Pipe, another Hong Kong private company that Mrs. Xu owned and controlled, because in November 2012, Sheng Min Pipe wired $500,000 to JA Comerica Account 8434 to partially fund the guarantee.  Mr. Gross had represented to ATN, Jiafang Americas, and Messrs. Cardenas and Benoudiz that Sheng Min Pipe was a sale representative for Liaoning.

72.     Thus, through the machinations of Mr. and Mrs. Gross and of Mr. Jin and Mrs. Xu and their respective companies, BMSI, Jiuyi Trading and Sheng Min Pipe, Jiafang Americas believed that it had received two payments of $500,000 from Shanghai Americas and Sheng Min Pipe, respectively, to fund the guarantee required by the Bolivian customer.  Jiafang Americas then proceeded to fund the guarantee by depositing $1,000,000 in a bank account that Jiafang Americas lost access to for the two-year duration of the project.

73.    Because of the cover up created by Mr. Gross, who had unencumbered access to Jiafang Americas' bank accounts until January 2014, Jiafang Americas was unaware, until recently, that it had provided the funds to finance the guarantee.

74.    Mr. Gross and his accomplices' scheme began to unravel in January of this year. Basically, in late 2013, ATN restructured its Houston office and hired several new employees to work in Houston.  Because Mr. Gross was difficult to work with, in January 2014, ATN assigned Mr. Gross to work from home before the new employees arrived.  At this time, I took over the management and control of Jiafang Americas' bank accounts and Mr. Gross was removed from the accounts.  We did not, however, suspect any illicit activity on the part of Mr. Gross until July 2014 after the Bolivia project was completed.

75.    Once the project with Jiafang Americas' Bolivian customer was completed in June 2014, Mr. Gross and Mrs. Xu attempted to defraud Jiafang Americas into returning the $1,000,000 to Sheng Min Pipe.

76.    Specifically, on June 24, 2014, Mr. Gross forwarded Mr. Benoudiz several emails from someone purporting to be Mr. Liu, Liaoning's representative.  Copies of the email chain is attached as **Exhibit 15**.

77.    While the emails were purportedly sent from Mr. Liu's company email address, liufushan@npc-pipe.com, I strongly suspect that the emails did not come from Mr. Liu (and if they did, it would be mean that Mr. Liu was yet another accomplice to Mr. Gross' fraud). Instead, I strongly suspect and believe that Mr. Gross fabricated or doctored the emails sent by Mr. Liu to deceive us into believing the emails came from Liaoning.  This belief was later strengthened after I was informed by one of my colleagues that Mr. Liu speaks little or no English.

78.     In the fake emails, the person purporting to be Mr. Liu demanded that Jiafang Americas pay $1,000,000 to Sheng Min Pipe to repay the guarantee that Sheng Min Pipe had supposedly financed on behalf of Liaoning.  The email further instructed that the payment be transmitted via wire transfer to Sheng Min Pipe's account at Bank of Communications in Shanghai, China, which we later learned belonged to Mrs. Xu.

79.     After receiving the forwarded emails from Mr. Gross, Mr. Benoudiz questioned Mr. Gross as to why the refund was owed by Jiafang Americas and not from Jiafang Americas' Bolivian customer.

80.     Mr. Gross was unable to explain how or why Jiafang Americas was responsible for refunding the guarantee to Sheng Min Pipe—because he couldn't.  Instead, on July 1, 2014, Mr. Gross abruptly resigned from ATN, claiming he had decided to seek opportunities elsewhere.  Two days later, however, on July 3, 2014, Mr. Gross sent Mr. Benoudiz an email claiming that Jiafang Americas still had to refund the guarantee to Sheng Min Pipe.

81.     Subsequently, on July 17, 2014, Mr. Gross forwarded Mr. Benoudiz additional emails that had been purportedly sent by Mr. Liu to Mr. Gross in the prior two weeks.  Copies of the emails are attached as Composite **Exhibit 16**.  In these emails, the person claiming to be Mr. Liu continued to demand a refund of the guarantee and threatened to take legal action.

82.     After receiving the emails, Mr. Benoudiz requested that Mr. Liu provide further information and supporting documentation regarding the underlying transaction.

83.     On July 21, 2014, Mr. Benoudiz received another email from the person claiming to be Mr. Liu.  The email falsely represented that the guarantee was paid by Liaoning and that the refund was due to Sheng Min Pipe, Liaoning's purported agent.  The communication again

threatened legal action and stated that Liaoning did not have to answer any questions regarding the transaction. *See* **Exhibit 16**.

84.    Shortly thereafter, I began to investigate and confirmed, as explained above, that Jiafang Americas had in fact provided the funds for the guarantee and that Jiafang Americas did not have to reimburse Liaoning or Sheng Min Pipe for the guarantee.

85.    When Mr. Benoudiz called Mr. Gross to discuss what we had learned, Mr. Gross placed the call on speakerphone and Mr. Gross' father-in-law, Mr. Schwartz, was present on the call.  After Mr. Benoudiz told Mr. Gross that something was amiss and questioned Mr. Gross as to what was going on, Mr. Schwartz told Mr. Benoudiz to not worry about the $1,000,000 and to ignore the refund requests.  Mr. Gross then hung up the phone.

86.    Following that conversation, Jiafang Americas stopped receiving threatening emails and neither Liaoning nor Sheng Min Pipe made any further demand against Jiafang Americas.

87.    Given the strange circumstances surrounding the issuance of the guarantee, and the fact that Liaoning was purportedly sending repeated threatening emails to collect on the guarantee only to have those emails immediately stop after Mr. Benoudiz confronted Mr. Gross in late July 2014, we began to suspect that Mr. Gross, acting with the assistance of others, had been stealing money from Jiafang Americas and I began to fully investigate Mr. Gross' conduct.

88.    Unfortunately, as explained above, my investigation has been hampered by Mr. Gross' cover up of his conduct.

**Payments to Fraudulent Paper Companies**

89.    As explained above, Mrs. Xu created various non-operating paper companies to receive Jiafang Americas' funds under fraudulent pretenses.

90.     Specifically, Mrs. Xu created Sheng Min Pipe and Jiuyi Trading, both Hong Kong private companies, on July 10 and September 10, 2012, respectively.

91.     My research has led me to conclude that neither Jiuyi Trading nor Sheng Min Pipe serve any legitimate business purposes and the entities were created by Mrs. Xu in concert with Mr. Gross and Mr. Jin for the sole purpose of receiving payments from Jiafang Americas under false pretenses.

92.     Indeed, like Gulf Maritime, these companies not have a website, do not advertise or market any services, and there is absolutely no information available regarding the companies other than their publically available ownership records.

93.     Notwithstanding, at the time that Jiafang Americas began making payments to Mrs. Xu's companies, Mr. Gross represented to us that Sheng Min Pipe was a Chinese steel pipe manufacturer and that Jiuyi Trading was a Chinese trading company specializing in petroleum industry equipment that had relationships with certain manufacturers.

94.     Between 2012 and 2014, Mr. Gross remitted nearly ten million dollars to Sheng Min Pipe and Jiuyi Trading under fraudulent pretenses, with neither company providing any real services or product to Jiafang Americas.

95.     Specifically, Mr. Gross directed the following payments totaling $3,384,906.32 to Jiuyi Trading via wire transfer:

      a.     On October 12, 2012, Mr. Gross directed a payment of $500,000 via wire from JA Compass Account 8532 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong[4];

---

[4] As explained above, Jiuyi Trading subsequently transferred these funds to Sheng Min Pipe, which in turn returned the funds to Jiafang Americas to mislead Jiafang Americas into believing

    b.   On November 9, 2012, Mr. Gross directed a payment of $227,560.00 via wire from JA Compass Account 8532 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong;

    c.   On March 5, 2013, Mr. Gross directed a payment of $560,000 via wire from JA Chase Account 8080 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong;

    d.   On March 5, 2013, Mr. Gross directed a payment of $660,000 via wire from JA Chase Account 8080 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong;

    e.   On August 29, 2013, Mr. Gross directed a payment of $1,410,481.80 via wire from JA Chase Account 8080 to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong; and

    f.   On May 14, 2014, Mr. Gross caused Jiafang Americas to remit a payment of $26,863.51 via wire to a bank account maintained by Jiuyi Trading with HSBC in Hong Kong.

96.    Similarly, Mr. Gross directed the following payments totaling $6,249,171.91 to Sheng Min Pipe via wire transfer:

    a.   On December 21, 2012, Mr. Gross directed a payment of $4,463,694.22 via wire from JA Chase Account 3570 to a bank account maintained by Sheng Min Pipe with Bank of Communications in Shanghai; and

---

that Sheng Min Pipe had paid Jiafang Americas $500,000 to partially fund the guarantee for the transaction with Liaoning.

b.  On January 11, 2013, Mr. Gross directed a payment of $1,785,477.69 via wire from JA Chase Account 3570 to a bank account maintained by Sheng Min Pipe with Bank of Communications in Shanghai.

97.    I suspect and believe that Mr. Gross, Mrs. Xu, Jiuyi Trading and Sheng Min Pipe subsequently distributed Jiafang Americas' funds received from the fraudulent payments amongst themselves.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 23 day of September 2014.

_____
Nancy Mayea