IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| A.T.N. INDUSTRIES, INC., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:14-cv-02743 |
| | § | |
| MAURICIO GROSS a/k/a MAURICIO | § | |
| GROSS DRACH *et al.*, | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW, ON APPLICATION FOR PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction ("Motion") seeking to stop Defendants from dissipating Plaintiffs' assets, mainly funds, Plaintiffs claim Defendants stole through a fraudulent scheme involving monetary wire transfers, intermediary, non-operating companies and the use of bank accounts operated under fictitious names. On October 9, 2014, the Court conducted an evidentiary hearing at which the parties with the assistance of their respective counsel presented witnesses, additional witnesses through declarations and depositions, and offered exhibits admitted into evidence. Following the hearing, the parties agreed to produce additional documents, continue with third party discovery, permit Plaintiffs' counsel to depose Defendant Mauricio Gross ("Gross"), and submit additional evidence to the Court. The Court has accepted this additional testimony and related documents and exhibits into evidence. After having considered the Motion, Defendants' responses, the testimony and exhibits received into evidence, the arguments of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

I.    PARTIES, RELEVANT ENTITIES, AND OWNERSHIP[1]

    A.    **A.T.N. Industries, Inc.**

1.    Plaintiff A.T.N. Industries, Inc. ("ATN") is a Florida corporation, established in 1994 and engaged in the business of buying and selling tools and equipment to customers in Latin America.  (PX178 at 62:19-23, 63:12-15, 63:19-20).

2.    ATN also functions as the procuring arm of a Venezuelan company by the name of Consorcio Pentamat, C.A. ("Pentamat"), which is likewise engaged in the trade of products and equipment.  (PX178 at 62:19-63:4, 63:12-15).

3.    ATN has offices in Miami, Florida and Houston, Texas.  (PX178 at 60:25-61:20).

4.    Defendant Gross was hired as a full-time employee of ATN on March 5, 2006. (PX135; PX181 at ¶¶ 8).

5.    During his employment with ATN in Houston, Gross was in a position to open, manage, and close bank accounts; generate invoices; approve payments for those invoices; direct the accounting entries of those invoices and payments; and direct the wire transactions related to those invoices and payments. (PX178 at 68:4-16, 70:21-71:10, 159:8-160:14; PX181 at ¶¶ 22, 23, 31; PX145 at 58:25-59:18, 195:12-196:3).

6.    After he was questioned regarding suspect transactions, Gross resigned from ATN on July 1, 2014, stating a desire to pursue other business opportunities. (PX178 at 72:8-25; PX138).

---

[1]    Section headings are included for clarity and ease of reading only.

**B.**    **Joseph Benoudiz**

7.     Plaintiff Joseph Benoudiz ("Benoudiz") is a director of ATN and part owner of Jiafang Steel Pipes Americas, Inc. and Pentamat. (PX178 at 64:3-18, 154:2-10, 221:18-25).

**C.**    **Pablo Cardenas**

8.     Non-party, Pablo Cardenas ("Cardenas") is also a director of ATN and part owner of Jiafang Steel Pipes Americas, Inc. and Pentamat. (PX178 at 64:3-18, 153:8-19).

**D.**    **Jiafang Steel Pipes Americas, Inc.**

9.     Plaintiff Jiafang Steel Pipes Americas, Inc. ("JFA") is a Texas corporation based in Houston, Texas, established in 2008, that engages in the business of buying and selling steel pipes and related tooling. (PX178 at 63:5-22; PX181 at ¶ 17).

10.     From its inception, ATN has managed the affairs of JFA. (PX181 at ¶¶ 4, 18).

11.     Similar to ATN, in the ordinary course of business, JFA entered into contracts to sell steel pipe to customers in Venezuela, Bolivia, and other South American countries. (PX178 at 62:19-63:17).

12.     JFA would purchase the steel pipe from steel suppliers in China, including Shanghai Jiafang Steel Pipe (Group) Co., Ltd. and others. (PX178 at 161:7-164:10).

13.     The organizational meeting of the Board of Directors of JFA was held on December 18, 2008. (PX141).

14.     On December 18, 2008, JFA issued Benoudiz 50% of the shares in the company. (PX141, PX142, PX145 at 64:21-65:13, 66:12-67:17; PX148).

15.     On December 18, 2008, JFA issued Cardenas 50% of the shares in the company. (PX141, PX142, PX145 at 64:21-65:13, 66:12-67:17; PX148).

16.     On January 19, 2011, Gross represented to JP Morgan Chase Bank that Cardenas was one of JFA's shareholders. (PX145 at 149:19-150:25; PX154).

17.     Xi Feng Hua, also known as Mr. Fletcher ("Fletcher"), never made any capital contributions to JFA. (PX145 at 15:25-16:7, 70:9-71:6, 85:21-86:1).

18.     Fletcher never loaned any money to JFA. (PX145 at 15:25-16:7, 71:4-9).

19.     Benoudiz and Cardenas initially capitalized JFA and subsequent to formation made contributions and/or loans to JFA. (PX145 at 86:9-87:3).

20.     Fletcher never paid any money for shares in JFA. (PX145 at 85:21-23).

21.     Benoudiz and Cardenas believed they were the sole owners of JFA. (PX178 at 154:5-10, 181:15-23, 183:19-24, 196:21-23, 221:18-21).

22.     Records received from the lawyer who created JFA, Jim Garcia, indicate that Benoudiz and Cardenas were the owners of JFA. (PX148).

23.     The Court finds that Benoudiz and Cardenas have been the owners of JFA from December 18, 2008 to the present.

24.     The Court finds that Fletcher has never been an owner of JFA.

25.     Gross, with the help of his assistant, maintained the accounting records for JFA from December 18, 2008 to January of 2014. (PX145 at 58:25-59:18).

**E.    Business Management Services Int., LLC**

26.     Defendant Business Management Services Int., LLC is a limited liability company organized in the State of Texas. (PX1; PX79).

27.     Prior to creating the limited liability company in Texas, Gross did business individually using Business Management Services ("BMS") as a d/b/a from 2009 to July 4, 2011. (PX100; PX101; PX102; PX145 at 60:21-61:11).

4

28.     Gross's 2009 personal tax return reflects gross income from BMS for consulting services as $103,501.00.  (PX100; PX145 at 184:14-23, 185:2-7, 185:22-186:9).

29.     Gross's 2010 personal tax return reflects gross income from BMS for consulting services as $281,177.00.  (PX101; PX145 at 184:14-23, 185:2-7, 185:22-186:9).

30.     Gross's 2011 personal tax return reflects gross income from BMS for consulting services as $174,664.00.  (PX102; PX145 at 184:14-23, 185:2-7, 185:22-186:9).

31.     Gross had a bank account at Chase Bank (account ending in 3311) in 2010 and early 2011 in the name "Mauricio Gross DBA Business Management Services."  (PX77).

32.     On July 5, 2011, Gross formed Business Management Services Int, LLC ("BMSI") as a Texas limited liability company.  (PX1; PX79).

33.     Mauricio Gross is the party responsible for filing tax returns for BMSI with the Internal Revenue Service.  (PX80).

34.     Gross and his wife Clara Schwartz ("Clara") are the managers of BMSI.  (PX1).

35.     BMSI is owned 50% by Gross and 50% by Clara.  (PX78; PX96; PX97; PX98; PX145 at 45:7-12).

36.     Gross registered the name "Shanghai Jiafang Steel Pipe (Group) Co., Ltd." as a d/b/a of BMSI in Texas ("BMSI d/b/a Shanghai Jiafang").  (PX3; PX57; PX145 at 124: 5-8).

37.     Gross did not disclose that he registered BMSI d/b/a Shanghai Jiafang as an assumed name of BMSI in Texas to ATN, Benoudiz or Cardenas.  (PX145 at 174:7-17).

38.     The true Shanghai Jiafang Steel Pipe (Group) Co., Ltd. ("Shanghai Jiafang"), is a Chinese manufacturer and supplier of steel pipe to JFA. Shanghai Jiafang did not give Gross permission in writing to register BMSI to do business as BMSI d/b/a Shanghai Jiafang in Texas. (PX145 at 11:21-23, 125:2-6).

39.      BMSI d/b/a Shanghai Jiafang led purchasers of steel pipe, including JFA and ATN, to believe that the customer was dealing with or making payments to Shanghai Jiafang when, in fact, the customer was dealing with or making payments to BMSI.  (PX178 at 223:6-19; PX119).

40.      BMSI opened a bank account with Comerica in the name "Business Management Services Int LLC DBA Shanghai Jiafang Steel Pipe Group Co Ltd."  (PX4; PX145 at 149:12-14).

41.      Gross did not disclose to Benoudiz or Cardenas that he opened a bank account with Comerica in the name "Business Management Services Int LLC DBA Shanghai Jiafang Steel Pipe Group Co Ltd."  (PX162 at 36:13-17).

42.      Gross opened and managed BMSI's bank accounts and was a signatory on BMSI's bank accounts with authority to authorize any transactions related to BMSI's bank accounts, including wire transfers.  (PX145 at 192:7-15).

43.      Gross was the person who was responsible for and had authority for all accounting books and records of BMSI. (PX145 at 61:24-62:3).

44.      Including BMSI, Gross created, controlled, or was affiliated with a total of six (6) shell companies: BMSI, Volanss Systems Co. Ltd., Seanway Pipe LLC, Gulf Maritime Co., Ltd., Jiuyi Trading Co., Limited, and Sheng Min Pipe Limited.

**F.      Volanss Systems Co. Ltd.**

45.      Defendant Volanss Systems Co., Limited ("Volanss") was incorporated by Gross in Hong Kong on December 31, 2008.  (PX5, PX143, PX145 at 125:24-126:6).

46.      Gross owns 100% of the shares in Volanss and is its sole director.  (PX6, PX143, PX145 at 37:1-2; 125:24-126:8).

6

47.    Volanss has never had any employees.  (PX145 at 123:1-10; 151:15-23).

48.    Volanss has no business operations in Hong Kong.  (PX145 at 165:13-19).

49.    Volanss has no accounting records.  (PX145 at 32:22-33:5).

50.    Volanss had at least one bank account at HSBC Bank in Hong Kong.  (PX14).

51.    Despite document requests by Plaintiffs and an Order of this Court, Gross has produced no HSBC Hong Kong bank account records related to this Volanss bank account. (Doc. #31).

52.    Gross was the signatory on a Volanss bank account at HSBC Bank in Hong Kong. (PX145 at 33:12-17).

53.    Within weeks after resigning from ATN, Gross closed a Volanss bank account at HSBC Bank in Hong Kong sometime in July or August of 2014 and withdrew more than $100,000.00, and potentially more than $500,000.00.  (PX145 at 33:18-35:17).

54.    Although the closing of the bank account occurred only three months prior to the deposition, Gross stated that he could not remember how much money he held in the account at the time it was closed.  (PX145 at 33:18-35:17).

55.    Gross transferred the money that he withdrew from the Volanss bank account at HSBC Bank in Hong Kong to his father-in-law, Rafael Schwartz ("Schwartz"), who resides in Venezuela, to hold for an investment, but Gross did not recall whether any of those funds were owed to Schwartz under any "verbal" agreements.  (PX145 at 12:24-25, 34:10-36:22, 38:5-41:7, 52:25-53:1, 102:12-20).

56.    Gross, through his company BMSI, received consulting fees from Volanss, but Gross could not explain where Volanss received the funds from (other than from JFA) to pay the fees.  (PX145 at 45:1-12; 120:1-121:5).

7

57.     Volanss never filed tax returns in Hong Kong or anywhere else, and Gross did not declare his foreign bank accounts in his U.S. tax returns, although he claimed that he believed he had, but did not know for sure.  (PX145 at 121:6-122:25; PX162 at 53:9-54:3; PX96-104).[2]

58.     Volanss received money from Seanway Pipe LLC.  (PX145 at 154:14-18).

**G.      Seanway Pipe LLC**

59.     Defendant Seanway Pipe LLC ("Seanway Pipe") is a Texas limited liability company formed on July 5, 2011. (PX87).

60.     Seanway Pipe Co., Ltd. ("Seanway Pipe Ltd.") was incorporated in the United Kingdom on November 22, 2010.  (PX54; PX84; PX85; PX86).

61.     Defendant Shumin Xu a/k/a Mina Xu ("Xu") is the sole director and shareholder of Seanway Pipe Ltd.  (PX54; PX86; PX145 at 152:7-153:10).

62.     Xu is a Chinese citizen.  (PX54).

63.     On June 30, 2011, Xu, as a director and shareholder of Seanway Pipe Ltd., authorized Medrano Administrative & Tax Services LLC to register a company in Texas fully owned by Seanway Pipe Ltd.—Seanway Pipe.  (PX83; PX145 at 153:14-16).

64.     Seanway Pipe was formed as a Texas limited liability company on July 5, 2011.  (PX87).

65.     Gross assisted in the formation of Seanway Pipe.  (PX145 at 161:13-20).

66.     Seanway Pipe is 100% owned by Seanway Pipe Ltd.  (PX145 at 153:11-13).

---

[2]      In addition to the Volanss account with HSBC Bank Hong Kong, Gross also maintained personal bank accounts in Hong Kong with Standard Chartered and HSBC Bank Hong Kong, and the account documents for his Standard Chartered account indicate that Gross falsely represented to Standard Chartered that he did not reside in the U.S. and was not a U.S. greencard holder. (PX151; PX162 at 33:3-34:24).

67.    Gross identified himself as the sole member of Seanway Pipe to the U.S. Internal Revenue Service. (PX88; PX145 at 163:7-22).

68.    Gross signed as the Manager of Seanway Pipe on its 2011, 2012 and 2013 U.S. tax returns. (PX93; PX94; PX95; PX145 at 187:17-189:8).

69.    Gross registered the name "Huludao City Steel Pipe Industrial Co., Ltd." ("Seanway Huludao") as a d/b/a for Seanway Pipe in Texas. (PX55; PX56; PX145 at 155:4-15).

70.    Gross did not disclose that he registered Seanway Huludao as an assumed name of Seanway Pipe in Texas to ATN, Benoudiz, or Cardenas. (PX145 at 174:7-17).

71.    The true Huludao City Steel Pipe Industrial Co., Ltd. ("Huludao China"), is a Chinese manufacturer and supplier of steel pipe to JFA. Huludao China did not give Gross permission in writing to register Seanway Pipe to do business under its name in Texas. (PX145 at 84:6-8, 155:13-18).

72.    The use of the d/b/a Seanway Huludao led purchasers of steel pipe, including JFA and ATN, to believe that the customer was dealing with or making payments to Huludao China when, in fact, the customer was dealing with or making payments to Seanway Pipe. (PX178 at 225:18-227:4; PX123).

73.    Seanway Pipe has a bank account at BBVA Compass Bank (account ending in 8958) in the name of "Seanway Pipe LLC DBA Huludao City Steel Pipe Industrial Co." (PX76).

74.    Gross did not disclose that he opened the bank account at BBVA Compass Bank in the name of "Seanway Pipe LLC DBA Huludao City Steel Pipe Industrial Co." to ATN, Benoudiz, or Cardenas. (PX162 at 55:22-56:8).

75.    Gross opened at least six accounts for Seanway Pipe at BBVA Compass Bank. (PX145 at 192:16-20).

9

76.     Gross had sole control of Seanway Pipe's bank accounts.  (PX145 at 157:6-16, 161:13-162:16).

77.     Gross kept the books and records of Seanway Pipe LLC.  (PX145 at 178:21-179:6).

78.     On June 30, 2014, the day before he resigned from ATN, Gross sent a letter to Medrano Administrative & Tax Services LLC instructing it to file a Voluntary Dissolution and Termination of Seanway Pipe LLC in Texas.  (PX118; PX145 at 158:13-159:5).

79.     Gross withdrew all funds Seanway Pipe's bank accounts after July 1, 2014. (PX145 at 157:23-158:12). Gross was unable to provide an explanation for where these funds were transferred. (*Id.*).

**H.     Gulf Maritime Co., Limited**

80.     Defendant Gulf Maritime Co., Limited ("Gulf Maritime") is a private company incorporated in Hong Kong on August 29, 2005.  (PX33; PX143).

81.     Defendant Shutian (David) Jin ("Jin") owned 100% of the shares in Gulf Maritime from August 2005 to August 27, 2008.  (PX34; PX143).

82.     In 2008, ATN hired Jin to serve as its "protective agent" to oversee the loading and latching of cargo onto vessels. (PX178 at 83:5-13, 166:4-167:3, 232:18-233:8).

83.     Shortly thereafter, on August 28, 2008, Jin transferred Gulf Maritime to his wife, Xu, and Xu now owns 100% of the shares in Gulf Maritime.  (PX178 at 82:24-83:4, 84:4-19, 151:2-15; PX43; PX143; PX181 at ¶ 44).

84.     Xu is also the sole director of Gulf Maritime.  (PX143).

85.    Based on representations made by Gross, Benoudiz and ATN believed that Gulf Maritime was a legitimate international shipping company. (PX178 at 98:5-10; 155:14-156:17; PX181 at ¶ 38).

86.    Gulf Maritime does not own any ships.  (PX145 at 145:7-14).

**I.    Jiuyi Trading Co., Limited**

87.    Defendant Jiuyi Trading Co., Limited ("Jiuyi") is a private company incorporated in Hong Kong on July 3, 2012.  (PX143; PX145 at 162:25-163:2).

88.    Gross caused JFA to do business with and made payments to Jiuyi. (PX178 at 98:11-16, 99:21-25).

89.    Xu owns 100% of the shares in Jiuyi and is its sole director.  (PX143; PX145 at 162:17-21).

**J.    Sheng Min Pipe Limited**

90.    Defendant Sheng Min Pipe Limited ("Sheng Min") is a private company incorporated in Hong Kong on September 10, 2012.  (PX143; PX145 at 162:25-163:2).

91.    Gross caused JFA to do business with and made payments to Sheng Min. (PX178 at 99:21-25).

92.    Xu owns 100% of the shares in Sheng Min and is its sole director.  (PX143; PX145 at 162:22-24).

**K.    Gross Controlled Bank Accounts**

93.    During the course of his employment with ATN, Gross created and/or controlled a total of forty-five (45) separate domestic bank accounts (including four certificates of deposit). (PX156).

     (1)    *BMSI Bank Accounts*

94.    Gross opened three accounts for the d/b/a Business Management Services. (PX145 at 189:15-190:6; PX156). After forming BMSI, Gross opened another eight accounts in the name of BMSI, including some under assumed names. (PX145 at 190:7-191:14; PX156). This included accounts at four separate banks: BBVA Compass, Cathay Bank,[3] Comerica Bank, and Prosperity Bank. (*Id.*).

95.    Gross was unable to explain why he would need a total of eleven different bank accounts related to BMSI. (PX145 at 191:15-23).

96.    Gross was the signatory on the accounts listed in PX156; opened the accounts; and had authority to direct transactions related to these accounts. (PX145 at 191:24-192:15, 196:7-8).

97.    Gross did not disclose to ATN, Cardenas, or Benoudiz that he opened a Comerica bank account for BMSI in an assumed name for Shanghai Jiafang. (PX145 at 196:23-197:3).

     (2)    *Seanway Pipe*

98.    Gross opened six accounts for Seanway Pipe, including a business checking account, money market account, and four certificates of deposit. (PX156). Certain Seanway Pipe bank accounts were opened under assumed names. (PX162 at 55:22-56:8).

99.    Gross was unable to explain why he would need six separate accounts for Seanway Pipe. (PX145 at 192:16-193:11).

100.    Gross opened all of these accounts. (PX145 at 192:18-20, 193:14-16). Gross was a signatory on each of these accounts. (PX145 at 193:17-19, 196:9-11).

---

[3]    In the deposition transcript, Cathay Bank is sometimes incorrectly transcribed as "Cafe Bank."

101.    Gross has control of Seanway Pipe's bank accounts. (PX145 at 157:6-16, 161:13-162:16).

    (3)    *JFA*

102.    During his employment with ATN and affiliation with JFA, Gross opened or had control of fourteen (14) bank accounts at four different banks: BBVA Compass, Chase, Comerica Bank, and Prosperity Bank. (PX156).

103.    During the time of his employment with ATN, Gross had signature authority on each of the JFA bank accounts. (PX145 at 195:12-196:3).

    (4)    *Personal Accounts*

104.    Gross (and/or Clara) controls at least fourteen (14) domestic personal bank accounts with at least three different banks: Citibank, Chase, and Bank of America. (PX145 at 194:9-17; PX156).

105.    Gross had signature authority on each of his and/or his wife's personal accounts. (PX145 at 196:12-14).

106.    In addition, Gross had personal accounts in Hong Kong at HSBC Bank Hong Kong and Standard Chartered Bank. (PX145 at 49:8-50:25; PX162 at 33:3-34:24).

**K.**    **Asset Misappropriation Schemes**

107.    Signs of an attempt to conceal the misappropriation of assets include alteration of bank statements, miscoding of transactions in accounting records, or sending payments to a shell company with a similar name to that of an existing vendor. (PX180 (Association of Certified Fraud Examiners, *Fraud Examiners Manual*, 2014 US Edition) at 1.434).

108.    Shell companies are business entities that typically have no physical presence (other than a mailing address), no employees, and generate little, if any, independent economic value. (PX180 at 1.437).

109.    In a large percentage of shell company cases, the perpetrator is in a position to approve payment on invoices that he or she fraudulently submits. (PX180 at 1.439-.440).

110.    A 'pass-through scheme' is a scheme to misappropriate assets. (PX180 at 1.442). Pass-through schemes are generally undertaken by employees in charge of purchasing on behalf of the victim company. (*Id.*). Instead of buying merchandise directly from a vendor, the employee sets up a shell company and purchases the merchandise through that fictitious entity. He or she then resells the merchandise to the employer from the shell company at an inflated price. (*Id.*).

## II.    DEFENDANTS' SCHEME

### A.    <u>Gross Begins Work for ATN</u>

111.    On March 5, 2006, ATN hired Defendant Gross on the strong recommendation of Schwartz, who is Gross' father-in-law and a long-time friend of Benoudiz.  (PX178 at 154:11-17, 227:14-229:4, PX181 at ¶¶ 8-9).

112.    At the time, Gross was a Venezuelan national living in Venezuela, and he was hired to work at ATN's Miami Office.  (PX178 at 64:19-24, 254:4-9).

113.    Gross's initial responsibilities at ATN were transportation logistics and assisting ATN with the purchases of products from various sources in the United States and China for delivery to customers in South America, principally Venezuela.  (PX178 at 64:19-24, 66:12-67:15; PX181 at ¶ 11-12).

114.    On the day he was hired, Gross signed an employment agreement (PX135) requiring full-time employment as well as a Confidentiality Agreement (PX136) that prohibited the use of his employer's information for his own benefit.  (PX178 at 64:25-66:11).

115.    Within months of Gross being hired, ATN began focusing on the petroleum industry and decided to open a Houston Office and placed Gross in charge of its operations. (PX178 at 66:12-67:18, 154:18-155:13; PX181 at ¶ 16.)

116.    At that time, ATN handled its accounting and payment functions from its Miami Office; thus Gross had no access to the company's accounts.  (PX178 at 68:4-16, 70:21-71:10, 159:8-160:14).

117.    Gross earned the trust of ATN's and Pentamat's principals and managers, and was placed in charge of contracting for all required transportation needs for ATN.  (PX178 at 67:4-8, 227:18-228:1; PX181 at ¶ 13).

### B.    Gross's Work Focuses on China

118.    Within a year, in 2007, ATN procured a significant contract with the Venezuelan Ministry of the Environment to source steel pipes to transport potable water over a 72 kilometer track from a reservoir to a municipality.  (PX178 at 160:15-161:6).

119.    After some missteps with another pipe manufacturer, ATN contracted with Chinese manufacturer Shanghai Jiafang, to obtain the steel pipes which would be transported from China to Venezuela.  (PX178 at 161:7-162:1l).

120.    As a result of this contract with the Ministry of the Environment, Gross began to travel to China in early 2008 to oversee the transportation logistics.  (PX178 at 164:6-166:19).

121.    On these trips, Gross was often accompanied by Jenny Graterol ("Graterol"), a mechanical engineer employed by Pentamat in Venezuela who was sent on behalf of ATN to

oversee the construction of the pipes by Shanghai Jiafang at its plant in China. (PX178 at 165:7-166:1).

122.    After a few trips to China, Gross approached Benoudiz and Cardenas with the recommendation that they retain a Chinese individual, Jin, who would serve as a Chinese-English translator and "protective agent," to oversee the loading and latching of the steel pipes aboard the cargo vessels that would transport them from China to Venezuela. (PX178 at 83:5-13, 166:4-167:3, 232:18-233:8). Jin was to be paid an estimated amount of $5,000 per shipment. (PX178 at 83:14-15, 232:18-233:11).

123.    Benoudiz and Cardenas assented to Gross's recommendation to retain Jin on the understanding that their engineer, Graterol, would not be permitted to board the vessels in China to inspect the loading and lashing of the steel pipes. (PX178 at 83:5-13, 166:4-167:3, 232:18-233:11).

124.    In April 2008, Gross approached Benoudiz and Cardenas again to recommend the retention of Gulf Maritime to handle the transportation needs of ATN (and later JFA), representing Gulf Maritime as an established shipping company with global operations. (PX178 at 98:5-10, 155:14-156:17; PX181 at ¶ 38).

125.    Benoudiz and Cardenas accepted Gross's recommendations, and thereafter, ATN began contracting its shipping needs through Gulf Maritime to fulfill the transportation of the steel pipes to be sourced to the Ministry of the Environment. (PX178 at 156:7-10).

126.    Unbeknownst to Benoudiz and Cardenas, or to anyone else at Pentamat and ATN, Gulf Maritime was a non-operating company created in Hong Kong by Jin on or around August 16, 2005, which Jin, on August 27, 2008, transferred to his wife, Xu, soon after he was retained by ATN to work as its protective agent, but not until after Gulf Maritime had already received

over $900,000 in payments from ATN. (PX178 at 82:24-83:4, 84:4-19, 151:2-15: PX43; PX143; PX181 at ¶¶ 42, 44).

127.    Between April 22, 2008 and July 2, 2009, ATN wired ten payments to Gulf Maritime's account in Hong Kong totaling $6.5 million. (PX178 at 97:14-24; PX181 at ¶¶ 41-43).

128.    Later, from February through March 2013, Benoudiz and Cardenas personally wire transferred $775,000 each to Gulf Maritime to cover the transportation needs of JFA, and JFA itself wire transferred two payments of $454,075 and $440,000 to Gulf Maritime. (PX178 at 97:14-24; 158:11-159:1; PX181 at ¶ 43).

**C.    Gross Forms Volanss Without Informing ATN or its Principals**

129.    In December 2008, Gross established a company in Hong Kong, Volanss, a fact he kept secret from Benoudiz, Cardenas, and ATN. (PX178 at 81:2-22; PX145 at 37:1-2, 120:12-13, 125:20-126:8; PX162 at 47:5-8, 49:6-50:9; PX6; PX143; PX181 at ¶¶ 32, 35, 60).

130.    Volanss and Gulf Maritime shared the same corporate address at Unit E, 15/F, Chek Nang Plaza, 250 Hennessy Road, Wanchai, Hong Kong. (PX143 at ¶ 15; PX181 at ¶ 36).

131.    Neither Gulf Maritime nor Volanss is listed in the Hong Kong telephone directory, has a website, or appears to advertise or market any services. (PX143 at ¶ 16).

132.    Evidence of their existence as Hong Kong companies is confined to what appears in the Hong Kong Companies Registry, through its official website, www.cr.gov.hk, which is available to the public for a fee. (PX181 at ¶¶ 32-33, 39; PX143 at ¶¶ 5, 15).

133.    ATN's dealings with Shanghai Jiafang over the sourcing of pipes for the Ministry of the Environment proved a successful endeavor for both companies, and in order to secure

future business on steel pipes, Shanghai Jiafang authorized the establishment of JFA by Benoudiz and Cardenas.  (PX178 at 64:3-18, 154:2-10, 221:18-22; PX181 at ¶¶ 17-19).

**D.     Ownership of JFA**

134.    On December 18, 2008, JFA issued Benoudiz 50% and Cardenas 50% of the shares in the company.  (PX141, PX142, PX145 at 64:21-65:13, 66:12-67:17; PX148).

135.    On January 19, 2011, Gross identified Cardenas as a JFA shareholder in a letter that he wrote, signed and transmitted to JPMorgan.  (PX145 at 149:15-150:25; PX154).

136.    On January 31, 2013, Cardenas and Benoudiz executed a document that Cardenas requested Gross prepare evidencing the transfer of shares to Cardenas and Benoudiz to meet the requirements of the Venezuelan Bank of the Interior for purposes of issuing certain U.S. Dollar guarantees.  (PX178 at 181:15-187:14).

137.    During all these times, Gross had control of the corporate books of JFA and the evidence indicates it was Benoudiz and Cardenas who were the sole source of operating capital for JFA and the only persons to receive distributions from the company.  (PX178 at 64:3-18, 213:19-24; PX145 at 86:9-87:3, 277:8-278:10).

138.    There is no evidence that Benoudiz or Cardenas transferred their interest in JFA to Fletcher or any other person or entity prior to executing the January 31, 2013 document.

139.    Gross admits that Fletcher never (a) funded JFA, (b) received distributions from JFA, or (c) paid Gross a salary.  (PX145 at 68:23-70:2, 85:21-87:3, 277:8-278:10).

140.    Gross testified in Court that Cardenas and Benoudiz were the initial owners of JFA, but later testified at his deposition that Fletcher was the initial owner. (PX178 at 255:1-12; PX145 at 68:24-69:7).

E.    **ATN's Continued Business in China**

141.    After JFA was formed, ATN, Benoudiz, and Cardenas worked to enhance the business of provisioning steel pipes from China, relying on the relationship that had been established with Shanghai Jiafang with the sourcing of pipes to the Ministry of the Environment. (PX178 at 162:21-163:4).

142.    As new projects arose that involved pipe specifications not handled by Shanghai Jiafang, JFA was directed to other Chinese pipe manufacturers.  (PX178 at 162:21-164:10).  This is how JFA came to do business with other Chinese manufacturers like Huludao China, Liaoning Northern Steel Pipe Co., Limited ("Liaoning China"), and Tiajin Pipe Group Corporation ("TPCC").  (PX178 at 104:16-19, 162:21-164:10).

143.    Gross continued to run the logistic operations and assist in the purchases for both ATN and JFA.  (PX178 at 164:11-165:4).

144.    Benoudiz and Cardenas continued to trust Gross, and as a result of the growth in business involving steel pipes, augmented his management duties to the point that by 2010, they conferred upon Gross broad responsibilities over JFA and transferred to Gross control over all the bank accounts funded by Benoudiz and Cardenas and maintained by JFA for its ongoing business.  (PX178 at 68:4-16, 70:21-71:10, 159:8-160:14).

145.    Gross, however, still reported to Benoudiz and Cardenas, as well as to Martin Olivares, the president of ATN. (PX178 at 69:1-6).

F.    **Scheme to Divert Funds**

146.    On July 7, 2011, Gross used BMSI to register BMSI d/b/a Shanghai Jiafang. (PX178 at 90:8-24; PX145 at 124:5-8, 149:5-11; PX3; PX57).

147.    With this fictitious name in hand, the Grosses directed BMSI to open bank accounts at Comerica Bank and Compass Bank in Houston using BMSI d/b/a Shanghai Jiafang for the accounts to conduct business. (PX145 at 149:5-14, 198:4-9; PX162 at 78:6-8; PX4; PX160).

148.    Gross admits that he did not disclose the fictitious name registrations or the accounts under the assumed names to Plaintiffs. (PX145 at 174:6-17, 196:23-197:3, 225:18-226:16; PX162 at 36:6-17).

149.    Between September 6, 2012 and November 3, 2013, BMSI's accounts received eleven (11) wire transfers totaling approximately $12.5 million from Plaintiffs' accounts. (PX178 at 102:2-21; PX4; PX60; PX181 at ¶¶ 52-56).

150.    Part of the moneys from many of these transfers eventually made their way into an account in the name of Volanss, the company that was solely under Gross's control in Hong Kong. (*See e.g.*, PX4).

151.    Gross admits that moneys were transferred to Volanss without the knowledge of ATN, Benoudiz, or Cardenas. (PX162 at 49:6-50:9).

152.    While it is unclear at this stage of the proceeding as to how much money ended up with Volanss, the record shows that Gross—who was compensated about $90,000 per year by his employer, ATN—somehow managed to hold over $800,000 (more than he was compensated during the nine years that he was employed by ATN) in a bank account with Standard Chartered Bank in Hong Kong. (PX162 at 22:24-23:2; PX151; PX164).

153.    Gross further admits he held anywhere from $100,000 to $500,000 (and possibly more) in a bank account belonging to Volanss with HSBC Bank in Hong Kong. (PX145 at 34:13-35:13).

154.    He also admitted that he invested $300,000—through Volanss—in a Texas-based energy company that was recently liquidated following a Chapter 7 bankruptcy.  (PX145 at 176:4-181:25; PX155).[4]

155.    While Gross admitted that his wife does not earn any income and that he has not inherited any large sums, despite repeated questioning, Gross could not explain how this money was earned, and was unable to even identify one customer or transaction that resulted in him earning any legitimate income outside of what he was paid by ATN or its related companies.  (PX145 at 114:11-121:15; PX162 at 62:22-64:19).[5]

156.    Gross hid his conduct and income not only from Plaintiffs, but from the United States Internal Revenue Service.  Indeed, despite the fact that Volanss earned or at least received millions of dollars over a multi-year period, Gross admitted that Volanss did not report or file taxes in Hong Kong, the United States or anywhere else, and Gross's and BMSI's tax returns filed in the United States do not report any of that income.  (PX145 at 120:12-122:25; PX96-104).

157.    Mimicking the success obtained through the use of bank accounts with the fictitious name identical to that of Shanghai Jiafang, Gross with help of Jin and Xu took similar steps with Huludao China.   With authority from Xu, Gross directed Eduardo Medrano ("Medrano"), his tax preparer, to establish Seanway Pipe.[6]  (PX178 at 42:21-43:6; 44:19-46:5).

---

[4]    *See In re Foyoro Biofuels, LLC*, No. 14-22010-rdd in the United States District Court for the Southern District of New York.

[5]    Gross sold an apartment in Venezuela and received not more than $200,000 in proceeds from the sale. (PX162 at 63:17-64:6).

[6]    It was with an authorization letter from Xu, that Gross directed Medrano to establish Seanway Pipe as a Texas limited liability company.  (PX178 at 44:19-46:5; PX83-87.)

158.    Thereafter, on July 7, 2011, Gross, as the authorized representative of Seanway Pipe, registered Seanway Huludao as the d/b/a for Seanway Pipe. (PX178 at 90:25-91:22; PX55-56).

159.    With this fictitious name in hand, bank accounts were opened by Seanway Pipe in the name of Seanway Huludao at Compass Bank in Houston. (PX178 at 85:15-87:15, 100:1-101:10; PX76).

160.    Gross admits that he never disclosed the existence of these fictitious name registrations or of the accounts opened under those names to Plaintiffs. (PX145 at 174:6-17; PX162 at 55:22-56:8).

161.    To the contrary, Gross presented Benoudiz with an email purporting to come from Huludao directing that payments be made to Seanway Pipe d/b/a Huludao's Compass Bank account. (PX123; PX162 at 57:12-58:2). Close examination of that email, however, reveals that the email address of the purported Huludao employee (china_sevenstar@hld-pipe.com) does not match Huludao's actual email domain (hldpipe.com), which does not contain a hyphen and does not match the two email addresses identified on Huludao's website (hldpipe@hldpipe.com and China_sevenstar@126.com).[7]

162.    Gross did not deny he created the email purportedly coming from Huludao, and was unable to answer whether he created the email or whether it actually came from Huludao. (PX162 at 58:3-62:1). Gross admitted he had access to an email account using the Huludao name. (PX162 at 60:14-61:3).

---

[7]    *See* http://www.hldpipe.com/en/Article/ShowArticle.asp?ArticleID=14.

163.    Between July and December 2012, Gross made at least nine wire transfers from Plaintiffs' accounts into these fictitious Huludao accounts, totaling approximately $5.4 million. (PX178 at 100:1-22; PX181 at ¶¶ 45-50).

164.    Thus, by the use of bank accounts under fictitious names controlled by Gross and Xu through the Texas limited liability companies, Defendants were able to interpose themselves in the purchase and sale of pipes from the actual suppliers, Shanghai Jiafang and Huludao China, to JFA.

165.    To cover purchases from the other Chinese pipe manufacturers, Jiuyi Trading and Sheng Min Pipe were created in Hong Kong within months of each other.  (PX178 at 79:12-82:23; PX143 at ¶¶ 9-12 and its composite exhibits 2 and 3).

166.    Notably, these companies appear in the Hong Kong Companies Register as sharing the same corporate address as Gulf Maritime and Volanss.  (PX178 at 81:2-20; PX143 at ¶¶ 9-12).

167.    Neither of these companies conducts any discernible business.  (PX178 at 96:22-97:13; PX181 at ¶¶ 90-92; PX143 at ¶ 16).  None is listed in the Hong Kong telephone directory, has a webpage, or advertises or markets its services.  (Id.).

168.    The Companies Registry also indicates that Xu is the sole shareholder and director of both Jiuyi Trading and Sheng Min Pipe.  (PX143 at ¶¶ 9-12 and its composite exhibits 2 and 3).

169.    Gross could not identify any employees working at these companies other than Xu or Jin.  (PX145 at 145:7-17, 166:22-167:16).

170.    Although Gross asserts that Jiuyi Trading is the designated factory agent for TPCC and Sheng Min Pipe is the designated factory agent for Liaoning China, ATN and JFA did

not use intermediaries in the past and had no reason to use intermediaries with TPCC and Liaoning where they were already doing business with those two entities. (PX178 at 103:13-104:5, 104:25-106:13, 241:9-242:7; PX124; PX127).

171.    A purported agreement dated November 15, 2012 (PX127) identifies Shen Min Pipe as Liaoning's agent for a specific contract in Bolivia, but the agreement itself indicates that the Bolivia contract had been entered into on August 24, 2010, two years before Sheng Min Pipe was even created. (PX178 at 107:13-25).

172.    Moreover, Gross admitted during his deposition that he has multiple signature stamps and seals to execute documents for third-parties, including Chinese manufacturers such as Liaoning China and Huludao China, placing into question the veracity of documents that never were made known to Plaintiffs during Gross's employment with ATN. (PX145 at 77:25-79:11; PX162 at 108:3-110:24; PX174.)

173.    No corroborative evidence to support Gross's assertion that he had authority to sign on behalf of any of these companies or persons using their signatures has been located. (PX145 at 225:9-226:16).

174.    Between October 12, 2012 and May 14, 2012, Gross directed from the Plaintiffs' accounts six international wire transfers to the account of Jiuyi Trading in Hong Kong totaling approximately $3.4 million, and between December 2012 and January 11, 2013, Gross directed from Plaintiffs' accounts two wire transfers to the account of Sheng Min Pipe totaling approximately $6.2 million.  (PX178 at 98:11-99:20; PX181 at ¶¶ 94-96).

III.    **EXAMPLES OF SPECIFIC TRANSACTIONS/FLOW OF FUNDS**

175.    Gross orchestrated complicated transactions between numerous entities and/or bank accounts solely created and controlled by Gross. Gross engaged in numerous transactions

whereby funds were transferred between shell companies solely controlled by him. Certain funds were not used to pay suppliers or vendors but kept by Gross or in Gross-controlled accounts. (PX156; PX179). The following are three examples of such transactions:

**A.**    **Example Transaction No. 1**

176.    Exhibit PX175 is a demonstrative that illustrates the transaction flow of Example Transaction No. 1:



- Bariven, S.A. issues a purchase order to Jiafang Americas d/b/a Liaoning ("JA dba Liaoning").
- JA dba Liaoning enters into a Purchase Agreement with Huludao.
- JA dba Liaoning issues invoice # JFVEN-1980 (PX170 at Gross 003983) and receives the total amount in installments from Bariven, S.A. between March 2012 and March 2013.
- Seanway d/b/a Huludao ("Seanway") issues an invoice for a total amount of $6.162 MM to JA dba Liaoning.
- JA dba Liaoning makes a payment toward this invoice by wiring $2.025 MM to Seanway.
- Five days later, Seanway pays the legitimate vendor $2 MM (Net $25k to Seanway)

* Per Quickbooks and ATN-JA000675, 682, 702. Missing bank statement for August 2012. Unable to confirm $1.8 MM of revenue on bank statements.

177.    On February 17, 2012, Bariven, S.A. (d/b/a PDVSA), issued Purchase Order No. 5100096190 for the purchase of $8,801,384 of steel pipe from JFA d/b/a Liaoning. (PX168 at GROSS003920-3934; PX162 at 65:21-67:2).[8]

178.    On June 14, 2012, JFA entered into Purchase Agreement No. JFVEN-1980 ("Contract 1980") with Chinese supplier Huludao China to purchase the steel pipe related to Purchase Order No. 5100096190. (PX169 at GROSS003935-3969; PX162 at 67:3-18). The Purchase Agreement was drafted by Gross. (PX162 at 67:25-68:5).

179.    Although Purchase Order No. 5100096190 was issued from Bariven, S.A. to JFA d/b/a Liaoning, the actual steel pipe supplier was Huludao China. (PX145 at 201:20-202:14; 206:17-22; PX162 at 67:16-24, 70:11-16).

180.    The total amount of Contract 1980 was $6,161,511.11. (PX162 at 69:13-20; PX169 at GROSS3957; PX157 at ATN-GROSS DOCS000003-4; PX145 at 201:20-202:14). This amount was recorded as accounts payable (credit) and cost of goods sold (debit) in JFA accounting records. (PX157 at ATN-GROSS DOCS000003).

181.    On September 20, 2012, JFA d/b/a Liaoning issued Invoice No. JFVEN-1980 to Bariven for a total of $8,801,384. (PX170 at GROSS003983; PX162 at 69:25-70:10).

182.    JFA's gross profit on this transaction should have been $2,639,872.89.

183.    It was normal for payments on JFA contracts to be made in installments, or tied to certain milestones. (PX145 at 213:10-16; PX162 at 70:19-22).

---

[8]    Gross registered JFA as a d/b/a of Liaoning Northern Steel Pipe Co., Limited ("JFA d/b/a Liaoning") in Texas on February 23, 2010. (PX145 at 89:15-21, PX150). The true Liaoning China is a Chinese manufacturer and supplier of steel pipe products to JFA. (PX145 at 84:11-12).

184.    Between March 2012 and March 2013, Bariven, S.A. made installment payments of a total of $8,801,384, in full payment for Purchase Order 5100096190 (related to Contract No. 1980). (PX162 at 70:19-22).

185.    Gross was responsible for all accounting entries and wire transfers for Seanway, BMSI, and JFA. (PX145 at 157:6-16, 200:10-12, 209:21-24; PX162 at 88:1-8).

186.    On December 19, 2012, Seanway Huludao recorded a Sales Receipt No. JFVEN1980/1 to JFA for $2,024,944.06 in an installment sale related to Contract No. 1980. (PX157 at ATN-GROSS DOCS000001-2; PX145 at 199:8-24).

187.    On December 19, 2012, JFA wired $2,024,944.06 from Chase Business Plus Extra (account ending in 3570) to Seanway Huludao. (PX157 at ATN-GROSS DOCS000005-6).

188.    Although the reference in the accounting books was recorded to make it appear that the payment was being made to Huludao China, the Bank records for Seanway Pipe demonstrate that the wire was actually received by Seanway Pipe d/b/a Seanway Huludao. (PX157 at ATN-GROSS DOCS000012/GROSS004558; PX145 at 199:8-10, 204:7-21 ("Q. But the payment's not actually going to the steel manufacturer is it? A: No, it goes to the DBA on Seanway.")).

189.    Five days later, on December 24, 2012, Seanway Pipe wired $1,999,999.99 to Huludao China. (PX157 at ATN-GROSS DOCS000009-10, ATN-GROSS DOCS000012/ GROSS4558; PX145 at 208:1-9).

190.    From the $2,024,944.06 partial payment from JFA to Huludao China related to Contract No. 1980, Seanway Pipe, whose bank accounts were controlled by Gross, netted $24,944.07. (PX145 at 208:10-12).

191. Gross did not disclose to ATN or its principals that Seanway received payments as part of this transaction. (PX145 at 174:07-17).

**B.    Example Transaction No. 2**

192. PX176 is a demonstrative that illustrates the transaction flow of Example Transaction No. 2:



193. Reference is made in the books and records of JFA to Invoice No. JFVEN-1983 in which ultimate customer Hidrocapital purchased $5,416,000.00 in steel pipe from JFA.[9] (PX172 at p.1-3).

194. On August 3, 2012, JFA entered into Sales Contract No. JFVEN-1983 ("Contract 1983") with Shanghai Jiafang for the purchase of steel pipe. (PX171 at GROSS003329-3372;

---

[9] To date, neither Gross nor any other defendant has produced this invoice or the purchase order upon which it is based or the Volanss bank account records.

PX162 at 71:7-18, 72:19-24). Contract 1983 related to the order of steel pipe from Hidrocapital. (PX171 at GROSS003329).

195.    Gross prepared Contract 1983. (PX162 at 71:19-20).

196.    The total amount of Contract 1983 was $4,608,087.17. (PX171 at GROSS003357; PX162 at 73:5-7).

197.    JFA's gross profit on this transaction should have been $807,912.83.

198.    Between September 2012 and March 2013, Hidrocapital made installment payments of a total of $5,416,000.00 for the full purchase price for the steel pipe. (PX172 at p.1-3).

199.    Similar to Example Transaction No. 1, although the JFA books were recorded to appear as if the invoice for steel was from the actual supplier, Shanghai Jiafang, it was actually recorded with BMSI d/b/a Shanghai Jiafang. (PX145 at 208:13-15, 213:17-214:10; PX158 at ATN-GROSS DOCS000036).

200.    JFA recorded one half of the transaction, $2,708,000.00, as a purchase of steel from BMSI d/b/a Shanghai Jiafang. (PX158 at ATN-GROSS DOCS000035-36; PX145 at 212:4-24; 215:22-216:1). This type of payment by milestone or installment was usual for the steel pipe purchases. (PX145 at 213:10-16).

201.    JFA's $2,708,000.00 payment for the steel pipe was recorded as an account payable in JFA accounting records (PX158 at ATN-GROSS DOCS000035), with $325,573.85 recorded as a "loan" from Pentamat (PX158 at ATN-GROSS DOCS000037); and $2,382,426.15 paid to BMSI via wire out of JFA's Chase Bank account ending in 4540. (PX158 at ATN-GROSS DOCS000039-40; PX172 at ATN-GROSS DOCS000166/CHASE000686).

202.    Although on JFA's accounting records, the wire out is purportedly to Shanghai Jiafang, the bank records demonstrate that this wire was actually sent to BMSI d/b/a Shanghai Jiafang. (PX145 at 216:2-25; PX158 at ATN-GROSS DOCS000040).

203.    On September 6, 2012, BMSI recorded the wire received in from JFA (for $2,382,426.15) to an "Other Current Liabilities" account for Volanss. (PX158 at ATN-GROSS DOCS000041-42, 000048/GROSS000474).

204.    Gross gave no explanation for why this wire to BMSI from JFA was recorded on BMSI's books as a liability to his wholly controlled company Volanss. (PX145 at 218:4-16).

205.    The same day, September 6, 2012, BMSI sent two wires out of its account, one for $1.2 million, the other for $1.0 million. (PX158 at ATN-GROSS DOCS000048/Gross000474). The wires were to the steel pipe manufacturer, Shanghai Jiafang. (PX158 at ATN-GROSS DOCS000048/Gross000474).

206.    On BMSI's books, however, Gross recorded the payments out to Volanss. (PX158 at ATN-GROSS DOCS000043-46).

207.    In summary, the bank records reflect that on September 6, 2012, JFA paid BMSI $2,382,426.156 and that same day, BMSI wired $2,200,000.00 to Shanghai Jiafang for payment for the steel pipe. BMSI's accounting records, however, falsely record the transactions as a liability to Volanss and the payment of that liability.

208.    These false accounting records leave liability of $182,426.15 to Volanss on BMSI's books at the end of this transaction. (PX158 at ATN-GROSS DOCS000041-46).

209.    The next month, on October 12, 2012, BMSI then actually does wire that balance (plus an additional small amount) to Volanss. (PX158 at ATN-GROSS DOCS000050/GROSS000472).

210.    From the $2,708,000.00 partial payment from JFA to Shanghai Jiafang related to Contract No. 1983 (one half of the contract), Volanss, an entity owned and solely controlled by Gross, netted $182,426.15. Gross gave no explanation for what services Volanss provided to entitle it to this windfall.

211.    Further, Gross did not disclose to ATN or its principals that Volanss received payments as part of this transaction. (PX145 at 225:18 – 226:16 ("Q: You never told Mr. Benoudiz or Mr. Cardenas that you were keeping some of the money that was not used by Jiafang Americas to pay the steel supplier? A: I never said anything to them about this.")).

**C.    Example Transaction No. 3**

212.    PX211 is a demonstrative that illustrates the transaction flow of Example Transaction No. 3:



- Bariven, S.A. issues a request for quotation to Jiafang Americas d/b/a Liaoning ("JA dba Liaoning").
- JA dba Liaoning enters into an a Sales Contract with Shanghai Jiafang.
- JA dba Liaoning issues invoice # JFVEN-2002 (PX173 at Gross 003543) and receives the total amount on 12/18/2012.
- JA dba Liaoning records a bill from BMSI d/b/a Shanghai Jiafang ("BMSI") to cost of good sold (Erw Steel Pipe), but there is no invoice recorded on BMSI's books. There is no account receivable on BMSI's books.
- JA dba Liaoning wires 2.047 MM to BMSI. This payment is applied by BMSI as a credit (increase) to an other current liability account (Volanss Systems Co. Ltd) instead of accounts receivable.
   ◦ The receipt of payment from JA dba Liaoning is recorded by BMSI as coming from Volanss instead of JA dba Liaoning.
- The next day, BMSI books a payments of $2 MM to Volanss. According to the bank statement, this wire actually goes to Shanghai Jiafang. (Net $47k to BMSI)
- BMSI records the payment to Volanss as a debit (decrease) in the same other current liability account (Volanss Systems Co. Ltd) where it recorded JA dba Liaoning's payment.

* Jiafang Americas accounts payable amount recorded as $3,925,052.66. The remaining balance was paid at different dates in several installments.
** Multiple funds transfers move amounts to Volanss.

213.    On February 15, 2012, Bariven, S.A. (d/b/a PDVSA) issued Request for Quotation No. 6500194433 for the purchase of steel pipe from JFA d/b/a Liaoning. (PX162 at 79:19-80:17; PX173 at GROSS003563-3575).

214.    On June 14, 2012, JFA entered into Sales Contract No. JFVEN-2002 ("Contract 2002") with supplier Shanghai Jiafang to purchase the pipe related to Request for Quotation No. 6500194433. (PX162 at 81:18-83:12; PX173 at GROSS003578-3615).

215.    Gross prepared Contract 2002. (PX162 at 83:18-20).

216.    The total amount of Contract 2002 was $3,925,052.66. (PX162 at 83:21-84:2; PX173 at GROSS003607).

217.    On October 10, 2012, in the accounting records of JFA, Gross recorded an accounts payable (credit) to Shanghai Jiafang and cost of goods sold (debit) for the full purchase price, $3,925,052.66. (PX162 at 88:9-89:7; PX173 at p.1-2).[10]

218.    On October 10, 2012, Gross created Invoice No. JFVEN-2002 to Bariven S.A. from JFA d/b/a Liaoning for a total of $5,636,245.68. (PX162 at 84:3-22; PX173 at GROSS003643). Similar to the prior two example transactions, although the actual steel supplier was to be Shanghai Jiafang, Gross prepared the invoice reflecting JFA d/b/a Liaoning as the supplier. (PX173 at GROSS003643).

219.    JFA's gross profit on this transaction should have been $1,711,193.02.

220.    On December 18, 2012, Bariven S.A. paid JFA d/b/a Liaoning the full amount of Invoice No. JFVEN-2002, $5,636,245.68. (PX173 at ATN-JA000663; PX162 at 87:13-22).

221.    On December 19, 2012, JFA wired $2,047,455.94 ostensibly (on its books) to Shanghai Jiafang from its Chase account ending in 3570. (PX173 at p.3-4; PX162 at 89:15-90:5).

---

[10]    The final thirteen pages of PX173 are denoted with handwritten page numbers.

222.   Although Gross recorded the books and records of JFA to show a payment to Shanghai Jiafang, this wire payment did not actually go to Shanghai Jiafang, but instead the $2,047,455.94 wire was directed to a domestic Comerica bank account of BMSI d/b/a Shanghai Jiafang. (PX173 at p.9-10/GROSS000466-467; PX162 at 90:25-91: 11).

223.   Although this wire was from JFA, in BMSI's books and records, Gross recorded this incoming wire to BMSI as a payment from (or account payable to) Volanss. (PX162 at 93:13-94:4; PX173 at p. 5-6).

224.   The next day, December 20, 2012, Gross records on the books and records of BMSI a wire payment of $2,000,000.00 to Volanss, offsetting a portion of this account payable. (PX173 at p.7-8). This wire, however, was actually directed to the actual supplier, Shanghai Jiafang. (PX173 at p.10/GROSS000467).

225.   From the $2,047,455.94 partial payment from JFA to Shanghai Jiafang related to Contract No. 2002, Volanss netted $47,455.94. Gross gave no explanation for what services Volanss provided to entitle it to this windfall. (PX162 at 94:5-23).

226.   There is no evidence that Gross disclosed to ATN or its principals that Volanss received payments as part of this transaction.

**D.     Summary of Transactions**

227.   In the three example transactions above, the record indicates that Gross (and/or Gross controlled accounts and entities) misappropriated a total of $254,826.16. This may only be the tip of the iceberg.

228.   Plaintiffs are still in the process of obtaining discovery from the various banks used by the Grosses, Jin, Xu, and the companies under Defendants' control. It is abundantly evident, however, that large sums of money emanating from Plaintiffs' accounts were directed

by Gross to accounts that were not of the actual pipe manufacturers or suppliers of transportation services, but rather were intermediate accounts with no legitimate business purposes.

229.    An analysis of the bank records produced to date indicates that JFA transferred at total of more than $29 million to bank accounts owned or controlled by Gross. (PX179).

230.    While a substantial amount of these funds ultimately went to pay legitimate Chinese manufacturers, much was retained in the accounts of various shell companies. (PX179).

231.    JFA made transfers to the shell company Jiuyi of over $3.3 million; to the shell company Gulf Maritime of over $800 thousand; to the shell company Sheng Min of over $8 million; to the shell company Seanway Pipe d/b/a Huludao of over $4 million; and to the shell company BMSI d/b/a Shanghai Jiafang of over $10 million. (PX179).

232.    Funds were also diverted to Volanss, which at all times since its creation has been solely under Gross's control. BMSI made transfers to the shell company Volanss of over $2.4 million. (PX179). Seanway Pipe made transfers to Volanss of over $500 thousand. (PX179).

233.    Of pivotal importance to the issuance of the Preliminary Injunction is the fact that Gross and Volanss itself, which has appeared through counsel as a party Defendant, have failed to produce a single bank statement for Volanss despite a specific court order directing production of such statements and numerous requests by Plaintiffs' counsel and notwithstanding Defendants' knowledge that the Volanss accounts are of primary importance in this litigation. (Doc. #31).

234.    Gross has also failed to produce the entirety of bank records for his personal accounts at HSBC Bank Hong Kong. Thus, the extent to which Gross profited from his misdeeds has been obfuscated by Gross's failure to produce these documents.

235.    In fact, Gross claims that despite being the sole owner of Volanss, he does not have one single document—not a bank statement, financial statement, accounting record, tax return, corporate record or anything else—related to Volanss. (PX145 at 28:9-29:16, 31:20-33:5, 43:7-21; PX162 at 10:5-11:2, 48:9-49:1, 51:21-52:18).[11]

## III.    DISCOVERY OF THE DEFENDANTS' CONDUCT

### A.    Guarantee on Surety Bond and Discovery of the Scheme

236.    For reasons unrelated to the fraud, but more due to a restructuring at ATN and new employees were arriving to ATN's Houston office, Gross was relieved of the trusted responsibility of operating the JFA accounts in January 2014 and asked to work from home. (PX178 at 62:8-18, 64:15-24, 70:21-71:16).

237.    In late June 2014, Gross began forwarding emails to Benoudiz from someone purporting to be Liu Fushan, a manager with Liaoning China. (PX178 at 72:12-25; PX129).

238.    The emails demanded that JFA pay $1 million to Sheng Min Pipe to repay a performance bond that Sheng Min Pipe had supposedly financed in connection with Liaoning China's project for the sale of pipes to a Bolivian customer. (PX129).

239.    While JFA was not an active participant in the project, it was promised a 10% commission for placing Liaoning China with the customer in Bolivia. (PX178 at 227:14-228:9; PX181 at ¶¶ 62-64).

240.    After receiving the emails, Benoudiz questioned the request and asked Gross why JFA and not the Bolivian customer was responsible for the refund. (PX178 at 227:14-229:4).

---

[11]    Gross recently produced some documentation that indicates that he requested Volanss' account statements from HSBC Bank in Hong Kong. (PX162 at 27:14-31:5; PX166). However, to date, none of these documents have been produced.

ATN's operations manager, Nancy Mayea ("Mayea"), also began looking into the transaction at Benoudiz's behest. (PX178 at 72:8-25; 229:11-24).

241.    Gross was not able to answer Benoudiz's questions, and instead, on July 1, 2014, submitted his resignation letter to ATN, thanking Benoudiz and Cardenas for his eight years of employment, and citing as reasons matters of his personal income and the desire to pursue other unexplained opportunities. (PX178 at 72:8-25; PX 138).

242.    After Gross's resignation, however, the requests for the return of the $1 million to Sheng Ming Pipe became more frequent, taking the form of messages claimed to have been received by Gross from Sheng Min Pipe and forwarded by Gross to Benoudiz, culminating in threats of legal action by Liaoning China if the $1 million were not promptly returned to its purported agent Sheng Min Pipe. (PX178 at 229:25-231:7; PX130-134).

243.    Following Gross' resignation, Mayea concluded her investigation and confirmed that the funds in question indeed emanated from JFA and not from Liaoning China or its purported agent, Sheng Min Pipe. (PX178 at 73:1-79:11).

244.    Mayea was able to trace $500,000 that Gross wired on November 1, 2012 from JFA's Chase bank account (account no. 8080) to a Comerica bank account (account no. 0549) held by BMSI d/b/a Shanghai Jiafang, and subsequently, JFA's receipt of the same $500,000 from BMSI by way of cashier's check on November 8, 2012. (PX178 at 73:15-78:4; PX181 at ¶¶ 66-69; PX4; PX60; PX145 at 231:4-232:11; PX161).[12]

---

[12]    The cashier's check indicated "Loan for JBOL-118 Gtee" in the remitter section. (PX161). Gross also produced the check that BMSI made out in the name of Comerica Bank to issue the cashier's check for $500,000. (*Id.*). That check indicated "Loan to Sheng Min JBOL-118" in the reference section. (*Id.*).

245.   The other $500,000 came from Sheng Min Pipe by way of a wire to JFA in November 2012.  (PX178 at 78:18-79:11[13]; PX181 at ¶¶ 69-72).  Sheng Min Pipe, however, received the $500,000 funds from Jiuyi Trading—another company owned by Xu—who in turn received the funds on October 12, 2012 by way of wire transfer initiated by Gross from JFA's Compass bank account (account no. 8532).  (*Id.*).  Thus, JFA, not Sheng Min Pipe, fully funded the $1 million guarantee.

246.   When Benoudiz challenged Gross on the propriety of the requests for the $1 million being made by Sheng Min Pipe, Gross's father-in law, Schwartz, who was partaking in the conversation, interceded for Gross and told Benoudiz to simply forget about the claim for the return of the $1 million.  (PX178 at 234:14-25).

247.   This about-face raised serious suspicions about Gross's conduct and caused Mayea to undertake a full investigation of Gross's handling of the JFA accounts and the discovery of Gross's conduct.  (PX181 at ¶ 87).

## B.   Post-Resignation Conduct

248.   After learning that Benoudiz and Cardenas were on to him, Gross presented Medrano with a letter—signed by Xu—instructing Medrano to immediately dissolve Seanway.  (PX178 at 46:9-47:4; PX145 at 157:19-161:16; PX118).

249.   Gross travelled with Schwartz, his father-in-law, to Hong Kong in July 2014, and on this trip, he closed his personal bank accounts with Standard Chartered and HSBC Hong Kong and closed Volanss's HSBC account as well.  (PX145 at 33:12-36:25, 49:8-50:25, 104:6-105:15; PX162 at 34:14-21).

---

[13]   There is an error in the deposition transcript in which "Seanway Pipe" was typed instead of Sheng Min Pipe.

250.    The HSBC Hong Kong bank for Volanss held more than $100,000.00 and potentially more than $500,000.00 at the time it was closed.  (PX145 at 33:18-35:17). Gross failed to produce any bank account statements related to this account.

251.    Gross refused to testify to the amount of funds in his personal HSBC Hong Kong bank account. (PX162 at 33:3-34:13).

252.    The personal Standard Chartered bank account held approximately $800,000 in funds at the time it was closed. (PX145 at 51:4-17; PX162 at 22:18-23:19).

253.    In total, Gross closed accounts and withdrew funds amounting to over $1 million during his July 2014 trip to Hong Kong, immediately following his resignation.

254.    Gross had the Hong Kong banks issue checks in favor of Schwartz for the complete balance of his and Volanss's accounts and Gross instructed Schwartz to invest the funds.  (PX145 at 33:12-36:25, 102:10-12; PX162 at 51:5-20).  Gross handed Schwartz one of the checks while in Houston, upon returning from Hong Kong. (PX145 at 104:6-11).  Gross did not provide any explanation for this conduct.  (PX145 at 102:5-106:23).

255.    Gross and Schwartz had never travelled to Hong Kong together and that he had never provided Schwartz with money to invest in the past.  (PX145 at 104:8-105:13; PX162 at 26:11-18).

256.    Gross could not even provide a credible explanation as to why he travelled to Hong Kong with Schwartz in the first place, and while he claims they were looking for business opportunities, he was unable to identify even one person that he and Schwartz met with, or one thing that he and Schwartz did, in Hong Kong other than closing Gross and Volanss's accounts. (PX145 at 105:11-106:21).

257.   Gross also claims that he does not know what Schwartz has done with the funds and that he does not recall how much money was held in the Hong Kong bank accounts. (PX145 at 35:18-36:25, 53:2-54:6; PX162 at 24:12-25:9, 33:12-35:7).  The Court does not find these claims credible.

**C.**   **Lawsuit Filed**

258.   This litigation followed and on September 24, 2011. Plaintiffs filed the Complaint asserting the following eleven counts: i) Civil RICO (against all Defendants); ii) Civil RICO conspiracy (against all Defendants); iii) fraud by nondisclosure (against Gross); iv) fraud (against Gross); v) civil conspiracy (against all Defendants); vi) money had and received (against all Defendants); vii) breach of fiduciary duty (against Gross); viii) aiding and abetting in breach of fiduciary duty (against Clara Gross, Jin, Xu, BMSI, Volanss, Seanway Pipe, Sheng Min Pipe and Gulf Maritime); ix) constructive trust (against all Defendants); x) resulting trust (against all Defendants); and xi) fraudulent transfer (against Gross). (Doc. #1).

259.   That same day, Plaintiffs filed the Motion wherein they sought, *inter alia*, a preliminary injunction (1) attaching any and all money that Gross stole from Plaintiffs and (2) enjoining Gross, BMSI, and Volanss, as well as their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of them, from further disposition of any and all money that Gross stole from Plaintiffs.

## CONCLUSIONS OF LAW

**I.**   **PRELIMINARY INJUNCTION STANDARD**

1.   To obtain a preliminary injunction, a plaintiff must establish four elements:

(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury out-weighs the threatened harm to the party whom he seeks to

enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (alterations omitted) (internal quotation marks omitted). "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

### A.    A Substantial Likelihood of Success on the Merits

2.    As stated, Plaintiffs have brought an eleven-count complaint against Defendants. Plaintiffs' principal claims against Defendants are brought under the Racketeer Influenced & Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO") and state law sounding chiefly in fraud and breach of fiduciary duty. Plaintiffs need only satisfy the substantial-likelihood-of-success-on-the-merits element for some of these claims. *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 378 (5th Cir. 2008). Further, to satisfy this "element, the plaintiff's evidence need not prove that plaintiff is entitled to summary judgment; plaintiff needs only to present a *prima facie* case, but not demonstrate that he is certain to win." *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011); 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.3 (3d ed. April 2014) ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." (footnote omitted)). The Court addresses only Plaintiffs' three principal claims—RICO, fraud, and breach of fiduciary duty—herein.

(1)    *RICO*

3.    "RICO creates a civil cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962.'" *Brown v. Protective Life Ins. Co.*, 353 F.3d 405, 406 (5th Cir. 2003) (alteration in original) (quoting 18 U.S.C. § 1964(c)). To state a claim

under section 1962, there must be three things: "(1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Id.* (internal quotation marks omitted). Each of these elements is present in this case.

4.      A "person" within the meaning of RICO "includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Calling this "a very broad definition," the Fifth Circuit has stated that a "RICO person must be one that either poses or *has posed* a continuous threat of engaging in the acts of racketeering." *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995) (emphasis added). Here, the testimony of Medrano, Mayea, Cardenas, Benoudiz, the legal opinion of Hong Kong counsel Max Cross, together with multiple exhibits admitted into evidence, and Gross' own admissions, show that Defendants undoubtedly have posed a continuous threat of engaging in racketeering activity beginning in or about 2008 and continuing through this year. Accordingly, Plaintiffs have demonstrated a substantial likelihood of success on the first element.

5.      Similarly, Plaintiffs' evidence establishes a *prima facie* case that Gross, Clara, Volanss, and BMSI (collectively "Defendants") have engaged in "a pattern of racketeering activity." *Brown*, 353 F.3d at 406. A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years … after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5); *accord Brown*, 353 F.3d at 406 ("A pattern of racketeering activity requires two or more predicate acts and a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity." (internal quotation marks omitted)). RICO defines "racketeering activity" to include mail and wire fraud. *See* 18 U.S.C. § 1961(1).

41

6. Here, the testimony of Medrano, Mayea, Cardenas, Benoudiz, the legal opinion of Hong Kong counsel Max Cross, together with multiple exhibits admitted into evidence, and Gross' own admissions, support the finding that Plaintiffs have demonstrated a substantial likelihood of success on the merits of the second element, namely that Defendants, from 2008 through 2014, engaged in numerous acts of wire fraud. Defendants transferred millions of dollars using the wires to bank accounts under the fraudulent pretense the moneys would be paid to Plaintiffs' suppliers for legitimate business purposes, when instead, Defendants were retaining a portion of the moneys for themselves—without the Plaintiffs' knowledge or consent—before remitting the remaining funds to the Plaintiffs' suppliers. These acts constitute wire fraud. *See* 18 U.S.C. § 1343. Plaintiffs have therefore demonstrated a substantial likelihood of success on the second element. *See Crowe*, 43 F.3d at 204 (agreeing with district court's findings that the plaintiff had adequately alleged "the existence of a pattern of racketeering activity consisting of numerous predicate acts of ... wire fraud"). Indeed, an employee's duty to disclose material information to an employer—which can be violated by either active concealment or affirmative misrepresentation—amounts to illegal mail fraud if violated. *United States v. Ballard*, 663 F.2d 534, 540–41 & n.4 (5th Cir. 1981). In fact, 18 U.S.C. § 1341 of the criminal code "is violated when an employee violates his duty to disclose to his employer economically material information which the 'employee has reason to believe . . . would lead a reasonable employer to change its business conduct.'" *United States v. Fagan*, 821 F.2d 1002, 1009 (5th Cir. 1987) (quoting *Ballard*, 663 F.2d at 541).

7. Last, the record establishes a *prima facie* case of Defendants' engagement in a pattern of racketeering activity connected to "the acquisition, establishment, conduct, or control of an enterprise." *Brown*, 353 F.3d at 406. The statute defines "enterprise" to "include[] any

42

individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Crowe*, 43 F.3d at 204 ("A RICO enterprise can be either a legal entity or an association-in-fact."). The Fifth Circuit has observed the statutory definition of the word "enterprise" is "very broad." *United States v. Brown*, 555 F.2d 407, 415 (5th Cir. 1977).

8.      Here, Gross and Clara Gross and their wholly owned companies, BMSI and Volanss, on the one hand, and Jin and Xu and their wholly owned companies, Seanway Pipe, Jiuyi Trading, Sheng Min Pipe, and Gulf Maritime, on the other hand, make up two distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4). *See* Compl. ¶¶ 134–36. Collectively, Defendants operated as an association in fact. The purpose of the enterprise was to steal money belonging to Plaintiffs under fraudulent pretenses and primarily through wire fraud. Accordingly, the Plaintiffs have demonstrated a substantial likelihood of success on the final element.[14]

9.      Based on the above, Plaintiffs have demonstrated a substantial likelihood of success on the merits on their RICO claim. *Cf. Am. Auto Guardian, Inc. v. Kramer*, No. 05 C 6404, 2008 WL 4553092 (N.D. Ill. July 8, 2008) (ruling in favor of employer's RICO claim against a former employee based on the former employee's embezzlement occurring over a four-year period).

   (2)    *Fraud*

10.     Plaintiffs also meet the first requirement of a preliminary injunction for their fraud claim. Under Texas law, there are six elements of fraud:

---

[14]      Plaintiffs also allege, in the alternative, that they themselves constituted the enterprise, as courts have recognized victims of schemes may also constitute a RICO enterprise. *See, e.g.*, *United States v. Warner*, 498 F.3d 666, 696 (7th Cir. 2007).

(1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew that it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). Plaintiffs have alleged—with the requisite particularity required by Federal Rule of Civil Procedure 9(b)—each of these elements. And, through testimony provided by Mayea, Cardenas, and Benoudiz, Plaintiffs have established a *prima facie* case that each of these elements is satisfied, too.

11.     Gross and Defendants made numerous material misrepresentations. While working for Plaintiffs, Gross, through BMSI and Seanway Pipe and related d/b/a's, opened up bank accounts in the names of actual suppliers, actions designed to misrepresent that payments were being made to the actual suppliers. Gross also misrepresented the amount of money that was owed to companies such as Gulf Maritime, Huludao, and Shanghai Jiafang to pay for products or for other legitimate business purposes.   Gross similarly misrepresented Gulf Maritime as an established shipping company with global operations where it was a shell company that had no business, vessels, or employees.   These representations, however, were false. Thus, the first and the second elements of fraud are satisfied.

12.     When Gross and Defendants made these false representations they knew they were false, and they did so with the intent that Plaintiffs act on the false statements. For example, Gross and Defendants set up bank accounts in Plaintiffs' suppliers' names for the purpose of deceiving Plaintiffs into believing money was being wired to those suppliers.

13.     Plaintiffs acted in reliance on Defendants' misrepresentations and suffered injuries because of them. Plaintiffs relied on Gross's representations that money was being paid

to their suppliers. Specifically, Plaintiffs made payments to Gross-controlled bank accounts based on his representations. Because Defendants were actually stealing this money from Plaintiffs, Plaintiffs have been injured.

14.    In sum, Plaintiffs have demonstrated a substantial likelihood of success on the merits on their fraud claim.

(3)    *Breach of Fiduciary Duty*

15.    Plaintiffs have met the substantial-likelihood-of-success element with regard to their breach-of-fiduciary-duty claim. Under Texas law, there are three elements of a breach-of-fiduciary-duty claim: "(1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in jury to the plaintiff or benefit to the defendant." *Saenz v. JP Morgan Chase Bank, N.A.*, No. 8:13-CV-156, 2013 WL 3280214, at *4 (S.D. Tex. June 27, 2013) (internal quotation marks omitted). Plaintiffs have established each of these three elements.

16.    Under Texas law, "an employee may owe fiduciary duties to his employer when the employee has been placed in a position of peculiar confidence or trust toward the employer." *See Tranman, Inc. v. Griffin*, 3:11-CV-1046-M, 2013 WL 944502, at *7 (N.D. Tex. Mar. 12, 2013); *Hewlett-Packard Co. v. Byd:Sign, Inc.*, 6:05CV456, 2007 WL 275476, at *7 (E.D. Tex. Jan. 25, 2007) (collecting cases); *see also Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 512 (Tex. 1942) ("The term 'fiduciary' generally applies 'to any person who occupies a position of peculiar confidence towards another.'"); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002) (same). This is because under Texas law, a fiduciary relationship arises in "those informal relations[,] which exist whenever one party trusts and relies upon another." *Kinzbach Tool Co.*, 160 S.W.2d at 512-13; *see also Associated Indem.*

*Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287-88 (Tex. 1998) ("informal fiduciary duty may arise from a moral, social, domestic or purely personal relationship of trust and confidence"). Texas courts recognize the breach of a fiduciary duty "in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Associated Indem. Corp.*, 964 S.W.2d at 288 (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992)).

17.    In particular, an employee owes fiduciary duties to his employer when he acts as the employer's agent in the pursuit of business opportunities on the employer's behalf. *Tranman*, 2013 WL 944502 at *7. In such cases, the employee has a duty of loyalty to act primarily for the benefit of his employer in matters connected with his employment and not to compete with his employer on his own account. *Id.*; *Hewlett-Packard*, 2007 WL 275476 at *7 ("When acting as agents or fiduciaries of an employer, employees may not act for their own account or to the detriment of their principal on matters within the scope of their agency."); *Johnson*, 73 S.W.3d at 200 ("When a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency."). Notably, some courts/jurisdictions have recognized a duty of loyalty is owed even by low-level employees (although here the facts easily establish a relationship of trust and confidence). *See* 19 Williston on Contracts § 54:26 (4th ed.).[15]

18.    An employee with a fiduciary relationship also "has a duty to deal openly and to fully disclose to his employer information that affects his employer's business. *Hewlett-Packard*, 2007 WL 275476 at *7; *Johnson*, 73 S.W.3d at 200 ("The employee has a duty to deal

---

[15]    In addition, all employees are generally "obligated to render reasonably diligent and skillful service, to avoid negligence, and to act in obedience to his or her instructions, so long as those instructions are of a type that the employer, by contract or usage, is entitled to give." 19 Williston on Contracts § 54:22 (4th ed.).

openly with the employer and to fully disclose to the employer information about matters affecting the company's business.).

19.    Gross was afforded trust and confidence by ATN.  Not only was he responsible for entering into purchase agreements for the business, managing the operations of JFA, handling supplier relationships, and coordinating transportation arrangements, he also had access to JFA's bank accounts and process payments.  Gross misused this position of trust and confidence for his benefit and at the expense of the ATN, JFA and Benoudiz.  In doing so, he violated his duty of loyalty and duty to disclose material facts relevant to the business.   In sum, Gross breached that fiduciary duty owed to Plaintiffs. Gross used his position of trust not to further the interests of Plaintiffs, but to enrich his and Defendants' pockets, and Plaintiffs suffered damages as a result.

20.    Plaintiffs have shown a substantial likelihood of success on the merits of their breach-of-fiduciary-duty claim as well.

**B.**    **A Substantial Threat of Irreparable Injury**

21.    To satisfy the second element of the preliminary-injunction standard, a movant "must demonstrate that if the district court denied the grant of a preliminary injunction, irreparable harm would result." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Generally, "a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Id.* Still, it is well-established that "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Id.* For example, a "district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." *Id.* For another, "a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the

47

defendant is likely to be insolvent at the time of judgment." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52 (1st Cir. 1986) (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)).

22.     Here, injunctive relief is needed to prevent Defendants from transferring or dissipating the money they stole from Plaintiffs, and which Plaintiffs seek to recover in this case. For at least four independent reasons, this threat of dissipation is real. *See Janvey*, 647 F.3d at 601 ("The party seeking a preliminary injunction must also show that the threatened harm is more than mere speculation.").

23.     There is a real threat of dissipation as Gross has already admitted that he closed his and Volanss's three Hong Kong bank accounts—containing at least over $1 million—in late July 2014, after he resigned from ATN and after Plaintiffs confronted him with evidence of the fraud he committed. Gross admitted that he transferred the funds in these accounts to Schwartz, his father-in-law, and that he does not know what Schwartz has done with the funds or where they are. Gross was unable to provide an explanation for this conduct.

24.     Defendants have international ties. Gross is a Venezuelan citizen. Gross's cohorts—Jin and Xu—are Chinese nationals. Many of the Defendant shell companies—including Volanss, Jiuyi Trading, Sheng Min Pipe, and Gulf Maritime—are Hong Kong companies. Given the Defendants' international character, the risk that Defendants would evade the Court's jurisdiction or not comply with its orders is a weighty one. In other circumstances, courts routinely cite the international character of the circumstances of a case in imposing restraints on a party. *See, e.g.*, *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990) (holding that nature and circumstances of charged offense "weigh[ed] against bail" where accusations were "of sophisticated criminal conduct, whose successful completion required the

ability to travel internationally, to adapt easily to foreign countries, and to move assets and individuals quickly from one country to another").

25.    Gross and Defendants have over the years demonstrated their sophistication and ability in using the wires to transfer large amounts of money internationally and deceptively for their own gain. The concern that Defendants would do so again is well-founded and based on past experience. *See Janvey*, 647 F.3d at 600 ("A showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." (alteration omitted) (internal quotation marks omitted)); *Donovan*, 830 F. Supp. 2d at 227 ("Regarding the second prong, a threat of irreparable harm, the injury at issue must be actual and imminent, not speculative or remote.").

26.    Plaintiffs' request is tailored to freezing the money that Gross and Defendants obtained while Gross was working for and in connection with Plaintiffs. *See Janvey*, 647 F.3d at 600 ("[A] district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds."). Plaintiffs do not seek to freeze money necessary to provide for Gross's and Clara Gross's reasonable living expenses during this action.

27.    Plaintiffs seek, in part, equitable remedies, such as the imposition of a constructive trust and a resulting trust. *See* Compl. pp. 39–40. If Defendants dissipate the money, Plaintiffs' equitable remedies will be rendered moot. *See Janvey*, 647 F.3d at 601 ("If the defendants were to dissipate or transfer these assets out of the jurisdiction, the district court would not be able to grant the effective remedy, either in equity or in law, that the Receiver seeks."); *see also Productos Carnic v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980) ("By showing that [the defendant] intended to frustrate any judgment on the

merits, the Judge was entitled to conclude that [the plaintiff] undoubtedly had shown potential irreparable injury."); *cf. Rio Bravo Produce, Ltd. v. Superior Tomato-Avocado, Ltd.*, No. SA-11-CA-1126-XR, 2011 WL 6938450, at *3 (W.D. Tex. Dec. 30, 2011) ("Trust dissipation can satisfy this factor if, absent injunctive relief, ultimate recovery is rendered unlikely." (citing *Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 141 (3d Cir. 2000))). Additionally, Gross himself received only a modest salary while working for Plaintiffs, and there is no reason to believe—nor did Gross even contest—that any of the Defendant non-operational shell companies has any assets beyond what Gross stole from Plaintiffs. Defendants' precarious financial position, which would frustrate any judgment, further underscores the substantial threat of irreparable injury. *See Teradyne*, 797 F.2d at 52.

28.     For these reasons, there is a substantial threat of irreparable injury if the injunction is not entered.

**C.     The Threatened Injury Outweighs the Threatened Harm**

29.     This element "involves an evaluation of the severity of the impact on defendant should the temporary injunction be granted and the hardship that would occur to plaintiff if the injunction should be denied." WRIGHT ET AL., *supra*, § 2948.2. Here, Plaintiffs are seeking to prevent Gross and Defendants from transferring or dissipating the money Defendants stole from Plaintiffs. If Gross and Defendants transfer or dissipate this money, Plaintiffs will effectively be left without a remedy. Maintaining the status quo pending the resolution of this action would not harm Defendants because the money sought to be frozen is traceable entirely to Defendants' scheme, and because Gross and Clara Gross would have access to money sufficient to provide for reasonable living expenses.

30.     Gross was unable to provide an explanation as to why he transferred over $1 million to Schwartz to "invest." If it were true, then the Court could reasonably assume that Gross does not need those funds to pay his living expense. Accordingly, this factor weighs in favor of Plaintiffs.

**D.     Granting the Preliminary Injunction Will Not Disserve the Public Interest**

31.     Granting the preliminary injunction will not disserve the public interest. Gross's and Defendants' conduct was criminal, and providing a remedy to uphold the law is in the public interest. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957) (noting "the public interest in effective law enforcement"); *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553 ¶ 35 (S.D. Tex. 2014) ("[I]t is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law.").

**II.     NO SECURITY SHOULD BE REQUIRED**

32.     Rule 65(c) states that the "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the Fifth Circuit, the amount can be nothing. *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (footnote omitted) (internal quotation marks omitted)); *Donovan*, 830 F. Supp. 2d at 235 ("The Fifth Circuit has held that courts in this Circuit have the discretion to issue injunctions without security.").

33.     Because Plaintiffs are the victims of Defendants' fraudulent scheme, and seek only to recover *their own money*, the Court will not require any security to be posted.

### III.    PLAINTIFFS ARE ENTITLED TO AN ATTACHMENT AND INJUNCTION UNDER STATE LAW

34.    Plaintiffs also request, at the preliminary-injunction stage, the entry of additional or alternative remedies available under Texas state law. Rule 64 provides that "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." FED. R. CIV. P. 64(a). Available remedies include "attachment" and "other corresponding or equivalent remedies." *Id.* 64(b). Based on the fraudulent acts set forth above, Plaintiffs' Complaint includes a count for violating the Texas Uniform Fraudulent Transfer Act (the "Act"). Specifically, Plaintiffs have alleged— and the evidence submitted with this motion shows—that Gross transferred money belonging to Plaintiffs to his personal bank accounts, to accounts held by BMSI and Volanss, and to accounts held by other Defendants with the actual intent to hinder, delay, or defraud Plaintiffs. *See* Compl. ¶ 187. The record further shows that Gross fraudulently transferred the balance of his Hong Kong accounts to Schwartz with the actual intent to hinder, delay, or defraud Plaintiffs. Thus, Plaintiffs have shown that Gross violated the Act. *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) ("A transfer made ... by a debtor is fraudulent as to a creditor ... if the debtor made the transfer ... with actual intent to hinder, delay, or defraud any creditor of the debtor").

35.    The Act provides that in "an action for relief against a transfer or obligation, a creditor ... may obtain," among other things, "an attachment or other provisional remedy against the asset transferred or other property of the transferee," "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property," and "any other relief the circumstances may require." *Id.* § 24.008(a). As provided by the Act, which applies to this action by reason of Rule 64, the Court, at the preliminary-injunction stage, orders (1) the attachment of any and all money that Gross stole from Plaintiffs and (2) and

enjoins Gross, Clara Gross, BMSI, and Volanss, as well as their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with any of them, from further disposition of any and all money that Gross stole from Plaintiffs. This order extends to Schwartz to the extend he received from Gross any funds kept by Gross in his personal bank accounts and the accounts of Volanss in Hong Kong at Standard Chartered Bank, HSBC or any other banking institution.

36.    If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

## ORDER

For the reasons set forth, Plaintiffs Motion for Preliminary Injunction is GRANTED. An Order of Preliminary Injunction is separately issued based upon the foregoing Findings of Fact and Conclusions of Law.

It is so ORDERED.

SIGNED on this 26th day of November, 2014.

Kenneth M. Hoyt
United States District Judge